IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                              §
                                    §      Case No. 18-34214
NOBLE REY BREWING, CO., LLC,        §
                                    §      Chapter 11
        Debtor.                     §

**AFFIDAVIT OF RICKY PATTERSON IN SUPPORT OF MOTION OF
1319 MOTOR CIRCLE, LP FOR RELIEF FROM AUTOMATIC STAY**

**STATE OF TEXAS**           §
                             §
**COUNTY OF DALLAS**         §

Before me, the undersigned authority, on this day personally appeared Ricky Patterson, who, after being duly sworn, upon his oath deposed and stated as follows:

1.      "My name is Ricky Patterson. I am more than twenty-one years of age and am competent and authorized to make this Affidavit. I have personal knowledge of the facts set forth herein. To the extent any information disclosed herein requires amendment or modification, I will submit a supplemental affidavit to the Court reflecting the same.

2.      "This Affidavit is submitted in connection with *Motion for Relief from the Automatic Stay* and the *Motion of 1319 Motor Circle, LP to Allow Administrative Claim Pursuant to 11 U.S.C. § 503(b) and to Compel Payment of Post-Petition Rent Pursuant to 11 U.S.C. § 365(d)(3).*

3.      "My name is Ricky Patterson. I am a co-owner of 1319 Motor Circle, LP ("Landlord") and I have personal knowledge of that certain *Industrial Lease Agreement*, a true and correct copy of which is attached hereto as Exhibit 1, and the currentness of the obligations of Noble Rey Brewing Company, LLC (the "Debtor") thereunder.

4.   "With respect to 2017 common-area maintenance obligations and other non-base-rent obligations due under the Lease, the Debtor is in default to the extent of $9,432.10. These obligations arose before December 19, 2018.

5.   "With respect to 2018 common-area maintenance obligations and other non-base-rent obligations due under the Lease, the Debtor, on a pre-petition basis, is in default to the extent of $26,582.10.

6.   "With respect to 2018 common-area maintenance obligations and other non-base-rent obligations due under the Lease, the Debtor, on a post-petition basis, is in default to the extent of $873.93.

7.   "Monthly obligations due under the Lease in 2019, inclusive of common-area maintenance and *ad valorem* taxes are $9,425.20.

8.   "In 2019, two payments has been received from the Debtor. The first payment was received via wire on January 14, 2019 in the amount of $6,829.13. This fell short of the total amount due on January 1, 2019 by $2,596.07.

9.   "The second payment in the amount of $8,482.72 was received in February. This fell short of the total amount due on February 1, 2019 by $942.48.

10.   "The Debtor has not made any payment for March 2019, and has communicated its intent not to pay March 2019 rent.

11.   "Accordingly, the Debtor is in default on its obligations under the Lease for 2019 to the extent of $12,963.75.

12.   "The Debtor's obligations under the Lease include base rent and its pro-rata share of common-area maintenance and *ad valorem* taxes. For 2017 the Debtor was under-billed for

these amounts to the extent of $9,432.10.   For 2018, the Debtor was under-billed for these amounts to the extent of $26,582.10.

13.    "A reconciliation of these amounts, as well as invoices embodying the same, is attached hereto as Exhibit 2.

14.    "Landlord has been advised by the potential purchaser of the Debtor's assets that it does not intend to assume the Lease.

**FURTHER AFFIANT SAYETH NOT**



Ricky Patterson

SWORN TO AND SUBSCRIBED BEFORE ME on this 29 day of March, 2019 to certify which witness my hand and seal of office.

WILLIAM COLBY SWAIN
My Notary ID # 130019022
Expires November 7, 2022

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

# EXHIBIT 1

## INDUSTRIAL LEASE AGREEMENT

THIS LEASE AGREEMENT is made this 17ᵗʰ day of September, 2014, between 1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord"), and the Tenant named below.

| | |
|---|---|
| **Tenant:** | NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company |
| **Tenant's Representative:** | Chris Rigoulot |
| **Address, and Telephone:** | 2636 Farrington<br>Dallas, Texas 75207<br>Attn: Chris Rigoulot<br>(817) 614 8917 |
| **Premises:** | All of the interior space in the Building, being approximately 8,466 square feet, as determined by Landlord, as shown on Exhibit A. |
| **Project:** | The Building and the parcel(s) of land on which it is located, which land is described in Exhibit E, and other buildings and improvements located on such land, generally known as 1319 – 1350 Motor Circle and 2636 Farrington and consisting of approximately 82,505 rentable square feet. |
| **Building:** | 2636 Farrington, Dallas, Texas, and containing 8,466 square feet. |
| **Tenant's Proportionate Share of Project:** | 10.26% |
| **Tenant's Proportionate Share of Building:** | 100% |
| **Lease Term:** | Beginning on the Commencement Date and ending on the last day of the sixty-third (63rd) calendar month thereafter. |
| **Commencement Date:** | The date of this Lease as set forth above. |
| **Initial Monthly Base Rent:** | $5,114.88* |

| **Initial Estimated Monthly Operating Expense Payments:** | | |
|---|---|---|
| (estimates only and subject to adjustment to actual costs and expenses according to the provisions of this Lease) | 1. Common Area Charges: | $367.53 |
| | 2. Taxes: | $690.12 |
| | 3. Insurance: | $115.54 |

| | |
|---|---|
| **Initial Estimated Monthly Operating Expense Payments:** | $1,173.19 |
| **Initial Monthly Base Rent and Operating Expense Payments:** | $6,288.07* |

*Provided that Tenant shall not be required to pay Base Rent during the initial three (3) Lease Months (hereinafter defined), but Tenant shall be required to pay Operating Expenses during such period. The three (3) Lease Month period that Tenant is not required to pay Base Rent shall be extended by up to one (1) Lease Months for Landlord Delay as set forth in Addendum 5 attached hereto.

| | |
|---|---|
| **Rent Payment Address:** | 1302-1350 MOTOR CIRCLE, L.P.<br>2001 Ross Avenue, Suite 2800<br>Dallas, Texas 75201<br>Attn: Property Manager |
| **Security Deposit:** | $7,500.00 |
| **Guarantors:** | Collectively, Chris Rigoulot, Kindra Hebert, Kenneth G. Rigoulot and Leslie J. Rigoulot. Concurrent with Tenant's execution and delivery of this Lease, Tenant shall cause Guarantor to execute and deliver a guaranty in favor of Landlord in the form attached hereto as Addendum 6. |
| **Brokers:** | Stream Realty, representing Landlord, and Jim Lake Inc. Realtors, representing Tenant. |

- 1 -

| | |
|---|---|
| **Addenda and Riders:** | 1. Renewal Option, 2. HVAC Maintenance Contract, 3. Move Out Conditions, 4. Base Rent Adjustments, 5. Initial Improvements; 6. Form of Continuing Lease Guaranty ; Condominium Rider to Industrial Lease Agreement |
| **Exhibits:** | A. Depiction of Premises, B. Rules and Regulations, C. Tenant Operations Inquiry Form, D. Legal Description |

1.    **Granting Clause.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease. Promptly upon execution of this Lease by Landlord and Tenant, Tenant shall engage a structural engineer and/or a geotechnical engineer to test the thickness of the slab of the Premises and to determine whether a void exists between the slab and the ground that it is located on. In the event such tests reflect that the slab is not at least three (3) inches thick or that a void exists which is not suitable for the installation of the equipment required to be installed by Tenant to operate a brewery (the "Termination Conditions"), Tenant shall have a right to terminate this Lease by delivering written notice of termination to Landlord not later than thirty (30) days after the execution and delivery of this Lease by Landlord and Tenant provided that such termination notice is accompanied by copies of such engineering reports substantiating the Termination Conditions. If Tenant fails to timely exercise the foregoing termination option (or if the engineering reports do not substantiate the Termination Conditions), the termination right set forth in this Paragraph 1 shall be null and void and of no force or effect.

2.    **Commencement Date; Acceptance of Premises.** (a) Subject to and upon the terms and conditions set forth in this Lease, this Lease shall continue in force for the Lease Term.

(b)    Tenant shall accept the Premises in its condition as of the Commencement Date, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. **TENANT ACKNOWLEDGES THAT (1) IT HAS INSPECTED AND ACCEPTS THE PREMISES IN AN "AS IS, WHERE IS" CONDITION, (2) THE BUILDINGS AND IMPROVEMENTS COMPRISING THE SAME ARE SUITABLE FOR THE PURPOSE FOR WHICH THE PREMISES ARE LEASED AND LANDLORD HAS MADE NO WARRANTY, REPRESENTATION, COVENANT, OR AGREEMENT WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PREMISES, (3) THE PREMISES ARE IN GOOD AND SATISFACTORY CONDITION, (4) NO REPRESENTATIONS AS TO THE REPAIR OF THE PREMISES, NOR PROMISES TO ALTER, REMODEL OR IMPROVE THE PREMISES HAVE BEEN MADE BY LANDLORD, (5) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, THAT EXTEND BEYOND THE DESCRIPTION OF THE PREMISES, AND (6) TENANT HAS NOT RELIED ON ANY REPRESENTATIONS OR WARRANTIES OF LANDLORD EXCEPT AS EXPRESSLY SET FORTH HEREIN.** Except as provided in Paragraph 10, in no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. The taking of possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken except for items that are Landlord's responsibility under Paragraph 10 and any punchlist items agreed to in writing by Landlord and Tenant. Notwithstanding the foregoing, except for any repairs or replacements necessitated by any action or inaction of Tenant or its agents, employees, invitees, licensees, or visitors, Landlord shall warrant the operation of the heating, ventilation and air conditioning ("HVAC") system serving the existing office and showroom areas of the Premises only which are existing as of the date of this Lease during the initial twelve (12) months of the Lease Term and shall make all required repairs and replacements to the same required to be made during such period, at no additional cost to Tenant. Landlord shall have no responsibility with respect to any HVAC unit installed in the Premises after the date of this Lease or with respect to any existing HVAC units serving any portion of the Premises other than the existing office and showroom areas.

(c)    Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be obligated to tender possession of any portion of the Premises or other space leased by Tenant from time to time hereunder that, on the date possession is to be delivered, is occupied by a tenant or other occupant or that is subject to the rights of any other tenant or occupant, nor shall Landlord have any other obligations to Tenant under this Lease with respect to such space until the date Landlord: (1) recaptures such space from such existing tenant or occupant; and (2) regains the legal right to possession thereof. This Lease shall not be affected by any such failure to deliver possession and Tenant shall have no claim for damages against Landlord as a result thereof, all of which are hereby waived and released by Tenant. If Landlord is prevented from delivering possession of the Premises to Tenant due to the holding over in possession of the Premises by a tenant or other occupant thereof, Landlord shall use reasonable efforts to regain possession of the Premises in order to deliver the same to Tenant. The Commencement Date shall be postponed until the date Landlord delivers possession of the Premises to Tenant, in which event the termination date shall, at the option of Landlord, correspondingly be postponed on a per diem basis.

(d)    If Tenant takes possession of the Premises prior to the Commencement Date, such possession shall be subject to all the terms and conditions of the Lease and Tenant shall pay Base Rent and Operating Expenses to Landlord for each day of occupancy prior to the Commencement Date. Notwithstanding the foregoing, if Tenant, with Landlord's prior approval, takes possession of the Premises prior to the Commencement Date for the sole purpose of performing any Landlord-approved improvements therein or installing furniture, equipment or other personal property of Tenant, such possession shall be subject to all of the terms and conditions of the Lease, except that Tenant shall not be required to pay rent with respect to the period of time prior to the Commencement Date during which Tenant performs such work. Tenant shall, however, be liable for the cost of any services that are provided to Tenant or the Premises during the period of Tenant's possession prior to the Commencement Date. Nothing herein shall be construed as granting Tenant the right to take possession of the Premises prior to the Commencement Date, whether for construction, fixturing or any other purpose, without the prior consent of Landlord.

3.    **Use.** The Premises shall be used only for the purpose of receiving, storing, shipping and selling (but limited to wholesale sales) products, materials and merchandise made and/or distributed by Tenant, for brewing

- 3 -

beer, and for such other lawful purposes as may be incidental thereto, including operation of a brewery; provided, however, with Landlord's prior written consent, Tenant may also use the Premises for light manufacturing. Tenant shall not conduct or give notice of any auction, liquidation, or going out of business sale on the Premises. Tenant shall obtain and maintain from the relevant governmental authorities, throughout the Lease Term and all renewals thereof, at Tenant's sole cost and expense, all licenses and permits required for Tenant's operation of its business, including but not limited to the sale of alcoholic beverages in and from the Premises. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any tenants of the Project. Outside storage, including without limitation, storage of trucks and other vehicles, is prohibited without Landlord's prior written consent. Tenant, at its sole expense, shall comply with all laws, including, without limitation, the Americans With Disabilities Act of 1990 (49 U.S.C. Section 12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended from time to time (collectively, the "ADA"), orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions with reference to the use, condition, configuration or occupancy of the Premises (collectively, with the ADA, "Legal Requirements"), including compliance outside of the Premises that is necessitated by Tenant's specific use of the Premises or as result of any alterations or additions, including the Initial Improvements (as defined in Addendum 5). Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, increase the insurance risk, or cause the disallowance of any sprinkler credits. If any increase in the cost of any insurance on the Premises or the Project is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord. Any occupation of the Premises by Tenant prior to the Commencement Date shall be subject to all obligations of Tenant under this Lease. On or prior to the date hereof, Tenant has completed and delivered for the benefit of Landlord a "Tenant Operations Inquiry Form" in the form attached hereto as Exhibit C describing the nature of Tenant's proposed business operations at the Premises, which form is intended to, and shall be, relied upon by Landlord. From time to time during the Term (but no more often than once in any twelve month period unless Tenant is in default hereunder or unless Tenant assigns this Lease or subleases all or any portion of the Premises, whether or not in accordance with Paragraph 17), Tenant shall provide an updated and current Tenant Operations Inquiry Form upon Landlord's request.

4.    **Base Rent.** Tenant shall pay Base Rent in the amounts set forth on Addendum 4 attached hereto. The installment of monthly Base Rent payable for the fourth (4th) Lease Month pursuant to Addendum 4 attached hereto, the Security Deposit, and the first monthly installment of estimated Operating Expenses (as hereafter defined) shall be due and payable on the date hereof, and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the first day of each calendar month succeeding the Commencement Date (provided that Tenant shall not be required to pay Base Rent until Lease Month 5 due to prepayment of Base Rent for Lease Month 4 as provided above). Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made at the Rent Payment Address, or at such place, within the continental United States, as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or of estimated Operating Expenses for more than 5 days, Tenant shall pay to Landlord on demand a late charge equal to 8 percent of such delinquent sum. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct installment of rent due under this Lease shall be deemed to be other than a payment on account of the earliest rent due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other available remedy. The acceptance by Landlord of an installment of rent on a date after the due date of such payment shall not be construed to be a waiver of Landlord's right to declare a default for any other late payment. If Tenant's payment by check is returned for non-sufficient funds or for any other reason, Landlord at its sole option may require all future payments to be made by cashier's or certified check, money order, or wire transfer, and the delivery of Tenant's personal or corporate check shall no longer constitute payment thereof.

5.    **Security Deposit.** The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease. The Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. Upon each occurrence of an Event of Default (hereinafter defined), Landlord may use all or part of the Security Deposit to pay delinquent payments due under this Lease, and the cost of any damage, injury, expense or liability caused by such Event of Default, without prejudice to any other remedy provided herein or provided by law. Tenant shall pay Landlord on demand the amount that will restore the Security Deposit to its original amount. Landlord's obligation respecting the Security Deposit is that of a debtor, not a trustee; no interest shall accrue thereon. The Security Deposit shall be the property of Landlord, but shall be paid to Tenant when Tenant's obligations under this Lease have been completely fulfilled. Landlord shall be released from any obligation with respect to the Security Deposit upon transfer of this Lease and the Premises to a person or entity assuming Landlord's obligations under this Paragraph 5.

6.    **Operating Expense Payments.** (a) During each month of the Lease Term (including during Lease Months 1 through 3), on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as estimated by Landlord from time to time, of Tenant's Proportionate Share (hereinafter defined) of Operating Expenses for the Project. Payments thereof for any fractional calendar month shall be

prorated. The term "Operating Expenses" means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to costs of: Taxes (hereinafter defined) and fees payable to ad valorem or property tax consultants and attorneys for consultation and contesting taxes; insurance; utilities; maintenance, repair and replacement of all portions of the Project, including without limitation, paving and parking areas, roads, roofs (including the roof membrane), alleys, and driveways, mowing, landscaping, snow removal, exterior painting, utility lines, heating, ventilation and air conditioning systems, lighting, electrical systems and other mechanical and building systems; amounts paid to contractors and subcontractors for work or services performed in connection with any of the foregoing; charges or assessments of any association to which the Project is subject; property management fees payable to a property manager, including any affiliate of Landlord (provided that property management fees shall not to exceed five percent (5%) of the gross revenue of the Project per calendar year), or if there is no property manager, an administration fee of 15 percent of Operating Expenses payable to Landlord; security services, if any; trash collection, sweeping and removal; and additions or alterations made by Landlord to the Project or the Building in order to comply with Legal Requirements (other than those expressly required herein to be made by Tenant) or that are appropriate to the continued operation of the Project or the Building as a bulk warehouse facility in the market area, provided that the cost of additions or alterations that are required to be capitalized for federal income tax purposes shall be amortized on a straight line basis over a period equal to the lesser of the useful life thereof for federal income tax purposes or 10 years. Operating Expenses do not include costs, expenses, depreciation or amortization for capital repairs and capital replacements required to be made by Landlord under Paragraph 10 of this Lease, debt service under mortgages or ground rent under ground leases, costs of restoration to the extent of net insurance proceeds received by Landlord with respect thereto, leasing commissions, or the costs of renovating space for tenants.

(b) If Tenant's total payments of Operating Expenses for any year are less than Tenant's Proportionate Share of actual Operating Expenses for such year, then Tenant shall pay the difference to Landlord within 30 days after demand, and if more, then Landlord shall retain such excess and credit it against Tenant's next payments. For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year except the first year, which shall begin on the Commencement Date, and the last year, which shall end on the expiration of this Lease. With respect to Operating Expenses which Landlord allocates to the entire Project, Tenant's "Proportionate Share" shall be the percentage set forth on the first page of this Lease as Tenant's Proportionate Share of the Project as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises or the Project; and, with respect to Operating Expenses which Landlord allocates only to the Building, Tenant's "Proportionate Share" shall be the percentage set forth on the first page of this Lease as Tenant's Proportionate Share of the Building as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises or the Building. Landlord may equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Project or Building that includes the Premises or that varies with occupancy or use. The estimated Operating Expenses for the Premises set forth on the first page of this Lease are only estimates, and Landlord makes no guaranty or warranty that such estimates will be accurate.

(c) Notwithstanding the foregoing, for purposes of computing Tenant's Proportionate Share of Operating Expenses, commencing on the first day of the second full calendar year of the Lease Term, the Controllable Operating Expenses (hereinafter defined) shall not increase by more than 7% per calendar year on a compounding and cumulative basis over the course of the Lease Term. In other words, Controllable Operating Expenses for the second full calendar year of the Lease Term shall not exceed 107% of the Controllable Operating Expenses for the first full calendar year of the Lease Term. Controllable Operating Expenses for the third full calendar year of the Lease Term shall not exceed 107% of the limit on Controllable Operating Expenses for the second full calendar year of the Lease Term, etc. By way of illustration, if Controllable Operating Expenses were $1.00 per square foot for the first full calendar year of the Lease Term, then Controllable Operating Expenses for the second full calendar year shall not exceed $1.07 per square foot, and Controllable Operating Expenses for the third full calendar year shall not exceed $1.1449 per square foot. "Controllable Operating Expenses" shall mean all Operating Expenses except (i) wages and salaries included in Operating Expenses to the extent of increases in minimum wage required by federal or state law or to the extent of increases required by a collective bargaining agreement, (ii) the cost of utilities, (iii) the cost of insurance, (iv) taxes and assessments and governmental charges, (v) fees for management services, and (vi) to the extent properly included in Operating Expenses, the costs of capital improvements required by laws not applicable to the Project as of the date of this Lease.

7. **Utilities and Other Services.** Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Landlord may cause any utilities to be separately metered or charged directly to Tenant by the provider. Tenant shall pay its share of all charges for jointly metered utilities based upon consumption, as reasonably determined by Landlord. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent.

8. **Taxes.** Landlord shall pay all taxes, assessments and governmental charges (collectively referred to as "Taxes") that accrue against the Project during the Lease Term, which shall be included as part of the Operating Expenses charged to Tenant. Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof. All capital levies or other taxes assessed or imposed on Landlord upon the rents payable to Landlord under this Lease and any franchise tax, any excise, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from the Premises and/or the Project or any portion thereof shall be paid by Tenant to Landlord monthly in estimated installments or upon demand, at the option of Landlord, as additional rent; provided, however, in no event shall Tenant be liable for any federal income taxes imposed on Landlord. If any such tax or excise is levied or assessed

directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant, and if any such taxes are levied or assessed against Landlord or Landlord's property and (a) Landlord pays them or (b) the assessed value of Landlord's property is increased thereby and Landlord pays the increased taxes, then Tenant shall pay to Landlord such taxes within 10 days after Landlord's request therefor.

9.      **Insurance.** (a) Landlord shall maintain causes of loss – special form property insurance covering the full replacement cost of the Building. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to, commercial liability insurance and rent loss insurance. All such insurance shall be included as part of the Operating Expenses charged to Tenant. Tenant shall be liable for the payment of any deductible amount under Landlord's insurance maintained pursuant to this Paragraph 9, in an amount not to exceed Twenty-Five Thousand Dollars ($25,000). The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the insurer's cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises.

(b)      Effective as of the earlier of: (1) the date Tenant enters or occupies the Premises; or (2) the Commencement Date, and continuing during the Lease Term, Tenant, at its expense, shall maintain during the Lease Term the following insurance:

(i)      Causes of Loss – Special Form Property Insurance covering leasehold improvements paid for by Tenant or required by the terms of this Lease to be maintained by Tenant and Tenant's personal property and fixtures from time to time in, on, or at the Premises, in an amount not less than 100% of the full replacement cost, without deduction for depreciation, providing protection against events protected under "Special Risk Coverage," as well as against sprinkler damage, vandalism, and malicious mischief. Any proceeds from the Causes of Loss – Special Form Property Insurance shall be used for the repair or replacement of the property damaged or destroyed, unless this Lease is terminated under an applicable provision herein. If the Premises are not repaired or restored following damage or destruction in accordance with other provisions herein, Landlord shall receive any proceeds from the Causes of Loss – Special Form Property Insurance allocable to Tenant's leasehold improvements.

(ii)      Business Interruption Insurance, providing in the event of damage or destruction of the Premises an amount sufficient to sustain Tenant for a period of not less than 1 year for: (i) the net profit that would have been realized had Tenant's business continued; and (ii) such fixed charges and expenses as must necessarily continue during a total or partial suspension of business to the extent to which they would have been incurred had no business interruption occurred, including, but not limited to, interest on indebtedness of Tenant, salaries of executives, foremen, and other employees under contract, charges under noncancelable contracts, charges for advertising, legal or other professional services, taxes and rents that may still continue, trade association dues, insurance premiums, and depreciation.

(iii)      Commercial General Liability insurance insuring Tenant against liability for bodily injury, property damage, products and completed operations and personal injury at the Premises, including contractual liability insuring the indemnification provisions contained in this Lease and "liquor liability" or "dram shop" coverage if alcoholic beverages are served in the Premises. Such insurance shall name Landlord, its property manager, any mortgagee, Stream Realty Partners, Flagship Capital Partners, and such other parties as Landlord may designate, as additional insureds on a form that does not limit the coverage provided under such policy to any additional insured i. by reason of such additional insured's negligent acts or omissions (sole or otherwise), ii. by reason of other insurance available to such additional insured, or iii. to claims for which a primary insured has agreed to indemnify the additional insured. Such insurance shall be for a limit of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) annual aggregate. Coverage shall also be included for fire damage (damage to rented premises) for a limit of $300,000 any one fire, and medical expense coverage in the amount of $10,000 any one person, together with an umbrella commercial liability policy in the initial amount of Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) annual aggregate and shall be subject to periodic increases specified by Landlord based upon inflation, increased liability awards, recommendation of Landlord's professional insurance advisers, and other relevant factors.

(iv)      Worker's Compensation Insurance in the statutory amount covering all employees of Tenant employed or performing services at the Premises required by the laws of the state in which the Premises are located, or non-subscriber's insurance providing coverage for claims that would have been covered by worker's compensation insurance, and Employer's Liability Insurance in the amount of $1,000,000 each accident/$1,000,000 disease-policy limit/$1,000,000 disease-each employee; provided that Tenant shall not be required to carry such insurance until the Tenant has employees.

(v)      Automobile Liability Insurance, including but not limited to, passenger liability, on all owned, non-owned, and hired vehicles used in connection with the Premises, with a combined single limit per occurrence of not less than One Million Dollars ($1,000,000) for Bodily Injury and Property Damage.

The commercial liability policies shall insure on an occurrence and not a claims-made basis and be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless 30 days' prior written notice shall have been given to Landlord (unless such cancellation is due to nonpayment of premiums, in which event 10 days' prior notice shall be provided. Further, the liability insurance obtained by Tenant under Paragraph

520380 000008 10993078.1

9(b)(iii) shall (i) be primary and (ii) insure Tenant's obligations to Landlord under Paragraph 18. The amount and coverage of such insurance shall not limit Tenant's liability nor relieve Tenant of any other obligation under this Lease. Landlord may also obtain commercial general liability insurance in an amount and with coverage determined by Landlord insuring Landlord against liability with respect to the Premises and the Project. The policy obtained by Landlord shall not provide primary insurance, shall not be contributory and shall be excess over any insurance maintained by Tenant.

The Tenant's insurers issuing the above described policies shall have a Best's Insurance Reports rating of A- X or better. Such policies or certificates thereof shall be delivered to Landlord by Tenant upon the earlier of (i) Tenant's entry into the Premises and (ii) commencement of the Lease Term and upon each renewal of said insurance. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord copies of such policies and certificates evidencing the coverage required herein, Landlord, in addition to any remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of fifteen percent (15%) of the cost.

(c)     The causes of loss – special form property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any loss or damage thereby insured against, **EVEN IF THE SAME IS CAUSED BY THE NEGLIGENCE OF THE OTHER PARTY.** Notwithstanding anything to the contrary set forth herein, neither party nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to the other for loss or damage caused by any risk coverable by causes of loss – special form property insurance, and each party waives any claims against the other party, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage, **EVEN IF THE SAME IS CAUSED BY THE NEGLIGENCE OF THE RELEASED PARTY.** The failure of a party to insure its property shall not void this waiver. Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the Project from any cause whatsoever, **INCLUDING WITHOUT LIMITATION, DAMAGE CAUSED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, BY THE NEGLIGENCE OF LANDLORD OR ITS AGENTS, EMPLOYEES OR CONTRACTORS.**

10.     **Landlord's Repairs.** Landlord shall maintain the structural soundness of the roof, foundation, and exterior walls of the Building in good repair, reasonable wear and tear and uninsured losses and damages caused by Tenant, its agents and contractors excluded. The term "walls" as used in this Paragraph 10 shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 10, after which Landlord shall have a reasonable opportunity to repair. Landlord, at Tenant's expense as provided in Paragraph 6, shall maintain in good repair and condition the parking areas and other common areas of the Project, including, but not limited to driveways, alleys, landscape and grounds surrounding the Premises.

11.     **Tenant's Repairs.** Subject to Tenant's obligation in Paragraph 10 and subject to Paragraphs 9 and 15, Tenant, at its expense, shall repair, replace and maintain in good condition all portions of the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, dock and loading areas, man doors, truck doors, dock levelers, shelters, seals and bumpers (if any), lighting, plumbing, restrooms, water and sewer lines up to points of common connection, fire sprinklers and fire protection systems, entries, doors, ceilings, windows, interior walls, and the interior side of demising walls, electrical systems, air rotation equipment, and HVAC systems. Such repair and replacements include capital expenditures and repairs whose benefit may extend beyond the Term. Hot water equipment and HVAC systems and other mechanical and building systems serving the Premises shall be maintained at Tenant's expense pursuant to maintenance service contracts entered into by Tenant or, at Landlord's election, by Landlord (but at Tenant's expense). The scope of services and contractors under such maintenance contracts shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld. The current scope of services under such maintenance contract is set forth on Addendum 2 attached hereto. Provided that Tenant maintains the required maintenance service contract for the HVAC systems serving the Premises as required herein, and except for any repairs or replacements necessitated by any action or inaction of Tenant or its agents, employees, invitees, licensees, or visitors, Landlord and Tenant agree that Tenant's obligations for repairs or replacements to the HVAC units serving the Premises as of the date of this Lease shall not exceed $2,000.00, per unit per year, during the initial Lease Term. In the event such repair or replacement cost for a particular unit existing on the date of this Lease exceeds $2,000.00 during any one year of the initial Lease Term, Landlord shall, at its sole discretion, elect to repair or replace such unit(s). Landlord shall not pay for any costs to repair or replace any HVAC unit that is installed after the date of this Lease. Upon request by Landlord, Tenant shall provide Landlord with copies of invoices and evidence of payment of all repair costs for the HVAC systems serving the Premises. If Tenant fails to maintain the required maintenance service contract in effect at any time during the Lease Term, Landlord's obligation to pay for any repair or replacement of any existing HVAC unit shall terminate and be of no force or effect. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant within 10 days after demand therefor, together with an administration charge in an amount equal to five percent (5%) of the cost of the repairs. Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors, or invitees and any repair that benefits only the Premises. Within the 15 day period prior to the expiration or termination of this Lease, Tenant shall deliver to Landlord a certificate from an engineer reasonably acceptable to Landlord certifying that the hot water equipment and the HVAC system are then in good repair and working order.

12.     **Tenant-Made Alterations and Trade Fixtures.** (a) Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior

written consent. However, Landlord's consent shall not be required for any proposed Tenant-Made Alteration that satisfies all of the following criteria: (1) is of a cosmetic nature such as painting and installing carpeting; (2) is not visible from the exterior of the Premises or Building; (3) will not affect the systems or structure of the Building; (4) does not require a building permit; and (5) will not, in the aggregate, cost more than $5,000.00 (a "Cosmetic Alteration"). Cosmetic Alterations shall be subject to all of the terms of this Paragraph 12 except for the required to obtain Landlord's consent. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. Landlord shall have the right to manage all Tenant-Made Alterations other than Cosmetic Alterations. Landlord's right to review plans and specifications and to manage construction shall be solely for its own benefit, and at no cost to Tenant, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. In no event shall Tenant perform any roof penetrations without Landlord's prior written consent, and Landlord shall have the right to designate any roofing contractor having a warranty or maintenance service agreement on the roof to perform such work, or otherwise approve of the contractor performing such work. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations; provided, however, notwithstanding the foregoing, Tenant shall have the right to remove all brewing equipment. Tenant shall repair any damage caused by such removal.

(b)     Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. At the expiration or earlier termination of this Lease, Tenant shall remove its Trade Fixtures and shall repair any damage caused by such removal.

13.     **Signs.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements.

14.     **Parking.** Tenant shall be entitled to use the parking directly in front of the entrance to the Premises on a non-exclusive basis and Tenant will be allocated two (2) non-exclusive parking spaces in the gated area along Motor Circle. Landlord may allocate parking spaces among Tenant and other tenants in the Project if Landlord determines that such parking facilities are becoming crowded. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. Vehicle parking shall be at Tenant's risk and Landlord shall not be responsible for any damage or theft to vehicles parking at the Project. Landlord shall not be responsible for policing the parking areas. Except for the two (2) parking spaces referenced in the first sentence of this Paragraph 14, Tenant shall not permit any of Tenant's agents, employees, invitees, licensees, customers, or visitors to park inside the Project along Motor Circle Drive. In the event Landlord determines that Tenant or Tenant's agents, employees, invitees, licensees, customers, or visitors are using more than Tenant's pro rata share of parking spaces at the Project and such overuse is interfering with parking of other tenants and occupants of the Project, or that Tenant or Tenant's agents, employees, invitees, licensees, customers, or visitors are parking inside the Project along Motor Circle Drive in violation of the above, Landlord may provide notice thereof to Tenant, and Tenant's failure to immediately cause such interference to cease or cause such Tenant's agents, employees, invitees, licensees, customers, or visitors to remove their vehicles from Motor Circle Drive, as applicable, following receipt of such notice from Landlord shall constitute an Event of Default under this Lease, entitling Landlord to immediately exercise all remedies available hereunder, at law or in equity, without any further notice required or cure periods available.

15.     **Restoration.** If at any time during the Lease Term the Building should be totally destroyed by fire or other casualty or in the event the Building (or any portion thereof) should be so damaged that rebuilding or repairs cannot be completed, in Landlord's reasonable opinion, within 6 months after the date of the casualty, Landlord may, at its option, terminate this Lease, in which event Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated during the unexpired portion of this Lease effective with the date of such

damage. Landlord shall exercise the termination right pursuant to the preceding sentence, if at all, by delivering written notice of termination to Tenant within 30 days after determining that the repairs cannot be completed within such 6 month period. If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 6 months, either Landlord or Tenant may elect to terminate this Lease upon written notice to the other party given no later than 30 days after Landlord's notice that the restoration is estimated to exceed such 6 month period. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 6 months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage. Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises; provided, that if such casualty was caused by Tenant, its agents, employees, licensees or invitees, Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated only to the extent Landlord is compensated for the same by loss of rents insurance, if any. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss. Any insurance which may be carried by Landlord or Tenant against loss or damage to the Building or to the Premises shall be for the sole benefit of the party carrying such insurance and under its sole control.

16.     **Condemnation.** If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership or operation of the Project, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

17.     **Assignment and Subletting.** (a) Without Landlord's prior written consent, which consent to an assignment (other than a collateral assignment) or sublease shall not be unreasonably withheld, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. Without limitation, it is agreed that Landlord's consent shall not be considered unreasonably withheld if: (1) the proposed transferee's financial condition is not adequate for the obligations such transferee is assuming in connection with the proposed assignment or sublease; (2) the transferee's business or reputation is not suitable for the Project considering the business and reputation of the other tenants and the Project's prestige, or would result in a violation of another tenant's rights under its lease at the Project; (3) the transferee is a governmental agency or occupant of the Project; (4) Tenant is in default beyond any applicable notice and cure period; (5) any portion of the Project or the Premises would likely become subject to additional or different laws as a consequence of the proposed assignment or sublease; or (6) Landlord or its leasing agent has received a proposal from or made a proposal to the proposed transferee to lease space in the Project within 6 months prior to Tenant's delivery of written notice of the proposed assignment or sublease to Landlord. For purposes of this paragraph, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "Tenant Affiliate"), without the prior written consent of Landlord, provided (1) Tenant is not in default under this Lease; (2) such proposed transferee operates the business in the Premises for the use permitted under Paragraph 3 above and no other purpose; and (3) Tenant shall give Landlord written notice at least 30 days prior to the effective date of the proposed assignment or sublease. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any proposed assignment or sublease. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

(b)     Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder all such excess rental and other excess consideration within 10 days following receipt thereof by Tenant.

- 9 -

(c)     If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

18.     **Indemnification.** (a)  Tenant agrees to indemnify, defend (with counsel reasonably acceptable to Landlord) and hold harmless Landlord, and Landlord's agents, employees and contractors, from and against any and all claims, demands, losses, liabilities, cause of action, suits, judgments, damages, costs and expenses (including attorney's fees) arising from any occurrence on the Premises, the use and occupancy of the Premises, or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents, or from  Tenant's failure to perform its obligations under this Lease (other than any loss arising from the negligence or willful misconduct of Landlord or it's agents). This indemnity provision shall survive termination or expiration of this Lease. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Paragraph 18.

(b)     Landlord shall indemnify, defend and hold harmless Tenant from and against all claims, demands, liabilities, causes of action, suits, judgments, attorneys' fees and expenses arising from any injury or damage to persons in the Premises, to the extent, and only to the extent the loss is caused solely by the gross negligence or intentional misconduct of Landlord, or its agents, employees or contractors.

19.     **Inspection and Access.**  Landlord and its agents, representatives, and contractors may enter the Premises upon twenty-four (24) hours prior notice (which may be oral) (except in the event of an emergency, no prior notice shall be required) at any reasonable time to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease and for any other business purpose.  Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers and, during the last 180 days of the Lease Term, to prospective tenants.  During the last 180 days of the Lease Term, Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale.  Landlord may grant easements, make public dedications, designate common areas and create restrictions on or about the Premises, provided that no such easement, dedication, designation or restriction materially interferes with Tenant's use or occupancy of the Premises.  At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.  Landlord shall have the right to temporarily close the Premises or the Building to perform repairs, alterations or additions in the Premises or the Building, provided that Landlord shall use reasonable efforts to perform all such work on weekends and after normal business hours.  Entry by Landlord hereunder shall not constitute a constructive eviction or entitle Tenant to any abatement or reduction of rent by reason thereof.

20      **Quiet Enjoyment.**  If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

21.     **Surrender.**  Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, and in compliance with Addendum 3 attached hereto, ordinary wear and tear and casualty loss and condemnation covered by Paragraphs 15 and 16 excepted.  Any Trade Fixtures and Tenant-Made Alterations not removed by Tenant as permitted or required herein, and any inventory, goods, equipment or other personal property remaining in the Premises following the termination of the Lease Term or earlier termination of Tenant's right of possession, shall be deemed abandoned and may either, at Landlord's option, (i) be stored, removed, sold and disposed of by Landlord at Tenant's expense, or (ii) be conclusively deemed to have been conveyed by Tenant to Landlord by bill of sale with general warranty of title without further payment or credit by Landlord to Tenant.  Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and/or disposition of such property.  All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Operating Expenses and obligations concerning the condition and repair of the Premises.

22.     **Holding Over.**  If Tenant retains possession of the Premises after the termination of the Lease Term, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period on a per month basis without reduction for any partial months during any such holdover, an amount equal to 150% of the Base Rent in effect on the termination date.  All other payments shall continue under the terms of this Lease.  In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over.  No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Paragraph 22 shall not be construed as consent for Tenant to retain possession of the Premises.  For purposes of this Paragraph 22, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

520380 000008 10993078.1

23.    **Events of Default.** Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(i)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(ii)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (C) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(iii)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(iv)    Tenant shall not occupy or shall vacate the Premises or shall fail to continuously operate its business at the Premises for the permitted use set forth herein, whether or not Tenant is in monetary or other default under this Lease.

(v)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(vi)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 30 days after any such lien or encumbrance is filed against the Premises.

(vii)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 23, and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default.

24.    **Landlord's Remedies.** (a) Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: terminate this Lease or Tenant's right of possession, (but Tenant shall remain liable as hereinafter provided) and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises.

(b)    If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: all Base Rent and all other amounts accrued hereunder to the date of such termination; the cost of reletting the whole or any part of the Premises, including without limitation brokerage fees and/or leasing commissions incurred by Landlord, and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and the excess of the then present value of the Base Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease, over the present value of any net amounts which Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing. Such present values shall be calculated at a discount rate equal to the 90-day U.S. Treasury bill rate at the date of such termination.

(c)    In order to regain possession of the Premises and to deny Tenant access thereto, Landlord or its agent may, at the expense and liability of the Tenant, alter or change any or all locks or other security devices controlling access to the Premises without posting or giving notice of any kind to Tenant and Landlord shall have no obligation to provide Tenant a key to new locks installed in the Premises or grant Tenant access to the Premises. Tenant shall not be entitled to recover possession of the Premises, terminate this Lease, or recover any actual, incidental, consequential, punitive, statutory or other damages or award of attorneys' fees, by reason of Landlord's alteration or change of any lock or other security device and the resulting exclusion from the Premises of the Tenant or Tenant's agents, servants, employees, customers, licensees, invitees or any other persons from the Premises. Tenant acknowledges that the provisions of this subparagraph of this Lease supersedes the Texas Property Code and Tenant further warrants and represents that it hereby knowingly waives any rights it may have thereunder.

(d)    If Landlord terminates Tenant's right of possession (but not this Lease), Landlord may, but shall be under no obligation to, relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant. For the purpose of such reletting Landlord is authorized to make any repairs,

- 11 -

changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rental reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent and other amounts accrued hereunder at the time of repossession, and the costs incurred in any attempt by Landlord to relet the Premises. If the Premises are relet and a sufficient sum shall not be realized from such reletting [after first deducting therefrom, for retention by Landlord, the unpaid Base Rent and other amounts accrued hereunder at the time of reletting, the cost of recovering possession (including attorneys' fees and costs of suit), all of the costs and expense of repairs, changes, alterations, and additions, the expense of such reletting (including without limitation brokerage fees and leasing commissions) and the cost of collection of the rent accruing therefrom] to satisfy the rent provided for in this Lease to be paid, then Tenant shall immediately satisfy and pay any such deficiency. Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

(e) Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

25. **Tenant's Remedies/Limitation of Liability.** Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary). All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Project, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. In no event shall Landlord be liable for any consequential, special or punitive damages.

26. **Waiver of Jury Trial.** TENANT AND LANDLORD KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LAWSUIT BROUGHT BY EITHER LANDLORD OR TENANT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, TO RESOLVE ANY DISPUTE ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS LEASE OR THE TRANSACTIONS RELATED THERETO. LANDLORD AND TENANT ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THE FOREGOING WAIVER.

27. **Subordination.** This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder. Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded. Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have

- 12 -

the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

28.     **Mechanic's Liens.**  Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged of record (by payment or bond) within 30 days of the filing or recording thereof.

29.     **Estoppel Certificates.**  Tenant agrees, from time to time, within 10 days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within 10 days after Landlord's written request thereof.

30.     **Environmental Requirements.**  (a) Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring Hazardous Material upon the Premises or transport, store, use, generate, manufacture, dispose, or release any Hazardous Material on or from the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and all requirements of this Lease. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture, or release of Hazardous Materials on the Premises, and Tenant shall promptly deliver to Landlord a copy of any notice of violation relating to the Premises or Project of any Environmental Requirement.

(b)     The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, permits, authorizations, orders, policies or other similar requirements of any governmental authority, agency or court regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Toxic Substances Control Act and all state and local counterparts thereto, and any common or civil law obligations including, without limitation, nuisance or trespass, and any other requirements of Paragraphs 3 and 31 of this Lease. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant or contaminant that is or could be regulated under any Environmental Requirement or that may adversely affect human health or the environment, including, without limitation, any solid or hazardous waste, hazardous substance, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, synthetic gas, polychlorinated biphenyls (PCBs), and radioactive material). For purposes of Environmental Requirements, to the extent authorized by law, Tenant is and shall be deemed to be the responsible party, including without limitation, the "owner" and "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

(c)     Tenant, at its sole cost and expense, shall remove all Hazardous Materials stored, disposed of or otherwise released by Tenant, its assignees, subtenants, agents, employees, contractors or invitees onto or from the Premises, in a manner and to a level satisfactory to Landlord in its sole discretion, but in no event to a level and in a manner less than that which complies with all Environmental Requirements and does not limit any future uses of the Premises or require the recording of any deed restriction or notice regarding the Premises. Tenant shall perform such work at any time during the period of the Lease upon written request by Landlord or, in the absence of a specific request by Landlord, before Tenant's right to possession of the Premises terminates or expires. If Tenant fails to perform such work within the time period specified by Landlord or before Tenant's right to possession terminates or expires (whichever is earlier), Landlord may at its discretion, and without waiving any other remedy available under this Lease or at law or equity (including without limitation an action to compel Tenant to perform such work), perform such work at Tenant's cost. Tenant shall pay all costs incurred by Landlord in performing such work within 10 days after Landlord's request therefor. Such work performed by Landlord on behalf of Tenant and Tenant remains the owner, generator, operator, transporter, and/or arranger of the Hazardous Materials for purposes of Environmental Requirements. Tenant agrees not to enter into any agreement with any person, including without limitation any governmental authority, regarding the removal of Hazardous Materials that have been disposed of or otherwise released onto or from the Premises without the written approval of the Landlord.

(d)     Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses

(including without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any Hazardous Materials, including without limitation asbestos, brought into the Premises or disturbed in breach of the requirements of this Paragraph 30, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials or any breach of the requirements under this Paragraph 30 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph 30 shall survive any termination of this Lease.

(e)     Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph 30, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. Tenant shall promptly notify Landlord of any communication or report that Tenant makes to any governmental authority regarding any possible violation of Environmental Requirements or release or threat of release of any Hazardous Materials onto or from the Premises. Tenant shall, within 5 days of receipt thereof, provide Landlord with a copy of any documents or correspondence received from any governmental agency or other party relating to a possible violation of Environmental Requirements or claim or liability associated with the release or threat of release of any Hazardous Material onto or from the Premises.

(f)     In addition to all other rights and remedies available to Landlord under this Lease or otherwise, Landlord may, in the event of a breach of the requirements of this Paragraph 30 that is not cured within 30 days following notice of such breach by Landlord, require Tenant to provide financial assurance (such as insurance, escrow of funds or third party guarantee) in an amount and form satisfactory to Landlord. The requirements of this Paragraph 30 are in addition to and not in lieu of any other provision in the Lease.

31.     **Rules and Regulations.** Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project. The current rules and regulations are attached hereto. In the event of any conflict between said rules and regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project. The current rules and regulations applicable to the Project are attached hereto as Exhibit B.

32.     **Security Service.** Tenant acknowledges and agrees that, while Landlord may patrol the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

33.     **Force Majeure.** Neither Landlord nor Tenant shall be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of such party ("Force Majeure"). The provisions of this Paragraph shall not operate to excuse Tenant from prompt payment of rent, additional rent or other monetary payments required by the terms of this Lease.

34.     **Entire Agreement.** This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

35.     **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

36.     **Brokers.** Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers set forth on the first page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

37.     **Miscellaneous.** (a)     Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

- 14 -

520380 000008 10993078.1

(b)     If and when included within the term "Tenant" as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)     All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses set forth below their respective signatures. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice sent by hand delivery shall be deemed given upon delivery and notice sent by mail or national overnight courier service shall be deemed given as of the date of first attempted delivery at the address and in the manner provided herein.

(d)     Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e)     Tenant shall pay Landlord's reasonable fees and expenses, including legal and other consultants' fees and expenses, incurred in connection with Tenant's request for Landlord's consent or approval under this Lease; provided that Tenant shall not be responsible for any expenses in connection with Landlord's approval of plans and specifications or construction monitoring of the Initial Improvements or any Tenant-Made Alterations.

(f)     At Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants; provided that Landlord shall not request such financial statements more than one (1) time per calendar year except in connection with a sale or financing of the Project or Building.

(g)     Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

(h)     The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(i)     The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties and delivery of a guaranty from the Guarantors (Chris Rigoulot, Kindra Hebert, Kenneth G. Rigoulot and Leslie J. Rigoulot) in the form of Addendum 6 attached hereto.

(j)     Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(k)     Any amount not paid by Tenant within 5 days after its due date in accordance with the terms of this Lease shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or 15 percent per year. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(l)     Construction and interpretation of this Lease shall be governed by the laws of the state in which the Project is located, excluding any principles of conflicts of laws.

(m)     Time is of the essence as to the performance of Tenant's obligations under this Lease.

(n)     All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda (other than the rules and regulations) and the terms of this Lease, such exhibits or addenda shall control. In the event of a conflict between the rules and regulations attached hereto and the terms of this Lease, the terms of this Lease shall control.

(n)     If either party shall prevail in any litigation instituted by or against the other related to this Lease, the prevailing party, as determined by the court, shall receive from the non-prevailing party all costs and reasonable attorneys' fee (payable at standard hourly rates) incurred in such litigation, including costs on appeal, as determined by the court. Tenant shall pay to Landlord all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in enforcing this Lease.

(o)     Landlord and Tenant agree that each provision of the Lease for determining charges, amounts and additional rent (including Operating Expense payments) by Tenant (including without limitation, Paragraph 6 hereof) is commercially reasonable, and as to each such charge or amount, constitutes a "method by which the charge is to be computed" for purposes of Section 93.012 (Assessment of Charges) of the Texas Property Code, as such section now exists or as it may be hereafter amended or succeeded.

- 15 -

520380 000008 10993078.1

(p)     Landlord and Tenant acknowledge and agree that this Lease, including all exhibits a part hereof, is not a construction contract or an agreement collateral to or affecting a construction contract.

38.     **Landlord's Lien/Security Interest**. Tenant hereby grants Landlord a security interest, and this Lease constitutes a security agreement, within the meaning of and pursuant to the Uniform Commercial Code of the state in which the Premises are situated as to all of Tenant's property situated in, or upon, or used in connection with the Premises (except merchandise sold in the ordinary course of business) as security for all of Tenant's obligations hereunder, including, without limitation, the obligation to pay rent. Such personalty thus encumbered includes specifically all trade and other fixtures for the purpose of this Paragraph and inventory, equipment, contract rights, accounts receivable and the proceeds thereof. Tenant hereby authorizes Landlord to file financing statement(s) in form sufficient to perfect the security interest granted hereunder. Landlord shall have all the rights and remedies of a secured party under the Texas Business and Commerce Code and this lien and security interest may be foreclosed by process of law. The requirement of reasonable notice prior to any sale under Article 9 of the Texas Business and Commerce Code shall be met if such notice is given in the manner prescribed herein at least 10 days before the day of sale. Any sale made pursuant to the provisions of this Paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held in the Premises after the time, place and method of sale and a general description of the types of property to be sold have been advertised for 10 consecutive days prior to the date of sale in a daily newspaper published in the county in Texas where the Premises is located. Notwithstanding the foregoing, Landlord agrees to subordinate its security interest as described in this Paragraph 38 to Tenant's lenders requiring a priority position under in Tenant's property pursuant to a subordination agreement in form and substance satisfactory to Landlord.

39.     **Limitation of Landlord's Liability**. The obligations of this Lease shall run with the land, and this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No owner of the Project shall be liable under this Lease except for breaches of Landlord's obligations occurring while owner of the Project. The obligations of Landlord shall be binding upon the assets of Landlord which comprise the Project but not upon other assets of Landlord. No individual partner, trustee, stockholder, officer, member, director, employee, advisors or beneficiary of Landlord or any partner, trustee, stockholder, officer, member, director, employee, advisor or beneficiary of any of the foregoing, shall be personally liable under this Lease and Tenant shall look solely to Landlord's interest in the Project in pursuit of its remedies upon an event of default hereunder, and the general assets of Landlord, its partners, trustees, stockholders, members, officers, employees, advisors or beneficiaries of Landlord, and the partners, trustees, stockholders, members, officers, employees, advisors or beneficiary of any of the foregoing, shall not be subject to levy, execution or other enforcement procedure for the satisfaction of the remedies of Tenant. **TENANT HEREBY WAIVES ITS STATUTORY LIEN UNDER SECTION 91.004 OF THE TEXAS PROPERTY CODE.**

40.     **Substitution of Premises**. Intentionally Omitted.

41.     **Reserved Rights**. Landlord reserves the following rights, exercisable without notice, except as provided herein, and without liability to Tenant for damage or injury to property, person or business and without affecting an eviction or disturbance of Tenant's use or possession or giving rise to any claim for setoff or abatement of rent or affecting any of Tenant's obligations under this Lease: (1) upon 30 days prior notice to change the name or street address of the Building; (2) to install and maintain signs on the exterior of the Building; (3) to designate and approve window coverings to present a uniform exterior appearance; (4) to make any decorations, alterations, additions, improvements to the Building or Project, or any part thereof (including, with prior notice, the Premises) which Landlord shall desire, or deem necessary for the safety, protection, preservation or improvement of the Building or Project, or as Landlord may be required to do by law; (5) to have access to the Premises at reasonable hours to perform its duties and obligations and to exercise its rights under this Lease; (6) to retain at all times and to use in appropriate instances, pass keys to all locks within and to the Premises; (7) to approve the weight, size, or location of heavy equipment, or articles within the Premises; (8) to change the arrangement and/or location of the public areas of the Project; (9) to regulate access to telephone, electrical and other utility closets in the Building and to require use of designated contractors for any work involving access to the same; (10) if Tenant has vacated the Premises during the last 6 months of the Lease Term, to perform additions, alterations and improvements to the Premises in connection with a reletting or anticipated reletting thereof without being responsible or liable for the value or preservation of any then existing improvements to the Premises; and (11) to grant to anyone the exclusive right to conduct any business or undertaking in the Building provided Landlord's exercise of its rights under this clause 11, shall not be deemed to prohibit Tenant from the operation of its business in the Premises and shall not constitute a constructive eviction.

42.     **Tax Protest**. **TENANT HEREBY WAIVES ALL RIGHTS TO PROTEST THE APPRAISED VALUE OF THE PROPERTY OR APPEAL THE SAME AND ALL RIGHTS TO RECEIVE NOTICES OF REAPPRAISALS SET FORTH IN SECTIONS 41.413 AND 42.015 OF THE TEXAS TAX CODE.**

43.     **WAIVER OF CONSUMER RIGHTS**. **TENANT HEREBY WAIVES ALL ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET. SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY CONSENTS TO THIS WAIVER.**

SIGNATURES FOLLOW ON NEXT PAGE

- 16 -

520380 000008 10993078.1

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

TENANT:

NOBLE REY BREWING COMPANY, LLC,
a Texas limited liability company

By: _____
Name: Chris Rigaud
Title: Owner

LANDLORD:

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership

By:     Stream Acquisition LVIII, L.L.C., a Texas
        limited liability company, it General Partner

        By: _____
        Name: Chris Jackson
        Title: Manager

Address:

1201 Mockingbird Dr
Grapevine TX 76051

Address:

1302-1350 MOTOR CIRCLE, L.P.
2001 Ross Avenue, Suite 2800
Dallas, Texas 75201
Attn: Property Manager

- 17 -

ADDENDUM 1

RENEWAL OPTION

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

A.     Tenant shall have the right to extend the Lease Term (the "Renewal Option") for one additional period of five (5) years (the "Renewal Term") commencing on the day following the expiration date of the initial Lease Term, provided that each of the following occurs:

    1.     Landlord receives notice of exercise of the Renewal Option ("Initial Renewal Notice") not less than six (6) full calendar months prior to the expiration of the initial Lease Term, and not more than nine (9) full calendar months prior to the expiration of the initial Lease Term; and

    2.     Tenant is not in default under the Lease beyond any applicable cure periods at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Renewal Notice (hereinafter defined); and

    3.     No more than two (2) Events of Default shall have occurred as of the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Renewal Notice; and

    4.     No part of the Premises is sublet at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Renewal Notice; and

    5.     The Lease has not been assigned prior to the date that Tenant delivers its Initial Renewal Notice or prior to the date Tenant delivers its Binding Renewal Notice.

B.     The initial Base Rent rate per square foot for the Premises during the Renewal Term shall equal the Prevailing Market (hereinafter defined) rate per square foot for the Premises; provided, however, in no event shall the initial Base Rent rate per square for the Premises during the Renewal Term be less than the Base Rent rate per square foot of the Premises during the last month of the initial Lease Term and in no event shall the initial Base Rent rate per square foot for the Premises exceed 105% of the Base Rent rate per square foot of the Premises during the last month of the initial Lease Term.

C.     Tenant shall pay Operating Expenses for the Premises during the Renewal Term in accordance with the terms of the Lease.

D.     Within thirty (30) days after receipt of Tenant's Initial Renewal Notice, Landlord shall advise Tenant of the applicable Base Rent rate for the Premises for the Renewal Term. Tenant, within fifteen (15) days after the date on which Landlord advises Tenant of the applicable Base Rent rate for the Renewal Term, shall either (i) give Landlord final binding written notice ("Binding Renewal Notice") of Tenant's exercise of its option, or (ii) if Tenant disagrees with Landlord's determination, provide Landlord with written notice of rejection (the "Rejection Notice"). If Tenant fails to provide Landlord with either a Binding Renewal Notice or Rejection Notice within such fifteen (15) day period, Tenant's Renewal Option shall be null and void and of no further force or effect. If Tenant provides Landlord with a Binding Renewal Notice, Landlord and Tenant shall enter into the Renewal Amendment (hereinafter defined) upon the terms and conditions set forth herein. If Tenant provides Landlord with a Rejection Notice, Landlord and Tenant shall work together in good faith to agree upon the Prevailing Market rate for the Premises during the Renewal Term. Upon agreement Tenant shall provide Landlord with the Binding Renewal Notice and Landlord and Tenant shall enter into the Renewal Amendment in accordance with the terms and conditions hereof. Notwithstanding the foregoing, if Landlord and Tenant are unable to agree upon the Prevailing Market rate for the Premises within thirty (30) days after the date Tenant provides Landlord with a Rejection Notice, Tenant's Renewal Option shall be null and void and of no further force or effect.

E.     If Tenant is entitled to and properly exercises its Renewal Option, Landlord and Tenant shall execute an amendment (the "Renewal Amendment") to reflect changes in the Base Rent, Lease Term, expiration date and other appropriate terms; provided that an otherwise valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed.

F.     For purpose hereof, "Prevailing Market" rate shall mean the arms length fair market annual rental rate per square foot under renewal leases and amendments entered into on or about the date on which the Prevailing Market is being determined hereunder for space comparable to the Premises in buildings comparable to the Building in the submarket in which the Building is included. The determination of Prevailing Market shall take into account any material economic differences between the terms of this Lease and any comparison lease, such as rent abatements, construction costs and other concessions and the manner, if any, in which the Landlord under any such lease is reimbursed for operating expenses and taxes. The determination of Prevailing Market rate shall also take into consideration any reasonably anticipated changes in the

Prevailing Market rate from the time such Prevailing Market rate is being determined and the time such Prevailing Market rate will become effective under this Lease.

520380 000008 10993078.1

ADDENDUM 2

HVAC MAINTENANCE CONTRACT

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

The service contract Tenant is required to maintain under Paragraph 11 of the Lease must become effective within 30 days after occupancy, and a copy of the service contract must be provided to Landlord during the same period of time. Service visits should be performed on at least a quarterly basis. The HVAC contractor that is used to service the equipment is required to provide a faxed copy of all work performed to the Landlord within 48 hours after work is completed. If the service provider cannot provide the Landlord with faxed copies within 48 hours, then Tenant will be required to contract with a service provider who can meet the requirement. The following items must be included in the maintenance contract:

1. Adjust belt tension;
2. Lubricate all moving parts, as necessary;
3. Inspect and adjust all temperature and safety controls;
4. Check refrigeration system for leaks and operation;
5. Check refrigeration system for moisture;
6. Inspect compressor oil level and crank case heaters;
7. Check head pressure, suction pressure and oil pressure;
8. Inspect air filters and replace when necessary;
9. Check space conditions;
10. Check condensate drains and drain pans and clean, if necessary;
11. Inspect and adjust all valves;
12. Check and adjust dampers; and
13. Run machine through complete cycle.

- A2-1 -

ADDENDUM 3

MOVE-OUT CONDITIONS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

Tenant is obligated to check and address prior to move-out of the Premises the following items. The following list is designed to assist Tenant in the move-out procedures but is not intended to be all inclusive.

1. All lighting is to be placed into good working order. This includes replacement of bulbs, ballasts, and lenses as needed.

2. All truck doors, dock levelers, and dock bumpers and shelters shall be serviced and placed in good operating order. This shall include the necessary replacement of any dented truck door panels and adjustment of door tension to insure proper operation. All door panels which are replaced shall be painted to match the Building standard.

3. All structural steel columns in the warehouse and office should be inspected for damage. Repairs of this nature must be pre-approved by the Landlord prior to implementation.

4. Heating/air-conditioning systems and air rotation equipment shall be placed in good working order, including the necessary replacement of any parts to return the same to a well maintained condition. This includes warehouse heaters and exhaust fans. Upon move-out, Landlord will have an exit inspection performed by a certified mechanical contractor to determine the condition.

5. All holes in the sheet rock walls shall be repaired prior to move-out.

6. The carpets and vinyl tiles shall be in a clean condition and shall not have any holes or chips in them. Landlord will accept normal wear on these items provided they appear to be in a maintained condition.

7. The Premises should be returned in a clean condition which shall include cleaning of the coffee bar, restroom areas, windows, and other portions of the space.

8. The warehouse shall be in broom clean condition with all inventory and racking removed. There shall be no protrusion of anchors from the warehouse floor and all holes shall be appropriately patched. If machinery/equipment is removed, the electrical lines shall be properly terminated at the nearest junction box.

9. All exterior windows with cracks or breakage shall be replaced.

10. The Tenant shall provide keys for all locks on the Premises, including front doors, rear doors, and interior doors.

11. Items that have been added by the Tenant and affixed to the building will remain the property of Landlord, unless agreed otherwise. This shall include but is not limited to mini-blinds, air conditioners, electrical, water heaters, cabinets, flooring, etc. If modifications have been made to the space, such as the addition of office areas, Landlord retains the right to have the Tenant remove these modifications at Tenant's expense.

12. All phone and data cabling exclusively serving the Premises (whether such cabling is located within or outside of the Premises) shall be removed to the originating panel, unless otherwise instructed by Landlord.

13. All electrical systems shall be left in a safe condition that conforms to code. Bare wires and dangerous installations should be corrected prior to move-out.

14. All plumbing fixtures shall be in good working order, including the water heater. Faucets and toilets shall not leak.

520380 000008 10993078.1

ADDENDUM 4

BASE RENT ADJUSTMENTS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

Base Rent shall equal the following amounts for the respective periods set forth below:

| Period | Monthly Rate Per Square Foot | Monthly Base Rent |
|---|---|---|
| Lease Months 1 – 3 | $0.00 | $0.00 |
| Lease Months 4 – 15 | $7.25 | $5,114.88 |
| Lease Months 16 -27 | $8.10 | $5,714.55 |
| Lease Months 28 – 39 | $8.45 | $5,961.48 |
| Lease Months 40 – 51 | $8.80 | $6,208.40 |
| Lease Months 52 – 63 | $9.15 | $6,455.33 |

As used herein, a "Lease Month" means a period of time commencing on the same numeric day as the Commencement Date and ending on (but not including) the day in the next calendar month that is the same numeric date as the Commencement Date; provided, however, that if the Commencement Date does not occur on the first day of a calendar month, then the fourth (4th) Lease Month shall be extended to end on the last day of the fourth (4th) full calendar month following the Commencement Date, Tenant shall pay Base Rent during the resulting partial calendar month at the same rate payable for the fourth (4th) Lease Month (prorated based on the number of days in such partial calendar month), and the succeeding Lease Months shall commence on the first day of each calendar month thereafter. Notwithstanding anything to the contrary set forth in this Lease, Lease Month 3 shall be extended by one (1) day for each day of Landlord Delay (as defined in Addendum 5 attached hereto) up to 30 days.

520380 000008 10993078.1

ADDENDUM 5

INITIAL IMPROVEMENTS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

1.  Following the delivery of possession of the Premises to Tenant and Tenant's payment of all rent and security deposits required to be paid upon the execution of the Lease and delivery of insurance certificates required under the Lease, Tenant shall have the right to perform certain alterations and improvements in the Premises (the "Initial Improvements"). Notwithstanding the foregoing, Tenant and its contractors shall not have the right to perform Initial Improvements in the Premises unless and until Tenant has complied with all of the terms and conditions of Paragraph 12 of the Lease, including, without limitation, approval by Landlord of (a) the final plans for the Initial Improvements, (b) the contractors to be retained by Tenant to perform such Initial Improvements, and (c) the insurance coverage obtained by Tenant and its contractors in connection with the Initial Improvements. Landlord shall approve or disapprove Tenant's proposed plans and specifications (including mechanical, electrical and plumbing plans) within seven (7) business days after receipt thereof. In the event Landlord fails to approve or disapprove any proposed plans and specifications within such seven (7) business day period, each day thereafter until Landlord notifies Tenant of its approval or disapproval of the proposed plans and specifications shall be a day of Landlord Delay (herein so called). Tenant shall be responsible for all elements of the plans for the Initial Improvements (including, without limitation, compliance with law, functionality of design, the structural integrity of the design, the configuration of the premises and the placement of Tenant's furniture, appliances and equipment), and Landlord's approval of such plans shall in no event relieve Tenant of the responsibility therefor. Landlord's approval of the contractors to perform the Initial Improvements shall not be unreasonably withheld. Landlord's approval of the general contractor to perform the Initial Improvements shall not be considered to be unreasonably withheld if any such general contractor (i) does not have trade references reasonably acceptable to Landlord, (ii) does not maintain insurance as required by Landlord, (iii) does not have the ability to be bonded for the work in an amount satisfactory to Landlord, (iv) does not provide current financial statements reasonably acceptable to Landlord, or (v) is not licensed as a contractor in the state and municipality in which the Premises is located. Tenant acknowledges the foregoing is not intended to be an exclusive list of the reasons why Landlord may reasonably withhold its consent to a general contractor. Tenant shall be entitled to one (1) additional day of free Base Rent for each day of Landlord Delay as set forth in Addendum 4 attached hereto up to thirty (30) days of Landlord Delay and the term of the Lease shall be extended by each day of additional free Base Rent.

2.  Promptly after obtaining Landlord's approval of the plans for the Initial Improvements and before commencing construction of the Initial Improvements, Tenant shall deliver to Landlord a reasonably detailed estimate of the cost of the Initial Improvements (the "Total Costs"). Tenant shall be solely responsible for the costs of the Initial Improvements and all applicable state sales or use taxes, if any, payable in connection with the Initial Improvements. Landlord shall manage the construction of the Initial Improvements at no additional cost to Tenant. Upon completion of the Initial Improvements, Tenant shall deliver the following to Landlord: the general contractor's and architect's completion affidavits, full and final waivers of lien, receipted bills covering all labor and materials expended and used, as-built plans of the Initial Improvements, the certification of the architect that the Initial Improvements have been installed in a good and workmanlike manner in accordance with the approved plans, and in accordance with applicable laws, codes and ordinances, a certificate of occupancy for the Premises, and a copy of Approved Texas Accessibility Standards (TAS) Certificate applicable to the Initial Improvements (the "Delivery Requirements"). Additionally, Tenant shall cause the general contractor to promptly complete all punchlist items identified by Landlord in good faith.

3.  The following provisions shall be applicable to Tenant's obligation to construct Initial Improvements:

    (a)  Tenant shall cause the Initial Improvements to be constructed in accordance with the approved plans and all applicable laws, rules, regulations, ordinances and restrictive covenants and otherwise in a good and workmanlike manner.

    (b)  Tenant and each of Tenant's contractors shall comply with all rules and regulations for the Building.

    (c)  Prior to commencement of construction of Initial Improvements, Tenant shall submit to Landlord a list setting forth the name of each of Tenant's contractors and the work that will be performed by each such contractor. Any approval by Landlord of any of Tenant's contractors shall not in any way be construed as or constitute a representation by or warranty of Landlord as to the abilities of the contractor.

    (d)  Tenant shall cause each of Tenant's contractors to deliver Landlord sufficient evidence (which shall include, without limitation, certificates of insurance naming Landlord and Landlord's

Building manager as additional insureds) that such contractor is covered under such workmen's compensation, public liability and property damage insurance as Landlord may reasonably request for its protection. All such evidence of insurance must be submitted to and approved by Landlord prior to commencement of construction of Initial Improvements.

(e) Prior to the execution of the construction contract for the construction of Initial Improvements, Tenant shall submit the proposed form thereof to Landlord for Landlord's review and acceptance. Such contract shall, without in any way limiting Landlord's right to approve the form of such contract, (i) require the contractor to waive all contractual, statutory and constitutional liens against the Premises, the Building and the Project as a condition to receipt of any payments thereunder, (ii) require the contractor to conform to the Building rules and regulations and any Building rules applicable to contractors performing work in the Building, (iii) require the contractor to deliver the certificates of insurance (and such other evidence of insurance as is required by Landlord) referred to above, (iv) recognize that Landlord is a third party beneficiary with respect to all warranties (implied or expressed) under the contract or otherwise applicable to Initial Improvements at law or in equity, and as a third party beneficiary, Landlord shall have the absolute right (but not the obligation) to enforce each and every such warranty, (v) require the contractor to maintain a set of recorded construction plans on a diskette in AutoCad or compatible format (the "Record Drawings"), and (vi) require the contractor to work in harmony and cooperate with each other contractor performing work at the Premises.

(f) Prior to commencement of construction of Initial Improvements (including, without limitation, demolition of any existing improvements to allow for the construction of Initial Improvements), the final plans will, if required by applicable laws, be approved by the appropriate governmental agency and all notices required to be given to any governmental agency shall have been given in a timely manner. In addition to obtaining all required approvals and permits, the final plans for any portion of the Initial Improvements which may affect the structural integrity of the Building, must be stamped by a structural engineer approved by Landlord, and such final plans must contain a certification that such alterations will not adversely affect the structural integrity of the Building.

(g) All materials used in the construction of Initial Improvements shall be new and first-class quality (other than materials located in the Premises on the date of the Lease). All doors, light fixtures, ceiling tiles and other improvements in the Premises having Building standard specifications shall comply with such specifications.

(h) Tenant shall maintain the Premises and the surrounding areas in a clean and orderly condition during construction. Tenant will cause Tenant's contractors to promptly remove from the Building, by use of their own trash containers, all rubbish, dirt, debris and flammable waste, as well as all unused construction materials, equipment, shipping containers and packaging generated by Initial Improvements; neither Tenant nor Tenant's contractors shall be permitted to deposit any such materials in Landlord's trash containers or elsewhere in the Building. Storage of construction materials, tools, equipment and debris shall be confined within the Premises.

(i) Upon completion of Initial Improvements and prior to occupancy of the Premises, Tenant shall deliver to Landlord one set of Record Drawings.

(j) Landlord shall not be liable for any injury, loss or damage to any of Initial Improvements or other installations.

(k) Tenant shall indemnify and hold harmless Landlord from and against any and all costs, expenses, claims, liabilities and causes of action arising out of or in connection with work performed by or on behalf of Tenant or Tenant's contractors.

(l) Notwithstanding the fact that Landlord shall be a third party beneficiary of any and all warranties under the contract for construction of Initial Improvements and any and all warranties applicable to Initial Improvements at law or in equity, Landlord shall in no way be responsible for the function and/or maintenance of Initial Improvements.

4. Tenant agrees to accept the Premises in its "as-is" condition and configuration, without representation or warranty by Landlord or anyone acting on Landlord's behalf, it being agreed that Landlord shall not be required to perform any work or incur any costs in connection with the construction or demolition of any improvements in the Premises.

5. This Work Letter shall not be applicable to any additional space added to the original Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions to the Premises in the event of a renewal or extension of the original Lease Term, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease. All capitalized terms used in this Work Letter but not defined herein shall have the same meanings ascribed to such terms in the Lease.

ADDENDUM 6

FORM OF CONTINUING LEASE GUARANTY

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

**Continuing Lease Guaranty**

In consideration of the making of that certain Industrial Lease Agreement by and between 1302-1350 Motor Circle, L.P., a Texas limited partnership ("Landlord") and Noble Rey Brewing Company, LLC, a Texas limited liability company ("Tenant") covering space in the building located at 2636 Farrington Dallas, Dallas County, Texas 75207 (the "Lease"), and for the purpose of inducing Landlord to enter into and make the Lease, the undersigned hereby unconditionally guarantees the full and prompt payment of rent and all other sums required to be paid by Tenant under the Lease (including without limitation all rent payable with respect to the initial Premises and all expansion space) (the "Guaranteed Payments") and the full and faithful performance of all terms, conditions, covenants, obligations and agreements contained in the Lease on the Tenant's part to be performed (the "Guaranteed Obligations") and the undersigned further promises to pay all of Landlord's costs and expenses (including reasonable attorneys' fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this Guaranty. All capitalized terms not defined herein shall have the meaning assigned to them in the Lease.

1.     Landlord may at any time and from time to time, without notice to or consent by the undersigned, take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned on this Guaranty:

(a)     grant an extension or extensions of time for payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

(b)     grant an indulgence or indulgences in any Guaranteed Payment or in the performance of any Guaranteed Obligation;

(c)     modify or amend the Lease or any term thereof or any obligation of Tenant arising thereunder;

(d)     consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant;

(e)     consent to an extension or extensions of the term of the Lease;

(f)     accept other guarantors; and/or

(g)     release any person primarily or secondarily liable hereunder or under the Lease or under any other guaranty of the Lease.

The liability of the undersigned under this Guaranty shall not be affected or impaired by any failure or delay by Landlord in enforcing any Guaranteed Payment or Guaranteed Obligation or this Guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor. In order to hold the undersigned liable hereunder, there shall be no obligation on the part of Landlord, at any time, to resort for payment to Tenant or to any other guaranty or to any security or other rights and remedies, and Landlord shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or actions are pending or being taken seeking resort to or realization upon or from any of the foregoing.

The Guaranteed Obligations of the undersigned shall be irrevocable and unconditional, irrespective of the genuineness, validity, regularity or enforceability of the Lease or any security given for the Guaranteed Obligations or any circumstances which might otherwise constitute a legal or equitable discharge of a surety or the undersigned. The undersigned waives the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty, and agrees that the Guaranteed Obligations of the undersigned shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or the undersigned, except for payment and performance in full of the Guaranteed Obligations. Specifically, the undersigned waives the benefits of any right of discharge under any statute applicable to sureties and any other rights of sureties and the undersigned thereunder. Without limiting the generality of the foregoing, the undersigned agrees that the occurrence of any of the following events, whether they occur with or without notice or consent by the undersigned, will in no way release or impair any liability or obligation of the undersigned hereunder: (i) Landlord transfers Landlord's interest in the premises covered by the Lease or Landlord's rights under this Guaranty; (ii) the Lease or the premises described therein or the property within which the same are located are transferred in any foreclosure proceeding or deed in lieu of foreclosure; (iii) Tenant is released or discharged in any creditor's proceeding, receivership, bankruptcy

or other proceeding; (iv) the liability of Tenant or Landlord's claim against the estate of Tenant in bankruptcy is impaired, limited or modified or any remedy for the enforcement of Tenant's said liability under the Lease, resulting from the operation of any present or future provision of the federal Bankruptcy Reform Act of 1978, as amended, or other statute or from the decision in any court, is impaired, limited, or modified; or (v) the Lease is rejected or disaffirmed in any such proceeding, or the Lease is assumed or assumed and assigned in any such bankruptcy proceeding. If, as a result of such proceedings, Landlord is forced to refund any payment made by Tenant to Landlord because it is found to be a preference or for any other reason, the undersigned hereby covenants to pay such amount on demand.

2. The undersigned waives all diligence in collection or in protection of any security, presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of any extensions granted or other action taken in reliance hereon and all demands and notices of any kind in connection with this Guaranty or any Guaranteed Payment or Guaranteed Obligation.

3. The undersigned hereby acknowledges full and complete notice and knowledge of all the terms, conditions, covenants, obligations and agreements of the Lease.

4. The payment by the undersigned of any amount pursuant to this Guaranty shall not in any way entitle the undersigned to any right, title or interest (whether by subrogation or otherwise) of Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

5. Except as set forth in Section 11 below, this Guaranty shall be continuing, absolute and unconditional and remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the undersigned under this Guaranty are fulfilled.

6. This Guaranty also shall bind the heirs, personal representatives, successors and assigns of the undersigned and shall inure to the benefit of Landlord, its successors and assigns, including any successor in connection with any foreclosure affecting the building in which the premises under the Lease are located.

7. This Guaranty shall be construed according to the laws of the State of Texas and shall be performed in the county in the first paragraph of this Guaranty. The situs for the resolutions (including any judicial proceedings) of any disputes arising under or relating to this Guaranty shall be the county referenced in the first paragraph of this Guaranty.

8. If this Guaranty is executed by more than one (1) person or entity, all singular nouns and verbs herein relating to the undersigned shall include the plural number, the obligations of the several guarantors shall be joint and several and Landlord may enforce this Guaranty against any one (1) or more guarantors without joinder of any other guarantor hereunder.

9. Landlord and the undersigned intend and believe that each provision of this Guaranty comports with all applicable law. However, if any provision of this Guaranty is found by a court to be invalid for any reason, the remainder of this Guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

10. The undersigned hereby warrants and represents unto Landlord that: (a) this Guaranty is a legal, valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms; (b) the execution, delivery and performance by the undersigned of this Guaranty do not and will not violate any authority having the force of law or any indenture, agreement, or other instrument to which the undersigned is a party or by which the undersigned or any of the properties or assets of the undersigned are or may be bound; (c) all balance sheets, net worth statements, financial statements and reports, and other financial data which have heretofore been given to Landlord with respect to the undersigned and Tenant fairly and accurately present the financial condition of the undersigned and Tenant as of the date thereof, and, since the date thereof, there has been no material adverse change in the financial condition of the undersigned or Tenant; (d) there are no legal or arbitration proceedings, material adverse claims, or demands pending against, or to the knowledge of the undersigned threatened against the undersigned or Tenant or against any of the assets or properties of the undersigned or Tenant; (e) no event (including, specifically, the undersigned's execution and delivery of this Guaranty) has occurred which, with the lapse of time or action by a third party (or both), could result in the undersigned's breach or default under any agreement binding upon the undersigned.

11. Notwithstanding anything contained herein to the contrary, Guarantor's obligation hereunder for the Guaranteed Payments shall be limited to the sum of twenty percent (20%) of the Total Costs of the Initial Improvements, plus Enforcement Costs. Further notwithstanding anything to the contrary contained herein, provided no default has occurred under the Lease or this Guaranty, beyond the expiration of any applicable notice and cure period, and the Initial Improvements have been completed in accordance with Addendum 5 and Tenant has satisfied all of the Delivery Requirements (collectively, the "Guaranty Release Requirements"), this Guaranty shall terminate effective as of the last day Lease Month 24. If the Guaranty Release Requirements are not satisfied as of the last day of Lease Month 24, a this Guaranty shall continue in full force and effect.

520380 000008 10993078.1

IN WITNESS WHEREOF, the undersigned has executed and delivered this Guaranty to Landlord as of the date of the Lease.

Address:

2211 Longwood Lane
Dallas, Texas 75228

_____
CHRIS RIGOULOT

SS#:

2211 Longwood Lane
Dallas, Texas 75228

_____
KINDRA HEBERT

SS#: _____

1201 Mockingbird Drive
Grapevine, Texas 76051

_____
KENNETH G. RIGOULOT

SS: _____

1201 Mockingbird Drive
Grapevine, Texas 76051

_____
LESLIE J. RIGOULOT

520380 000008 10993078.1

## CONDOMINIUM RIDER TO INDUSTRIAL LEASE AGREEMENT

This Condominium Rider to Industrial Lease Agreement (this "Rider") is attached to and made a part of that certain Industrial Lease Agreement (the "Lease") between 1302-1350 Motor Circle, L.P., a Texas limited partnership ("Landlord") and Noble Rey Brewing Company, LLC, a Texas limited liability company ("Tenant"). If there is any conflict between the terms and provisions of the Lease and the terms and provisions of this Rider, the terms and provisions of this Rider shall supersede such conflicting provisions of the Lease and shall control. Capitalized terms used but not defined in this Rider shall have the meanings ascribed to them in the Lease.

1. The Premises is part of a condominium regime known as Motor Circle Condominium (the "Condominium"), which Condominium consists of 18 Units and Common Elements appurtenant to each unit (the "Common Elements"), portions of which Condominium are not owned by Landlord. The Condominium is managed by an association of owners of the units therein (the "Condominium Association"). The Condominium is subject to the terms of a Condominium Declaration, Rules established by the Condominium Association, and Certificate of Formation and Bylaws of the Condominium Association (collectively, as amended, the "Governing Documents"). "Condominium Assessments" means all sums assessed against Landlord as owner of a Unit pursuant to the Governing Documents.

2. The Premises is designated Unit 2636 of the Condominium, which includes the mechanical, electrical and plumbing systems which exclusively service the Premises. Tenant acknowledges that the methodology utilized to determine the square footage of the Premises as described in the Lease may differ from the methodology utilized to determine the square footage of the Unit in the Governing Documents.

3. Landlord and Tenant, in fulfilling their respective obligations to obtain and maintain insurance as described in the Lease, shall comply with the requirements applicable thereto set forth in the Governing Documents.

4. Tenant acknowledges that, in addition to Landlord, other parties may have the right pursuant to the Governing Documents to take the actions described in Paragraph 11 of the Lease.

5. Tenant's acceptance of the Premises in its "AS IS" condition upon taking possession thereof shall include Tenant's acceptance of the Common Elements appurtenant thereto in their "AS IS" condition and the other provisions of Paragraph 2(b) of the Lease relating to the Premises apply in the same manner to the Common Elements appurtenant thereto.

6. Tenant acknowledges that the Governing Documents provide that the Condominium Association is responsible to maintain the structural components of the Building containing the Premises and certain other Common Elements of the Condominium, including the roof, foundation, the structural soundness of the exterior walls (excluding all windows, window glass, plate glass, and all doors of the Premises), in good repair and condition and that Landlord has no obligation to repair or maintain the Premises, the Building, the Common Elements, the Condominium or any part thereof. Tenant shall promptly notify the Condominium Association and Landlord of the need for any such work. Landlord shall use such efforts as it deems appropriate to cause the Condominium Association to maintain such elements in accordance with the terms of the Governing Documents.

7. Tenant's obligation to maintain and repair the Premises shall include the obligation to maintain doors and utility and mechanical equipment which exclusively serve the Premises. Tenant agrees to comply with the requirements of the Governing Documents in connection with repairing and maintaining the aspects of the Premises which are Tenant's responsibility to repair and maintain pursuant to the Lease.

8. The prohibition on alterations contained in Paragraph 12 applies to Common Elements in addition to the Premises. In making any such alterations, in addition to obtaining the written consent of Landlord, Tenant must also comply with the applicable provisions of the Governing Documents.

9. Tenant's installation, repair, restoration and removal obligations and requirements set forth in Paragraphs 11 and 12 of the Lease shall also apply to any applicable portions of the Common Elements and Building, in addition to the Premises.

10. Tenant agrees to comply with the terms and provisions of the Governing Documents with respect to its use and occupancy of the Premises and appurtenant Common Elements and exercise of its rights and performance of its obligations under the Lease.

11. The prohibition set forth in Paragraph 3 of the Lease is also applicable to any use of the Premises which invalidates or increases the rate of insurance obtained or required or desired to by maintained by the Condominium Association or prevents the Condominium Association from obtaining any such policy in a form acceptable to the Condominium Association.

12. Tenant shall give immediate written notice to Landlord and the Condominium Association of any damage caused to the Premises or the Building by fire or other casualty. Provided this Lease is not terminated pursuant to Paragraph 15 or any other provision of this Lease, in the event the Premises and/or Building are hereafter damaged or destroyed or rendered partially untenantable for their accustomed uses by fire or other casualty, Tenant acknowledges that pursuant to the Governing Documents, the Condominium Association has the responsibility to restore the Common Elements to the extent provided in and in accordance with the provisions thereof. After completion of the reconstruction or repair by the Condominium Association as described above, Landlord and Tenant shall promptly comply with the requirements of Section 8 of the Lease.

520380 000008 10993078.1

13. Tenant acknowledges that property insurance and commercial general liability insurance as to the Common Elements of the Condominium is to be obtained and maintained by the Condominium Association pursuant to the Governing Documents and not Landlord. Landlord shall not have the obligation under the Lease to obtain any insurance; provided, however, that Landlord shall carry such insurance as it deems prudent for its ownership and operation of the Shopping Center. To the extent that the Governing Documents require additional amounts or types of insurance to be carried by Landlord, Tenant shall promptly obtain and maintain all such insurance with respect to the Premises, at Tenant's sole cost and expense.

14. The Condominium Association shall be allowed to enter or cause its agents to enter the Premises as provided in the Governing Documents.

15. Landlord's obligation to restore in the event of eminent domain pursuant to Article 9 of the Lease shall not apply until any applicable restoration work required to be performed by the Condominium Association is completed.

COMPLIANCE WITH GOVERNING DOCUMENTS; CONDOMINIUM ASSOCIATION RIGHTS. Tenant acknowledges receipt of copies of, and is familiar with the terms, conditions and provisions of the Governing Documents, and Tenant understands that Tenant's right to use and occupy the Premises shall be subject to, and subordinated in all respects to, the provisions of the Governing Documents. Tenant further acknowledges that pursuant to the Declaration, (a) the Condominium Association has a security interest in the rental due and payable pursuant to the Lease; and (b) upon Landlord's failure to comply with the Governing Documents, the Condominium Association has the right (among other rights) to collect rental payable pursuant to the Lease directly from Tenant. Tenant hereby agrees that upon receiving a written request from the Condominium Association for the direct payment of the rental payable pursuant to the Lease, Tenant shall transmit all rental payable pursuant to the Lease to the Condominium Association until Tenant receives further notice from the Condominium Association that Landlord is no longer in default under the Governing Documents. Tenant's failure to comply with the Governing Documents shall constitute a material breach of the Lease. The Lease grants to Tenant a leasehold estate in the Premises for the Term, together with a right to use the Common Elements but specifically excluding any membership rights in the Condominium Association. Tenant shall indemnify and hold harmless Landlord and the Condominium Association from and against all damage, direct or indirect, incurred by Landlord or the Condominium Association as a result of noncompliance by Tenant, Tenant's agents, guests and invitees, with the provisions of any of the Governing Documents, or any covenant of this Rider or the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Rider as of the date of the Lease.

TENANT:

NOBLE REY BREWING COMPANY, LLC,
a Texas limited liability company

By: _____
Name: Chris Rigoulot
Title: Owner

LANDLORD:

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership

By:   Stream Acquisition LVIII, L.L.C., a Texas
      limited liability company, it General Partner

      By: _____
      Name: Chris Jackson
      Title: Manager

- Condominium Rider 2-

EXHIBIT A

DEPICTION OF PREMISES

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")



520380 000008 10993078.1

EXHIBIT B

RULES AND REGULATIONS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

1. The sidewalk, entries, and driveways of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2. Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project.

3. Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

4. If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense.

5. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

6. Parking any type of recreational vehicles is specifically prohibited on or about the Project. Further, parking any type of trucks, trailers or other vehicles in the Premises is specifically prohibited. Except for the overnight parking of operative vehicles, no vehicle of any type shall be stored in the parking areas at any time. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord.

7. Tenant shall maintain the Premises free from rodents, insects and other pests.

8. Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

9. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

10. Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

11. Tenant shall not permit storage outside the Premises, including without limitation, outside storage of trucks and other vehicles, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

12. All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

13. No auction, public or private, will be permitted on the Premises or the Project.

14. No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

15. The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

16. Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

- B-1 -

17.    Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

18.    Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

EXHIBIT C

TENANT OPERATIONS INQUIRY FORM

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

1. Name of Company/Contact _Noble Rey Brewing Company, LLC_

2. Address/Phone _2636 Farrington St., Dallas, TX 75207_
   _817-614-8917_

3. Provide a brief description of your business and operations: _Noble Rey is a production_
   _brewery that will manufacture a variety of beer styles._
   _Production capacity will range from 1,000 to 2,000_
   _barrels in the first year._

4. Will you be required to make filings and notices or obtain permits as required by Federal and/or State regulations for the operations at the proposed facility? Specifically:

   a. SARA Title III Section 312 (Tier II) reports     YES   **NO**

        (> 10,000lbs. of hazardous materials STORED at any one time)

   b. SARA Title III Section 313 (Tier III) Form R reports     YES   **NO**

        (> 10,000lbs. of hazardous materials USED per year)

   c. NPDES or SPDES Stormwater Discharge permit     YES   **NO**

        (answer "No" if "No-Exposure Certification" filed)

   d. EPA Hazardous Waste Generator ID Number     YES   **NO**

5. Provide a list of chemicals and wastes that will be used and/or generated at the proposed location. Routine office and cleaning supplies are not included. Make additional copies if required.

| Chemical/Waste | Approximate Annual Quantity Used or Generated | Storage Container(s) (i.e. Drums, Cartons, Totes, Bags, ASTs, USTs, etc) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Completed By:

Name: _Chris Rigoulot_

Title: _Owner_

Date: _9/19/2014_

- C-1 -

EXHIBIT D

LEGAL DESCRIPTION OF BUILDING (OR PROJECT)

ATTACHED TO AND A PART OF THE LEASE AGREEMENT BETWEEN

1302-1350 MOTOR CIRCLE, L.P., a Texas limited partnership ("Landlord")
and
NOBLE REY BREWING COMPANY, LLC, a Texas limited liability company ("Tenant")

BEING a tract of land out of the H. Couch Survey, Abstract No. 275, City of Dallas, Dallas County, Texas, being part of Lot 1, Block 58/7905, Trinity Industrial District, Installment No. 17, an addition to the City of Dallas, Texas according to the plat recorded in Volume 35, Page 175, Map Records of Dallas County, Texas; same being all of a tract of land described in Special Warranty Deed to Three Way Street Properties, Ltd., recorded in Volume 2003018, Page 3603 of the Deed Records of Dallas County, Texas and being more particularly described as follows:

BEGINNING at a point in a building for corner at the intersection of the southeast right-of-way line of Medical District Drive (formerly Motor Street; an 80-foot wide right-of-way) with the northeast right-of-way line of Farrington Street (an 80-foot wide right-of-way); same being the westernmost corner of said Lot 1;

THENCE with said southeast right-of-way line and the northwest line of said Lot 1, North 29°53'50" East, a distance of 249.39 feet to a 1/2" iron rod with "Pacheco Koch" cap found for corner; same being the west corner of a tract of land described in Special Warranty Deed to Ronald H. Bloom, Trustee of the Ronald H. and Sandra D. Bloom Trust recorded in Volume 89044, Page 409, Deed Records of Dallas County, Texas; from said point a 1/2" iron rod found for reference bears North 10°01' West, a distance of 0.6 feet and a 1/2" iron rod found for reference bears South 09°22' East, a distance of 0.5 feet;

THENCE departing the said southeast right-of-way line and the said northwest line of Lot 1, with the southwest line of said Bloom Trust tract, South 60°06'10" East, a distance of 596.41 feet to a 5/8" iron rod with "KHA" cap set for corner in the northwest line of the Trinity River and the southeast line of said Lot 1 at the south corner of said Bloom Trust tract;

THENCE with the said northwest line of the Trinity River and the said southeast line of Lot 1, South 66°37'05" West, a distance of 528.78 feet to a 3/4" iron pipe found in the said northeast right-of-way line of Farrington Street at the south corner of said Lot 1;

THENCE with said northeast right-of-way line and the southwest line of said Lot 1, North 28°12'00" West, a distance of 330.11 feet to the POINT OF BEGINNING and containing 3.704 acres or 161,339 square feet of land.

The bearings for this survey are based on a bearing of North 28°12'00" West for the northeast right-of-way line of Farrington Street according to the plat recorded in Volume 35, Page 175 of the Map Records of Dallas County, Texas.

# EXHIBIT 2

| Lease Month # | Month | Actual Amounts Paid | | | | | Corrected Obligations | | | Corrected Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Date Paid | Rent Paid | Expenses Paid | Taxes Paid | Total Paid | Base Rent | Condo Dues | Taxes | |
| 32 | May-17 | 5/10/2017 | $ 4,230.82 | $ 615.66 | | $ 4,846.48 | $ 5,961.48 | | | |
| 33 | Jun-17 | 6/6/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| 34 | Jul-17 | 7/5/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| 35 | Aug-17 | 8/3/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| 36 | Sep-17 | 9/5/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| 37 | Oct-17 | 10/9/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| 38 | Nov-17 | 11/2/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| 39 | Dec-17 | 12/4/2017 | $ 5,961.48 | $ 867.65 | | $ 6,829.13 | $ 5,961.48 | | | |
| Subtotal Additions | | | | $ 6,689.21 | | | | $ 5,418.31 | $ 10,703.00 | $ 9,432.10 |
| 40 | Jan-18 | 1/5/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 41 | Feb-18 | 2/1/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 42 | Mar-18 | 3/8/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 43 | Apr-18 | 4/4/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 44 | May-18 | 5/6/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 45 | Jun-18 | 6/4/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 46 | Jul-18 | 7/9/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 47 | Aug-18 | 8/14/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 48 | Sep-18 | 9/10/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 49 | Oct-18 | 10/23/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.00 | $ 6,208.40 | | | |
| 50 | Nov-18 | 11/6/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| 51 | Dec-18 | 12/18/2018 | $ 6,208.40 | $ 620.80 | | $ 6,829.20 | $ 6,208.40 | | | |
| Subtotal Additions | | | | $ 7,449.60 | | | | $ 9,703.08 | $ 24,328.62 | $ 26,582.10 |
| 52 | Jan-19 | 1/14/2019 | $ 6,455.33 | $ 373.80 | | $ 6,829.13 | $ 6,455.33 | $ 942.48 | $ 2,027.39 | $ 2,596.07 |
| 53 | Feb-19 | 2/5/2019 | $ 6,455.33 | | $ 2,027.39 | $ 8,482.72 | $ 6,455.33 | $ 942.48 | $ 2,027.39 | $ 942.48 |
| 54 | Mar-19 | | | | | | $ 6,455.33 | $ 942.48 | $ 2,027.39 | $ 9,425.20 |
| Total Balance | | | | | | | | | | $ 48,977.95 |

# Statement

1319 Motor Circle LLC
PO Box 50076
Midland, TX 79710

| Date |
|------|
| 2/2/2019 |

| To: |
|-----|
| Noble Rey Brewing Co LLC<br>2636 Farrington St<br>Dallas, TX 75207 |

| Amount Due | Amount Enc. |
|------------|-------------|
| $48,035.47 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 12/31/2018 | Balance forward | | 0.00 |
| 01/14/2019 | PMT #wire 011419. | -6,829.13 | -6,829.13 |
| 02/02/2019 | INV #1009. Due 02/02/2019. | 9,432.10 | 2,602.97 |
| 02/02/2019 | INV #1010. Due 02/02/2019. | 26,582.10 | 29,185.07 |
| 02/02/2019 | INV #1011. Due 02/02/2019. | 9,425.20 | 38,610.27 |
| 02/02/2019 | INV #1012. Due 02/02/2019. | 9,425.20 | 48,035.47 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|--------------------|------------|
| 48,035.47 | 0.00 | 0.00 | 0.00 | 0.00 | $48,035.47 |

1319 Motor Circle LLC

# Invoice

PO Box 50076
Midland, TX 79710

| Date | Invoice # |
|------|-----------|
| 2/2/2019 | 1009 |

| Bill To |
|---------|
| Noble Rey Brewing Co LLC<br>2636 Farrington St<br>Dallas, TX 75207 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 2017 | Due on receipt | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | 2017 Condo Assoc Dues | 5,418.31 | 5,418.31 |
| | 2017 Property Taxes | 10,703.00 | 10,703.00 |
| | 2017 Expense pmts paid with monthly rent payment | -6,689.21 | -6,689.21 |

| | **Total** | $9,432.10 |
|--|-----------|-----------|

1319 Motor Circle LLC

PO Box 50076
Midland, TX 79710

# Invoice

| Date | Invoice # |
| --- | --- |
| 2/2/2019 | 1010 |

| Bill To |
| --- |
| Noble Rey Brewing Co LLC<br>2636 Farrington St<br>Dallas, TX 75207 |

| P.O. No. | Terms | Project |
| --- | --- | --- |
| 2018 | Due on receipt | |

| Quantity | Description | Rate | Amount |
| --- | --- | --- | --- |
| | 2018 Condo Assoc Dues | 9,703.08 | 9,703.08 |
| | 2018 Property Taxes | 24,328.62 | 24,328.62 |
| | 2018 Expense pmts paid with monthly rent payments | -7,449.60 | -7,449.60 |

| Total | $26,582.10 |
| --- | --- |

1319 Motor Circle LLC

PO Box 50076
Midland, TX 79710

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/2/2019 | 1011 |

| Bill To |
|---------|
| Noble Rey Brewing Co LLC<br>2636 Farrington St<br>Dallas, TX 75207 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| Jan 2019 | Due on receipt | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | January 2019 rent | 6,455.33 | 6,455.33 |
| | Monthly Condo Assoc Dues | 942.48 | 942.48 |
| | Monthly Property Tax estimate based on 2018 | 2,027.39 | 2,027.39 |

| **Total** | $9,425.20 |
|-----------|-----------|

# Invoice

1319 Motor Circle LLC

PO Box 50076
Midland, TX 79710

| Date | Invoice # |
| --- | --- |
| 2/2/2019 | 1012 |

**Bill To**

Noble Rey Brewing Co LLC
2636 Farrington St
Dallas, TX 75207

| P.O. No. | Terms | Project |
| --- | --- | --- |
| Feb 2019 | Due on receipt | |

| Quantity | Description | Rate | Amount |
| --- | --- | --- | --- |
| | February 2019 rent | 6,455.33 | 6,455.33 |
| | Monthly Condo Assoc Dues | 942.48 | 942.48 |
| | Monthly Property Tax Estimate based on 2018 | 2,027.39 | 2,027.39 |

| **Total** | **$9,425.20** |
| --- | --- |