## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 18-34214-bjh |
| NOBLE REY BREWING CO., LLC, | § | Chapter 11 |
| | § | |
| | § | Hearing Date: May 1, 2019 |
| Debtor. | § | Hearing Time: 9:30 a.m. |

### JPMORGAN CHASE BANK, N.A.'S
### MOTION FOR RELIEF FROM AUTOMATIC STAY

**THE TRUSTEE OR THE DEBTOR SHALL FILE A RESPONSE TO ANY MOTION FOR RELIEF FROM THE AUTOMATIC STAY WITHIN TWELVE (12) DAYS FROM THE SERVICE OF THE MOTION. THE DEBTOR'S RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE "ADEQUATELY PROTECTED" IF THE STAY IS TO BE CONTINUED. IF THE DEBTOR DOES NOT FILE A RESPONSE AS REQUIRED, THE ALLEGATIONS IN THE CREDITOR'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY SHALL BE DEEMED ADMITTED, UNLESS GOOD CAUSE IS SHOWN WHY THESE ALLEGATIONS SHOULD NOT BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT. UNDER BANKRUPTCY RULE 9006(e) SERVICE BY MAIL IS NOW COMPLETE UPON MAILING; UNDER BANKRUPTCY RULE 9006(f), THREE (3) DAYS ARE ADDED TO THE PERIOD FOR FILING A RESPONSE WHEN NOTICE OF THE PERIOD IS SERVED BY MAIL.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

JPMorgan Chase Bank, N.A. ("Chase") hereby files its Motion for Relief from Automatic Stay, and would show as follows.

1.      Chase, a secured creditor in this case, files this Motion pursuant to 11 U.S.C. §362, would show the Honorable U.S. Bankruptcy Court that good cause exists to modify the automatic stay as shown more particularly below.

2.      This Court has jurisdiction to consider this matter under 28 U.S.C. § 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

3.      On or about September 30, 2014, Noble Rey Brewing Company, LLC (the "Debtor") executed and delivered to Chase a Note in the original principal amount of $593,100.00 ("Contract 1"). A true and correct copy of Contract 1 is attached as Exhibit "1." Contract 1 provided for Debtor to make monthly payments consisting of principal and interest to Chase. The terms of Contract 1 are more particularly described therein and incorporated herein by reference for all purposes.

4.      On or about September 30, 2014, the Debtor executed and delivered to Chase a Commercial Security Agreement wherein it pledged specific equipment to Chase as a security interest. A true and correct copy of the Commercial Security Agreement is attached as Exhibit "2". The terms of the Commercial Security Agreement are more particularly described therein and incorporated herein by reference for all purposes.

5.      On or about September 30, 2014, the Debtor executed and delivered to Chase a Line of Credit Note in the original principal amount of $75,000.00 ("Contract 2"). A true and correct copy of Contract 2 is attached as Exhibit "3". Contract 2 provided for Debtor to make monthly payments consisting of principal and interest to Chase. The terms of Contract 2 are more particularly described therein and incorporated herein by reference for all purposes. At the same time, Debtor executed and delivered to Chase a Continuing Security Agreement assigning all of its business assets to Chase as a security interest. A true and correct copy of the Continuing Security Agreement is attached as Exhibit "4". The terms of the Continuing Security

Agreement are more particularly described therein and incorporated herein by reference for all purposes.

6. On or about October 2, 2014, a UCC Financing Statement was filed with the Texas Secretary of State perfecting Chase's interest in the Debtor's business assets. A true and correct copy of the UCC Financing Statement is attached as Exhibit "5". The terms of the UCC Financing Statement are more particularly described therein and incorporated herein by reference for all purposes.

7. Debtor became in default of the Contracts by failing and refusing to make payment as required under the terms of the Contracts. The Debtor refused and failed to make payments due. $702,651.68 is due and owing on the Contracts as of the date of filing.

8. The Debtor filed this Chapter 11 bankruptcy proceeding with this Court on December 19, 2018. The Debtor is continuing to use the Bank's collateral but not making adequate protection payments to Chase. The equipment's value continues to depreciate. Therefore, cause exists for relief from the automatic stay for all the above stated reasons, including that Debtor has failed to make adequate protection payments to Chase.

9. The Debtor was unable confirm its plan of reorganization. The Plan does not meet the confirmation standards. The sale of the property is subject to the Chase security interest. The Chase secured claim greatly exceeds the value of the property. Thus, there is no equity in the property for the estate or other creditors. Therefore, good cause exists for granting the relief requested.

THEREFORE, JPMorgan Chase Bank, N.A. respectfully prays for an order granting the following relief: termination of the stay against the collateral to allow JPMorgan Chase Bank,

N.A. to proceed with its lawful remedies against the collateral, and for such other and further relief, special and general, in equity or at law that the Honorable Court deems fair and just.

Respectfully submitted,

*/s/* Richard G. Dafoe
Richard G. Dafoe
State Bar No. 05309500
Vincent Serafino Geary Waddell Jenevein, P.C.
1601 Elm Street, Suite 4100
Dallas, Texas 75201
214-979-7427- Telephone
214-979-7402 – Facsimile
rdafoe@vinlaw.com

ATTORNEYS FOR JPMORGAN CHASE BANK, N.A.

## CERTIFICATE OF CONFERENCE

I hereby certify that on April 9, 2019, I conferred with Eric A. Liepins, the Debtor's attorney, regarding the above motion for relief. Mr. Liepins opposes the Motion and therefore it needs to be heard by the Court for determination.

*/s/* Richard G. Dafoe
Richard G. Dafoe

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 9th day of April, 2019, to the parties listed below and attached and to those requesting notice either electronically or by U.S. first class mail:

Noble Rey Brewing Co., LLC
2636 Farrington
Dallas, TX 75207
DEBTOR

Eric A. Liepins
Eric A. Liepins, P.C.
12770 Coit Rd., Suite 1100
Dallas, TX 75251
DEBTOR'S ATTORNEY

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX  75242
U.S. TRUSTEE

<u>/s/ Richard G. Dafoe</u>
Richard G. Dafoe

2 Pinnacle Capital Partner
PO Box 2049
Gig Harbor, WA 98335

Ascentium Capital
23970 Highway 59 North
Kingwood, TX 77339

Can Source
2120 Miller Drive, Suite G
Longmont, CO 80501

Capital One – Spark
1680 Capitol One Drive
McLean, VA 22102-3491

Chris & Kindra Rigoulot
3663 Weebrurn Drive
Dallas, TX 75229

Domino Amjet, Inc.
3809 Collection Center Dr.
Chicago, IL 60693

Gamer Packaging
330 2nd Avenue South, #895
Minneapolis, MN 55401

JPMorgan Chase
270 Park Avenue
New York, NY 10017

Keg Logistics
9360 Station Street #325
Lone Tree, CO 80124

Ken & Leslie Rigoulot
1201 Mockingbird
Grapevine, TX 76051

Lynn Pinker Cox & Hurst
2100 Ross Ave., Ste. 2700
Dallas, TX 75201

McCarthy, Rose Mills
3001 Dallas Parkway 750
Frisco, TX 75034

Pawnee Leasing Corporation
3801 Automation Way, Suite 207
Fort Collins, CO 80525

Platinum
348 RXR Plaza
Uniondale, NY 11556

Willamitte Valley
PO Box 276
Saint Paul, OR 97137



# U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | ████50-01 |
| SBA Loan Name | Noble Rey Brewing Company, LLC |
| Date | September 30, 2014 |
| Loan Amount | $593,100.00 |
| Interest Rate | Variable |
| Borrower | Noble Rey Brewing Company, LLC |
| Operating Company | |
| Lender | JPMorgan Chase Bank, NA |

## 1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of Five Hundred Ninety-three Thousand One Hundred & 00/100 Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

## 2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

## 3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

**NOTE TERMS:**

1. Maturity: This Note will mature on October 3, 2024

2. Repayment Terms:

The interest rate on this Note will fluctuate. The initial interest rate is 5.00% per year. This initial rate is the LIBOR Base Rate in effect on the first business day of the month in which SBA received the loan application, plus 1.84%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.



EXHIBIT

## PROMISSORY NOTE
### (Continued)

Page 2

Borrower must pay a total of 6 payments of interest only on the disbursed principal balance beginning on November 3, 2014; payments must be made on the third calendar day in the months they are due.

Borrower must pay principal and interest payments of $6,568.01 every month, beginning on May 3, 2015; payments must be made on the third calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted monthly (the "change period").

The "LIBOR Base Rate" is the combination of the One Month London Interbank Offered Rate in effect on the first business day of the month (as published in a national financial newspaper or website) in which SBA received the application, or any interest rate change occurs, plus an additional 3.0 percentage points. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 1.84% above the LIBOR Base Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread as identified in the Note may not be changed during the life of the Loan without the written agreement of the Borrower.

For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the Borrower.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable on October 3, 2024.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;
B. Defaults on any other loan with Lender;
C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

SBA FORM 147 (06/03/02) Version 4.1

## PROMISSORY NOTE
### (Continued)

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. **LENDER'S RIGHTS IF THERE IS A DEFAULT:**

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgement;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. **LENDER'S GENERAL POWERS:**

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. **WHEN FEDERAL LAW APPLIES:**

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. **SUCCESSORS AND ASSIGNS:**

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. **GENERAL PROVISIONS:**

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

SBA FORM 147 (06/03/02) Version 4.1

## PROMISSORY NOTE
### (Continued)

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

## 10. STATE-SPECIFIC PROVISIONS:

NONE. .

## 11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

BORROWER:

NOBLE REY BREWING COMPANY, LLC

By: _____

Christopher Rigoulot, Manager of Noble Rey Brewing
Company, LLC

# COMMERCIAL SECURITY AGREEMENT



EXHIBIT
2

| Grantor: | Noble Rey Brewing Company, LLC | Lender: | JPMorgan Chase Bank, NA |
|---|---|---|---|
| | 2636 Farrington St | | Dallas Preston Business Banking LPO |
| | Dallas, TX 75207 | | 8111 Preston Road, 2nd Floor |
| | | | Dallas, TX 75225 |

**THIS COMMERCIAL SECURITY AGREEMENT** dated September 30, 2014, is made and executed between Noble Rey Brewing Company, LLC ("Grantor") and JPMorgan Chase Bank, NA ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

Specific Equipment - See Exhibit A attached hereto and made a part hereof

All of which "Collateral" shall have the meaning attributed to such word in the Uniform Commercial Code referenced in the section of this Agreement captioned "Definitions" (whenever such word appears in this Agreement, and whether the first letter of such word is upper case or lower case). In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records of data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise. However, this Agreement shall not secure, and the "Indebtedness" shall not include, any obligations arising under Subchapters E and F of Chapter 342 of the Texas Finance Code, as amended.

**RIGHT OF SETOFF.** Grantor grants to Lender a security interest in, as well as a right of setoff against, and hereby assigns, conveys, delivers, pledges and transfers to Lender, as security for repayment of the Indebtedness, all Grantor's right, title and interest in and to all Grantor's accounts (whether checking, savings, or some other account) with Lender or any subsidiary or affiliate of JPMorgan Chase & Co. (each hereinafter referred to as a "Lender Affiliate") and all other obligations at any time owing by Lender or any Lender Affiliate to Grantor. This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which the grant of a security interest would be prohibited by law. Grantor authorizes Lender, without prior notice to Grantor and irrespective of (i) whether or not Lender has made any demand under this Agreement or the Related Documents or (ii) whether the Indebtedness is contingent, matured or unmatured, to the extent permitted by law, to collect, charge and/or setoff all sums owing on the Indebtedness against any and all such accounts and other obligations, and, at Lender's option, to administratively freeze or direct a Lender Affiliate to administratively freeze all such accounts and other obligations so as to allow Lender to protect Lender's security interest, collection, charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor covenants, agrees, represents and warrants to Lender that:

Perfection of Security Interest. Grantor hereby authorizes Lender to file such financing statements with respect to the Collateral as Lender shall deem appropriate and Grantor shall take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral, and Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

Location of the Collateral. Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located. If the Collateral is equipment, such equipment shall be located at the addresses shown and shall not be attached to or incorporated into any real property in such a manner that it becomes a fixture thereon.

Removal of the Collateral. Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

Transactions Involving Collateral. Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

Repairs and Maintenance. Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order,

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine, audit and inspect the Collateral wherever located. To the extent any of the following types of property are included in the Collateral, then as often as Lender shall require, in detail satisfactory to Lender, Grantor shall deliver to Lender schedules of accounts and general intangibles, including, without limitation, names and addresses of account debtors and aging reports, and lists and descriptions of the nature and location of inventory and equipment.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws, that the business operations of Grantor are not now, and have never been, the subject of any governmental authority's investigation regarding non-compliance with Environmental Laws, that Grantor is not aware of any material consequent liability related to the violation of any Environmental Law, and that the Collateral shall not be used for the improper or unlawful manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value of the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**GRANTOR'S RIGHT TO POSSESSION.** Until the occurrence of any Event of Default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement, the Note, or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession, attachment, levy, execution, or forfeiture proceedings, whether by judicial proceeding, self-help, or any other method, by any creditor of Grantor, or by any governmental agency against the Collateral or any other assets of Grantor. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page 3

in its sole discretion, as being an adequate reserve or bond for the dispute.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Events Affecting Guarantor.** Any of the preceding Events of Default occurs with respect to any guarantor of the Indebtedness as if the word "guarantor" were substituted for the word "Grantor" in such Event of Default, or any guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the Indebtedness.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Texas Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness immediately due and payable, without notice of any kind to Grantor (except that in the case of any Event of Default of the type described in the DEFAULT - Insolvency section herein, such acceleration shall be automatic and not at Lender's option).

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and all and certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Grantor to take possession of and remove the Collateral, and prior to completion of the removal, disable or otherwise secure the Collateral to prevent its use by Grantor or any third parties, with or without process of law, and with or without notice or demand. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. Lender may buy the Collateral, or any portion thereof, at public sale or, if the Collateral is of the type which is sold on a recognized market or subject to widely distributed price quotations, at private sale. Lender shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale by announcement at the time and place fixed therefor, and such sale may be made, without further notice, at such time and place announced at such adjournment. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** To the extent permitted by applicable law Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Upon notice from the Lender or upon any Event of Default, the Grantor agrees that all sums of money it receives on payment, settlement or otherwise related to any Collateral, including, without limitation, on any accounts, shall be held by Grantor as trustee for Lender without commingling with any of Grantor's funds and shall be immediately delivered to the Bank. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender. Grantor acknowledges that the Lender shall not be obligated in any manner to make any demand, make any inquiry as to the nature and sufficiency of any payment received by Lender, present or file any claim, or take any other action to collect or enforce the payment of any amounts which may have been due relate to the Collateral, including without limitation, any amounts due on accounts.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Texas Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy will not bar any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**JURY WAIVER. THE UNDERSIGNED AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG THE UNDERSIGNED AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS DOCUMENT, THE RELATED DOCUMENTS, OR ANY RELATIONSHIP BETWEEN OR AMONG THE UNDERSIGNED AND LENDER WHETHER ANY SUCH RIGHT NOW OR HEREAFTER EXISTS. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING EVIDENCED BY THIS DOCUMENT AND THE RELATED DOCUMENTS.**

**GOVERNING LAW AND VENUE.** The Lender's loan production office for this transaction is located at the address and in the State (the "LPO State") indicated in the LPO address or the loan production office address on the first page of this document. Subject to the paragraph in this document titled "Applicable Law", this document and the Related Documents will be governed by, construed and enforced in accordance with federal law and the laws of the LPO State, except for matters related to interest and the exportation of interest, which matters shall be governed by and interpreted in accordance with federal law (including, but not limited to, statutes, regulations, interpretations and opinions) and the laws of the State of Ohio. However, if there is ever a question about whether any provision of this document is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. This document and the Related Documents have been made by Lender in the State of Ohio. If there is a lawsuit, the undersigned agrees upon Lender's request to submit to the jurisdiction of the courts of the county in the LPO State in which the Lender's loan production office is located.

**INFORMATION WAIVER.** Lender may provide, without any limitation whatsoever, to any one or more purchasers, potential purchasers, or affiliates of JPMorgan Chase & Co., any information or knowledge Lender may have about Grantor or about any matter relating to this Agreement, and Grantor hereby waives any right to privacy Grantor may have with respect to such matters.

**EXAMPLES OF INDEBTEDNESS, INCLUDING DEPOSIT ACCOUNT INDEBTEDNESS, LOAN INDEBTEDNESS, ETC..** Grantor agrees the Indebtedness described herein is used in its most comprehensive sense and means and includes any and all liabilities, obligations and debts of Borrower, or any one of them, to Lender, now existing or hereinafter incurred or created, whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise. As examples, and not as limitation, the Indebtedness of Borrower includes: (a) any overdraft in any deposit account of Borrower, accruing for any reason, (b) any obligations, including any overdraft in any deposit account of Borrower, related to Automated Clearing House ("ACH") services or products, deposit account services or products, or treasury management services or products, including any agreement with respect thereto; (c) any transaction (including any agreement with

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page 4

respect thereto) between Borrower and the Lender or JPMorgan Chase & Co... or any of its subsidiaries or affiliates or their successors, which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures (each a "Rate Management Transaction"); (d) any obligation related to any loan or credit transaction (including any agreement with respect thereto), whether evidenced by a promissory note, credit agreement, letter of credit application, or any other agreement; (e) any obligation related to commercial credit card transactions (including an agreement with respect thereto); (f) any obligation related to any lease (including an agreement with respect thereto), (g) any obligation related to any guaranty of the obligations of others by Borrower; the and obligation under a Related Document, and (i) all other obligations of Borrower to Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement.

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Applicable Law.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: (a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law. (b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby irrevocably appoints Lender as its true and lawful attorney-in-fact, such power of attorney being coupled with an interest, with full power of substitution to do the following in the place and stead of Grantor and in the name of Grantor: (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral, and, in the place and stead of Grantor, to execute and deliver its release and settlement for the claim, (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Lender may seem to be necessary or advisable; (e) to execute any documents or instruments necessary to perfect or continue Lender's security interest in the Collateral; and (f) to file such financing statements (including filing carbon, photographs or other reproduction of any financing statement or this Agreement for use as a financing statement) or other documents or instruments to perfect or continue Lender's security interest in the Collateral. This power is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Lender.

**Indemnity.** Grantor hereby agrees to indemnify, defend and hold harmless Lender, and its officers, directors, shareholders, employees, agents and representatives (each an "Indemnified Person") from and against any and all liabilities, obligations, claims, losses, damages, penalties, actions, judgments, suites, costs, expenses or disbursements of any kind or nature (collectively, the "Claims") which may be imposed on, incurred by or asserted against, any Indemnified Person (whether or not caused by any Indemnified Person's sole, concurrent or contributory negligence) arising in connection with the Agreement or the Collateral (including, without limitation, the enforcement of this Agreement and the Related Documents and the defense of any Indemnified Person's action and/or inactions in connection with this Agreement and the Related Documents), except to the limited extent that the Claims against the Indemnified Person are proximately caused by such Indemnified Person's gross negligence or willful misconduct. The indemnification provided for in this Section shall survive the termination of this Agreement and shall extend and continue to benefit each individual or entity who is or has at any time been an Indemnified Person hereunder. WITHOUT LIMITING ANY PROVISION OF THIS AGREEMENT, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH PERSON TO BE INDEMNIFIED HEREUNDER SHALL BE INDEMNIFIED AND HELD HARMLESS AGAINST ANY AND ALL LOSSES, LIABILITIES, CLAIMS AND DAMAGES ARISING OUT OF OR RESULTING FROM THE ORDINARY, SOLE AND CONTRIBUTORY NEGLIGENCE OF SUCH PERSON.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Texas Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Noble Rey Brewing Company, LLC, and all other persons and entities signing the Note in whatever capacity.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all federal, state, local and foreign statutes, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof.

**Event of Default.** The words "Event of Default" mean any of the events set forth in the section of this Agreement entitled "Default".

**Grantor.** The word "Grantor" means Noble Rey Brewing Company, LLC.

**Hazardous Substances.** The words "Hazardous Substances" mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.  In addition, and without limitation, the term "Indebtedness" includes all amounts identified in the Cross-Collateralization and Future Advance paragraphs as contained in one or more of the Related Documents.

**Lender.** The word "Lender" means JPMorgan Chase Bank, NA, its successors and assigns.

**Note.** The word "Note" means the Note executed by Grantor in the principal amount of $592,100.00 dated September 30, 2014, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now existing or hereafter arising, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED SEPTEMBER 30, 2014.

**GRANTOR:**

**NOBLE REY BREWING COMPANY, LLC**

By: _____
Cristopher Rigoulot, Manager of Noble Rey Brewing
Company, LLC

# EXHIBIT A

A Security Interest in all of the following specific equipment:

Noble Rey Brewing Company, LLC
2636 Farrington
Dallas TX 75207

| Qty | Item | Description |
|---|---|---|
| 1 | Brew Equip | Brewery Equipment: Glycol Chiller |
| 1 | GRAIN MILL | Grain Mill |
| 1 | FLEX AUGER | Flex Auger (3") |
| 1 | FLEX AUGER | Flex Auger (3.5") |
| 1 | AZZ-Brewhouse x1 | 15 BBL Brewhouse:Brew Kettle/Whirlpool 15 BBL Mash Lauter Tun 15 BBL Platform, Valves, Tubing, Pumps, Grant & Control Panels |
| 1 | HEAT Exchanger | Heat Exchanger for Brewery |
| 1 | MISC001B | Oversize Mash Lauter up to 60 lbs malt/bbl |
| 1 | MISC001B | Mixer in Mash/Lauter |
| 1 | MISC001B | Hop Back - Approx. 2 bbl Capacity |
| 1 | MISC001B | Airless Grant |
| 1 | GRIST HYDRATOR | Grist Hydrator |
| 1 | CH/HLT-30 BBL | 30 BBL HLT |
| 1 | CH/CLT-30 BBL | 30 BBL CLT |
| 2 | PUMP-Ebara 1 phase | Ebara Pump 220 Volt 1 ph 60 HZ CDXME 70-106 |
| 5 | CH/KT-30 | 30 BBL Kombitank |
| 2 | CH/BBT-30 BBL | 30 BBL Bright Beer Tank |
| 1 | FILT/Alph-40 | 40 Frame Plate Filter c/w 30 plates |
| 1 | MISC001B | Mobile transfer Pump |
| 1 | CRIV/Keg Washer | Keg Washer |
| 2 | PUMP-Ebara 1 phase | Ebara Pump 220 Volt 1 ph 60 HZ for above keg washer |
| 1 | CRIV/Keg Filler | Keg Filler - Four keg filling manifold |
| 1 | MISC001B | CIP mobile unit (single tank) |
| 1 | MISC001B | Temperature Control Panel for TEN TANKS |



**Line of Credit Note**

$75,000.00
Date: September 30, 2014

**Promise to Pay.** Noble Rey Brewing Company, LLC (the "Borrower") promises to pay to JPMorgan Chase Bank, N.A., whose address is 8111 Preston Rd., Dallas, TX 75225 (the "Bank") or order, in lawful money of the United States of America, the sum of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) or so much thereof as may be advanced and outstanding:

Accrued interest or $100.00, whichever is greater, but not to exceed the then outstanding balance of this Note, shall be payable monthly, beginning on November 3, 2014 and on the same calendar day monthly thereafter until the Final Availability Date. As of the Final Availability Date, no further advances under this Note will be available. Thereafter, 47 consecutive monthly payments shall be due on the same calendar day as payments were due prior to the Final Availability Date, in an amount equal to the greater of (1) $250.00, or (2) the aggregate sum of (a) accrued interest, plus (b) 1/84th of the unpaid principal balance immediately following the Final Availability Date. A final payment shall be due and payable on the same calendar day in the 48th month following the Final Availability Date in the amount of the outstanding principal balance of this Note, plus all accrued but unpaid interest and any other amounts due under this Note.

Interest on this Note is computed on the basis of the actual number of days elapsed in a year of 360 days at the rate of 3.80% Per Annum above the Prime Rate (the "Note Rate"), and at the rate of 3.00% Per Annum above the Note Rate, at the Bank's option, upon the occurrence of any default under this Note, whether or not the Bank elects to accelerate the maturity of this Note, from the date such increased rate is imposed by the Bank. In this Note, "Prime Rate" means the rate of interest Per Annum announced from time to time by the Bank as its prime rate. The Prime Rate is a variable rate and each change in the Prime Rate is effective from and including the date the change is announced as being effective. THE PRIME RATE IS A REFERENCE RATE AND MAY NOT BE THE BANK'S LOWEST RATE.

In no event shall the interest rate exceed the maximum rate allowed by law. Any interest payment that would for any reason be unlawful under applicable law shall be applied to principal.

Interest will be computed on the unpaid principal balance from the date of each borrowing.

The Borrower shall make all payments on this Note and the other Related Documents, without setoff, deduction, or counterclaim, to the Bank at the Bank's address above or at such other place as the Bank may designate in writing. If any payment of principal or interest on this Note shall become due on a day that is not a Business Day, the payment will be made on the next succeeding Business Day. The term "Business Day" in this Note means a day other than a Saturday, Sunday or any other day on which national banking associations are authorized to be closed. Payments shall be allocated among principal, interest and fees at the discretion of the Bank unless otherwise agreed or required by applicable law. Acceptance by the Bank of any payment that is less than the payment due at that time shall not constitute a waiver of the Bank's right to receive payment in full at that time or any other time.

**Annual Fee.** A non-refundable annual fee of $150.00, or such other amount as advised by the Bank, may be charged to this Note for each year that advances are available under this Note or for each year there remains a principal amount outstanding on this Note. No refund of any part of the annual fee will be made in the event of cancellation of this Note for any reason. The annual fee for the first year will be $150.00. If the annual fee has been waived by the Bank based on any promotional offer made in connection with Borrower's Chase business checking account, the annual fee may be reinstated by the Bank if such account is closed for any reason whatsoever.

**Credit Holds.** Notwithstanding anything to the contrary in this Note, the Bank may apply all payments and credits in accordance with the standard operating procedures of the Bank and with the requirements of applicable law. For billing and interest accrual purposes, credit for the payment is given on the Business Day the payment is processed and posted to the account. Nevertheless, after processing the Bank may elect to verify the receipt of good funds or otherwise elect to place a "credit hold" on such payments before releasing any payment amount as available credit for additional advances on the line of credit.

The Bank makes the following line of credit payments available for readvance the next Business Day after processing: (a) electronic payments, (b) payments made on Chase.com, and (c) payments made at any branch office of the Bank if made (i) by check drawn upon a deposit account with the Bank or (ii) in cash. The Bank currently places a credit hold on most other payments for a period of seven

BBHD

113141020390

EXHIBIT
3

days commencing on the Business Day the payment is processed; provided that when the day following the seventh day of the credit hold period is not a Business Day, then the payment amount will not be available for additional advances until the next Business Day.

The Bank may change its credit hold policy from time to time and will advise Borrower, including by inclusion of a message on the billing statement for this Note. To preclude an overdraft during the credit hold period Borrower must remember the portion of each payment intended to reduce the principal balance may not be immediately available for additional advances on the line of credit. The balance available for advances can be verified by contacting the Bank on-line, by telephone or in person at a branch location.

**Bank's Rights to Limit Credit Availability.** Regardless of whether a default exists under this Note, the Bank may exercise any of the following options:

**Reductions in Credit Available.** Upon written notice to Borrower, in its sole discretion and for any reason, the Bank may reduce the maximum amount of credit available under this Note to an amount that will not be less than the principal balance then outstanding at the date the notice is provided. Notwithstanding any such reduction, all other provisions of this Note shall remain in full force and effect, including the payment terms as set forth in this Note, and including the Bank's right to convert the line of credit, or to elect to make future further reductions in the available credit. The effective date of the reduction in credit available shall be the date stated in the notice the Bank provides to the Borrower.

**Termination of Revolving Credit.** The Bank's obligation to make revolving advances shall terminate as of the third anniversary date of this Note and the Note shall convert to a term note. Prior to the third anniversary date of this Note, upon written notice to the Borrower, in its sole discretion and for any reason, the Bank may terminate its obligation to make revolving advances under this Note and convert this Note to a term note. The effective date of the conversion to a term note shall be the earlier of the date stated in the notice the Bank provides or the third anniversary date of this Note and this date shall be known as the "Final Availability Date."

**Line of Credit Advances.** The Note evidences a revolving line of credit. The unpaid balance of this Note shall increase and decrease with advances and payments made from time to time. Until the earlier of the third anniversary date of this Note, the Final Availability Date or the occurrence of any default, Borrower may borrow, pay down and reborrow under this Note. Advances under this Note shall be deemed to have been authorized by Borrower, and Borrower agrees to be liable for all such advances, if either (a) requested orally or in writing by the Borrower or by an authorized person or (b) credited to any of Borrower's accounts with the Bank. Each person or entity signing this Note on behalf of the Borrower and each guarantor is an authorized person. The Bank may, but need not, require that all oral requests be confirmed in writing. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by the Bank's internal records, including daily computer printouts. The Bank will have no obligation to advance funds under this Note if: (a) any Event of Default has occurred; (b) any Obligor ceases doing business or is insolvent; (c) any guarantors seek, claim or otherwise attempts to limit, modify or revoke their guarantee of this Note or any other loan with the Bank; (d) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by the Bank; or (e) the Bank in good faith believes itself insecure.

**Methods for Advances.** Additional advance procedures applicable to this Note include the following: The principal amount of this Note may be advanced by means including but not limited to, where available, credit card(s), check(s), telephone transfer/access, and online transfers and may be repaid and re-advanced in full or part until the Final Availability Date. Borrower assumes liability for, and agrees to pay for, purchases and cash advances made by Borrower or anyone authorized by Borrower, through use of any method of advance, including any credit card issued at Borrower's request or any other means, and agrees to pay, at such place as the Bank designates, all extensions of credit and charges in accordance with statement billings and the interest, fees and other charges as same may be modified from time to time by the Bank. Borrower is bound and liable for repayment of the entire Note, regardless of who received the benefit of the transaction(s) or to whom any advance of credit was made. Borrower may be liable for any loss, theft, or unauthorized use of any credit card issued at Borrower's request.

**Overdraft Facility.** The principal amount of this Note may also be advanced to Borrower's designated checking account(s) at the Bank and/or another JPMorgan Chase & Co. affiliate (individually and collectively referred to as the "Deposit Account") if any check or other charge against the Deposit Account exceeds the available balance of the Deposit Account. Borrower must confirm in writing any request for such overdraft protection for the Deposit Account. Such advances will be in $50.00 increments or as otherwise provided in the Account Rules and Regulations, now existing or hereafter modified, rounded up to cover the entire amount by which the check(s) or other charges exceed(s) the available Deposit Account balance. If the available balance of this Note is not sufficient to cover the entire overdraft, the Bank will transfer the maximum available Note balance. The Bank where the Deposit Account is maintained will pay items in accordance with the Deposit Account Rules and Regulations, now existing or hereafter modified. If the amount transferred is less than the amount of the overdraft, all checks or other charges may not be paid. Advances on this Note will be made to cover an overdraft created by any authorized signer on the Deposit Account, even if that authorized signer is not a Borrower.

**Stop Payment Fee.** A stop payment charge of $25.00 will be assessed and charged directly to this Note for each check written against this Note upon which a stop payment order is issued.

**Overlimit Fee.** At its discretion, from time to time, the Bank may charge Borrower a fee when any advance increases the principal balance in excess of the maximum principal amount of this Note. If the Bank should make any advance in excess of the maximum principal amount of this Note, the making of the advance shall not be deemed to constitute an increase in the maximum principal amount of this Note and shall be due and payable upon demand. The overlimit fee is $25.00.

**Authorization for Direct Payments (ACH Debits).** To effectuate any payment due under this Note or under any other Related Documents, the Borrower hereby authorizes the Bank to initiate debit entries to Account Number ■■■9730 at the Bank and to debit the same to such account. This authorization to initiate debit entries shall remain in full force and effect until the Bank has received written notification of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. The Borrower represents that the Borrower is and will be the owner of all funds in such account. The Borrower acknowledges: (1) that such debit entries may cause an overdraft of such account which may result in the Bank's refusal to honor items drawn on such account until adequate deposits are made to such account; (2) that the Bank is under no duty or obligation to initiate any debit entry for any purpose; and (3) that if a debit is not made because the above-referenced account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

**Late Fee.** If a payment is 10 days or more late, Borrower will be charged a late fee of 5.00% of the payment due or $25.00, whichever is greater, up to the maximum amount of $250.00 per late fee. Borrower shall pay the late payment charge upon demand by the Bank or, if billed, within the time specified.

**Dishonored Item Fee.** The Borrower will pay a fee to the Bank of $25.00 if the Borrower makes a payment on this Note and the check or preauthorized charge with which the Borrower pays is later dishonored.

**Purpose of Loan.** The Borrower acknowledges and agrees that this Note evidences a loan for a business, commercial, agricultural or similar commercial enterprise purpose, and that no advance shall be used for any personal, family or household purpose. The proceeds of the loan shall be used only for the Borrower's working capital purposes.

**Credit Facility.** The Bank has approved a credit facility to the Borrower in a principal amount not to exceed the face amount of this Note. The credit facility is in the form of advances made from time to time by the Bank to the Borrower. This Note evidences the Borrower's obligation to repay those advances. The aggregate principal amount of debt evidenced by this Note is the amount reflected from time to time in the records of the Bank. Until the earliest to occur of maturity, declaration of Final Availability Date by the Bank, any default, event of default, or any event that would constitute a default or event of default but for the giving of notice, the lapse of time or both, the Borrower may borrow, pay down and reborrow under this Note subject to the terms of the Related Documents.

**Usury.** To the extent any law other than Federal law or Ohio law is deemed to govern this Note with respect to interest, the following provisions shall apply: The Bank does not intend to charge, collect or receive any interest that would exceed the maximum rate allowed by law. If the effect of any applicable law is to render usurious any amount called for under this Note or the other Related Documents, or if any amount is charged or received with respect to this Note, or if any prepayment by the Borrower results in the payment of any interest in excess of that permitted by law, then all excess amounts collected by the Bank shall be credited on the principal balance of this Note (or, if this Note and all other indebtedness arising under or pursuant to the other Related Documents shall have been paid in full, refunded to the Borrower), and the provisions of this Note and the other Related Documents shall immediately be deemed reformed and the amounts thereafter collectable reduced, without the necessity of the execution of any new document, so as to comply with the then applicable law. All sums paid, or agreed to be paid, by the Borrower for the use, forbearance, or detention of money under this Note or the other Related Documents shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the usury ceiling from time to time in effect and applicable to such indebtedness for so long as such indebtedness is outstanding.

**U.S. Small Business Administration Program Provisions.** The Borrower hereby certifies to Bank and to the U.S. Small Business Administration ("SBA"), which may guarantee a portion of this Note, that as of the date of this Note: (a) there has been no adverse change in the Borrower's financial condition, organization, operations or fixed assets since the date of the application for this extension of credit; (b) the Borrower is current on all federal, state, and local taxes, including, but not limited to, income taxes, payroll taxes, real estate taxes, and sales taxes; and (c) all business and personal tax returns, financial statements, projections and other information submitted by the Borrower as part of the loan application are accurate, true and complete; including, but not limited to, accurately representing all assets and liabilities of the spouse or minor children (each, as applicable) of the Borrower. The Borrower fully understands that the tax returns, financial statements, projections and other information of the Borrower submitted in connection with the loan application are being relied upon by Bank and SBA in making their decision regarding the extension of credit under the terms of this Note.

The Borrower acknowledges and agrees that the Borrower's liability under this Note will continue with respect to any amounts SBA may pay Bank based on an SBA guarantee of this Note. Any agreement with Bank under which SBA may guarantee this Note does not

create any third party rights or benefits for the Borrower and, if SBA pays Bank under such an agreement, SBA or Bank may then seek recovery from the Borrower of amounts paid by SBA.

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Bank or SBA may use state or local procedures for filing papers, recording documents, giving notices, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, the Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

**Per Annum.** In this Note the term "Per Annum" means for a year deemed to be comprised of 360 days, unless the calculation would result in a usurious interest rate, in which case interest will be calculated on the basis of a 365 or 366 day year, as the case may be.

[The remainder of the page is intentionally left blank.]

**Miscellaneous.** This Note binds the Borrower and its successors, and benefits the Bank, its successors and assigns. Any reference to the Bank includes any holder of this Note. This Note is subject to that certain Credit Agreement by and between the Borrower and the Bank, dated September 30, 2014, and all amendments, restatements and replacements thereof (the "Credit Agreement") to which reference is hereby made for a more complete statement of the terms and conditions under which the loan evidenced hereby is made and is to be repaid. The terms and provisions of the Credit Agreement are hereby incorporated and made a part hereof by this reference thereto with the same force and effect as if set forth at length herein. No reference to the Credit Agreement and no provisions of this Note or the Credit Agreement shall alter or impair the absolute and unconditional obligation of the Borrower to pay the principal and interest on this Note as herein prescribed. Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement. If any one or more of the obligations of the Borrower under this Note or any provision hereof is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of the Borrower and the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of such obligations or provisions in any other jurisdiction. Time is of the essence under this Note and in the performance of every term, covenant and obligation contained herein.

THIS NOTE AND THE OTHER RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.
THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Borrower:

Address:     1400 E Jefferson Blvd
             Dallas, TX 75203

Noble Rey Brewing Company, LLC

By: _____

Christopher Rigoulot                    Manager
Printed Name                            Title

Date Signed: _10/1/2014_____

The Bank is executing this Note for the purpose of acknowledging and agreeing to the notice given under §26.02 of the Texas Business and Commerce Code and the Bank's failure to execute or authenticate this Note will not invalidate this Note.

Bank:

JPMorgan Chase Bank, N.A.

By: _____

Joey Myers                    AVP
Printed Name                  Title

683.2



**Credit Agreement**

This agreement dated as of September 30, 2014 is between JPMorgan Chase Bank, N.A. (together with its successors and assigns, the "**Bank**"), whose address is 8111 Preston Rd., Dallas, TX 75225, and Noble Rey Brewing Company, LLC (individually, the "**Borrower**" and if more than one, collectively, the "**Borrowers**"), whose address is 1400 E Jefferson Blvd, Dallas, TX 75203.

**1.    Credit Facility.**

    **1.1    Scope.** This agreement governs only the Credit Facility (hereinafter defined). Advances under the Credit Facility shall be subject to the procedures established from time to time by the Bank. Any procedures agreed to by the Bank with respect to obtaining advances, including automatic loan sweeps, shall not vary the terms or conditions of this agreement or the other Related Documents regarding the Credit Facility.

    **1.2    Credit Facility (Line of Credit).** The Bank has approved a credit facility to the Borrower in the form of a line of credit in the principal sum not to exceed $75,000.00 in the aggregate at any one time outstanding Credit under the Credit Facility shall be repayable as set forth in a Note (hereinafter defined) executed concurrently with this agreement, and any renewals, modifications, extensions, rearrangements, restatements thereof and replacements or substitutions therefor.

**2.    Definitions and Interpretations.**

    **2.1    Definitions.** As used in this agreement, the following terms have the following respective meanings:

        **A.    "Affiliate"** means any Person which, directly or indirectly Controls or is Controlled by or under common Control with, another Person, and any director or officer thereof. The Bank is under no circumstances to be deemed an Affiliate of the Borrower or any of its Subsidiaries.

        **B.    "Anti-Corruption Laws"** means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

        **C.    "Authorizing Documents"** means certificates of authority to transact business, certificates of good standing, borrowing resolutions, appointments, officer's certificates, certificates of incumbency, and other documents which empower and authorize the power and authority of all Persons (other than the Bank) executing any Related Document or their representatives to execute and deliver the Related Documents and perform the Person's obligations thereunder.

        **D.    "Collateral"** means all Property, now or in the future subject to any Lien in favor of the Bank, securing or intending to secure, any of the Liabilities.

        **E.    "Control"** as used with respect to any Person, means the power to direct or cause the direction of, the management and policies of that Person, directly or indirectly, whether through the ownership of Equity Interests, by contract, or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

        **F.    "Credit Facility"** means the extension of credit described in Section 1.

        **G.    "Distributions"** means all dividends and other distributions made to any Equity Owners, other than salary, bonuses, and other compensation for services expended in the current accounting period.

        **H.    "Equity Interests"** means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

        **I.    "Equity Owner"** means a shareholder, partner, member, holder of a beneficial interest in a trust or other owner of any Equity Interests.

        **J.    "GAAP"** means generally accepted accounting principles in effect from time to time in the United States of America, consistently applied.

BBHD                                                                                                              113141020390

K.      "**Legal Requirement**" means any law, ordinance, decree, requirement, order, judgment, rule, Sanctions, regulation (or interpretation of any of the foregoing) of any foreign governmental authority, the United States of America, any state thereof, any political subdivision of any of the foregoing or any agency, department, commission, board, bureau, court or other tribunal having jurisdiction over the Bank, any Pledgor or any Obligor or any of its Subsidiaries or their respective Properties or any agreement by which any of them is bound.

L.      "**Liabilities**" means all indebtedness, liabilities and obligations of every kind and character of the Borrower to the Bank, whether the obligations, indebtedness and liabilities are individual, joint and several, contingent or otherwise, now or hereafter existing, including, without limitation, all liabilities, interest, costs and fees, arising under or from any note, open account, overdraft, credit card, lease, Rate Management Transaction, letter of credit application, endorsement, surety agreement, guaranty, acceptance, foreign exchange contract or depository service contract, whether payable to the Bank or to a third party and subsequently acquired by the Bank, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing.

M.      "**Lien**" means any mortgage, deed of trust, pledge, charge, encumbrance, security interest, collateral assignment or other lien or restriction of any kind.

N.      "**Note**" means the promissory note dated September 30, 2014, and any renewals, modifications, extensions, rearrangements, restatements thereof and replacements or substitutions therefor evidencing the Credit Facility.

O.      "**Obligor**" means any Borrower, guarantor, surety, co-signer, endorser, general partner or other Person who may now or in the future be obligated to pay any of the Liabilities.

P.      "**Organizational Documents**" means, with respect to any Person, certificates of existence or formation, documents establishing or governing the Person or evidencing or certifying that the Person is duly organized and validly existing in accordance with all applicable Legal Requirements, including all amendments, restatements, supplements or modifications to such certificates and documents as of the date of the Related Document referring to the Organizational Document and any and all future modifications thereto approved by the Bank.

Q.      "**Permitted Investments**" means (1) readily marketable direct obligations of the United States of America or any agency thereof with maturities of one year or less from the date of acquisition; (2) fully insured (if issued by a bank other than the Bank) certificates of deposit with maturities of one year or less from the date of acquisition issued by any commercial bank operating in the United States of America having capital and surplus in excess of $500,000,000.00; and (3) commercial paper of a domestic issuer if at the time of purchase such paper is rated in one of the two highest rating categories of Standard and Poor's Corporation or Moody's Investors Service.

R.      "**Person**" means any individual, corporation, partnership, limited liability company, joint venture, joint stock association, association, bank, business trust, trust, unincorporated organization, any foreign governmental authority, the United States of America, any state of the United States and any political subdivision of any of the foregoing or any other form of entity.

S.      "**Pledgor**" means any Person providing Collateral.

T.      "**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

U.      "**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option, derivative transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

V.      "**Related Documents**" means this agreement, the Note, and any other instrument or document executed in connection with the Credit Facility, including but not limited to, applications for letters of credit, all loan agreements,

credit agreements, reimbursement agreements, security agreements, mortgages. deeds of trust, pledge agreements, assignments, and guaranties.

**W. "Sanctions"** means economic or financial sanctions or trade embargoes imposed. administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

**X. "Sanctioned Country"** means, at any time. a country or territory which is the subject or target of any Sanctions.

**Y. "Sanctioned Person"** means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, (b) any Person operating. organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

**Z. "Subsidiary"** means, as to any particular Person (the "parent"), a Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of the date of determination. as well as any other Person of which fifty percent (50%) or more of the Equity Interests is at the time of determination directly or indirectly owned. Controlled or held, by the parent or by any Person or Persons Controlled by the parent, either alone or together with the parent.

**2.2 Interpretations.** Whenever possible, each provision of the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements. If any provision of this agreement cannot be enforced, the remaining portions of this agreement shall continue in effect. In the event of any conflict or inconsistency between this agreement and the provisions of any other Related Documents, the provisions of this agreement shall control. Use of the term "including" does not imply any limitation on (but may expand) the antecedent reference. Any reference to a particular document includes all modifications, supplements, replacements, renewals or extensions of that document, but this rule of construction does not authorize amendment of any document without the Bank's consent. Section headings are for convenience of reference only and do not affect the interpretation of this agreement. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP. Whenever the Bank's determination, consent, approval or satisfaction is required under this agreement or the other Related Documents or whenever the Bank may at its option take or refrain from taking any action under this agreement or the other Related Documents, the decision as to whether or not the Bank makes the determination, consents, approves. is satisfied or takes or refrains from taking any action, shall be in the sole and exclusive discretion of the Bank, and the Bank's decision shall be final and conclusive.

**3. Conditions Precedent to Extensions of Credit.**

**3.1 Conditions Precedent to Initial Extension of Credit under the Credit Facility.** Before the first extension of credit governed by this agreement and any initial advance under the Credit Facility. whether by disbursement of a loan. issuance of a letter of credit, or otherwise. the Borrower shall deliver to the Bank, in form and substance satisfactory to the Bank:

**A. Loan Documents.** The Note, and as applicable, the letter of credit applications. reimbursement agreements. the security agreements, the pledge agreements, financing statements. mortgages or deeds of trust, the guaranties, the subordination agreements, and any other documents which the Bank may reasonably require to give effect to the transactions described in this agreement or the other Related Documents;

**B. Organizational and Authorizing Documents.** The Organizational Documents and Authorizing Documents of the Borrower and any other Persons (other than the Bank) executing the Related Documents in form and substance satisfactory to the Bank that at a minimum: (i) document the due organization. valid existence and good standing of the Borrower and every other Person (other than the Bank) that is a party to this agreement or any other Related Document: (ii) evidence that each Person (other than the Bank) which is a party to this agreement or any other Related Document has the power and authority to enter into the transactions described therein; and (iii) evidence that the Person signing on behalf of each Person that is a party to the Related Documents (other than the Bank) is duly authorized to do so; and

**C. Liens.** The termination. assignment or subordination. as determined by the Bank, of all Liens on the Collateral in favor of any secured party (other than the Bank).

**3.2    Conditions Precedent to Each Extension of Credit.** Before any extension of credit governed by this agreement, whether by disbursement of a loan, issuance of a letter of credit or otherwise, the following conditions must be satisfied:

**A.    Representations.** The representations of the Borrower and any other parties, other than the Bank, in the Related Documents are true on and as of the date of the request for and funding of the extension of credit;

**B.    No Event of Default.** No default, event of default or event that would constitute a default or event of default but for the giving of notice, the lapse of time or both, has occurred in any provision of this agreement, the Note or any other Related Documents and is continuing or would result from the extension of credit;

**C.    Additional Approvals, Opinions, and Documents.** The Bank has received any other approvals, opinions and documents as it may reasonably request; and

**D.    No Prohibition or Onerous Conditions.** The making of the extension of credit is not prohibited by and does not subject the Bank, any Obligor, or any Subsidiary of the Borrower to any penalty or onerous condition under, any Legal Requirement.

**4.    Affirmative Covenants.** The Borrower agrees to do, and cause each of its Subsidiaries to do, each of the following:

**4.1    Insurance.** Maintain insurance with financially sound and reputable insurers, with such insurance and insurers to be satisfactory to the Bank, covering its Property and business against those casualties and contingencies and in the types and amounts as are in accordance with sound business and industry practices, and furnish to the Bank, upon request of the Bank, reports on each existing insurance policy showing such information as the Bank may reasonably request.

**4.2    Existence.** Maintain its existence and business operations as presently in effect in accordance with all applicable Legal Requirements, pay its debts and obligations when due under normal terms, and pay on or before their due date, all taxes, assessments, fees and other governmental monetary obligations, except as they may be contested in good faith if they have been properly reflected on its books and, at the Bank's request, adequate funds or security has been pledged or reserved to insure payment.

**4.3    Financial Records.** Maintain proper books and records of account, in accordance with GAAP, and consistent with financial statements previously submitted to the Bank.

**4.4    Inspection.** Permit the Bank, its agents and designees to: (a) inspect and photograph its Property, to examine and copy files, books and records, and to discuss its business, operations, prospects, assets, affairs and financial condition with the Borrower's or its Subsidiaries' officers and accountants, at times and intervals as the Bank reasonably determines; (b) perform audits or other inspections of the Collateral, including the records and documents related to the Collateral; and (c) confirm with any Person any obligations and liabilities of the Person to the Borrower or its Subsidiaries. The Borrower will, and will cause its Subsidiaries to cooperate with any inspection or audit. The Borrower will pay the Bank the reasonable costs and expenses of any audit or inspection of the Collateral (including fees and expenses charged internally by the Bank for asset reviews) promptly after receiving the invoice.

**4.5    Financial Reports.** Furnish to the Bank whatever information, statements, books and records the Bank may from time to time reasonably request.

**4.6    Notices of Claims, Litigation, Defaults, etc.** Promptly inform the Bank in writing of: (1) all existing and all threatened litigation, claims, investigations, administrative proceedings and similar actions or changes in Legal Requirements affecting it which could materially affect its business, assets, affairs, prospects or financial condition; (2) the occurrence of any event which gives rise to the Bank's option to terminate the Credit Facility; (3) the institution of steps by it to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which it may have liability; (4) any reportable event or any prohibited transaction in connection with any employee benefit plan; (5) any additions to or changes in the locations of its businesses; and (6) any alleged breach by the Bank of any provision of this agreement or of any other Related Document.

**4.7    Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between it and any other Person.

**4.8    Title to Assets and Property.** Maintain good and marketable title to all of its Properties, and defend them against all claims and demands of all Persons at any time claiming any interest in them.

4.9 **Additional Assurances.** Promptly make, execute and deliver any and all agreements, documents, instruments and other records that the Bank may request to evidence the Credit Facility, cure any defect in the execution and delivery of any of the Related Documents, perfect any Lien, comply with any Legal Requirement applicable to the Bank or the Credit Facility or describe more fully particular aspects of the agreements set forth or intended to be set forth in any of the Related Documents.

4.10 **Employee Benefit Plans.** Maintain each employee benefit plan as to which it may have any liability, in compliance with all Legal Requirements.

4.11 **Compliance with Anti-Corruption Laws and Sanctions.** Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

5. **Negative Covenants.**

5.1 Unless otherwise noted, the financial requirements set forth in this section will be computed in accordance with GAAP applied on a basis consistent with financial statements previously submitted by the Borrower to the Bank.

5.2 Without the written consent of the Bank, the Borrower will not and no Subsidiary of the Borrower will:

**A.** **Distributions.** If there is no existing default under this agreement or any other Related Document and to do so will not cause a default under this agreement or any other Related Document, be restricted from paying Distributions to its Equity Owners.

**B.** **Guaranties.** Guarantee or otherwise become or remain secondarily liable on the undertaking of another, except for endorsement of drafts for deposit and collection in the ordinary course of business.

**C.** **Liens.** Create or permit to exist any Lien on any of its Property except: existing Liens known to and approved by the Bank; Liens to the Bank; Liens incurred in the ordinary course of business securing current non-delinquent liabilities for taxes, worker's compensation, unemployment insurance, social security and pension liabilities.

**D.** **Use of Proceeds.** Use, or permit any proceeds of the Credit Facility to be used, directly or indirectly, for: (1) any personal, family or household purpose; or (2) the purpose of "purchasing or carrying any margin stock" within the meaning of Federal Reserve Board Regulation U. At the Bank's request, it will furnish a completed Federal Reserve Board Form U-1. Request any Credit Facility or use, or permit any proceeds of the Credit Facilities to be used, directly or indirectly, by the Borrower or any of its Subsidiaries or its or their respective directors, officers, employees and agents: (1) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws; (2) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person; or in any Sanctioned Country; or (3) in any manner that would result in the violation of any Sanctions applicable to any party hereto .

**E.** **Continuity of Operations.** (1) Engage in any business activities substantially different from those in which it is presently engaged; (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other Person, change its name, dissolve, or sell any assets out of the ordinary course of business; (3) enter into any arrangement with any Person providing for the leasing by it of Property which has been sold or transferred by it to such Person; or (4) change its business organization, the jurisdiction under which its business organization is formed or organized, or its chief executive office, or any places of its businesses.

**F.** **Limitation on Negative Pledge Clauses.** Enter into any agreement with any Person other than the Bank which prohibits or limits its ability to create or permit to exist any Lien on any of its Property, whether now owned or hereafter acquired.

**G.** **Conflicting Agreements.** Enter into any agreement containing any provision which would be violated or breached by the performance of its obligations under this agreement or any of the other Related Documents.

**H.** **Transfer of Ownership.** Permit any pledge of any Equity Interest in it or any sale or other transfer of any Equity Interest in it in excess of 25% in the aggregate .

I. **Organizational Documents.** Alter, amend or modify any of its Organizational Documents.

J. **Government Regulation.** (1) Be or become subject at any time to any Legal Requirement or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits the Bank from making any advance or extension of credit to it or from otherwise conducting business with it, or (2) fail to provide documentary and other evidence of its identity as may be requested by the Bank at any time to enable the Bank to verify its identity or to comply with any applicable Legal Requirement, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

K. **Subsidiaries.** Form, create or acquire any Subsidiary.

6. **Representations.**

6.1 **Representations and Warranties by the Borrower.** To induce the Bank to enter into this agreement and to extend credit or other financial accommodations under the Credit Facility, the Borrower represents and warrants as of the date of this agreement and as of the date of each request for credit under the Credit Facility that each of the following statements is and shall remain true and correct throughout the term of this agreement and until the Credit Facility and all Liabilities under the Note and other Related Documents are paid in full: (a) its principal residence or chief executive office is at the address shown above, (b) its name as it appears in this agreement is its exact name as it appears in its Organizational Documents, (c) the execution and delivery of this agreement and the other Related Documents to which it is a party, and the performance of the obligations they impose, do not violate any Legal Requirement, conflict with any agreement by which it is bound, or require the consent or approval of any other Person, (d) this agreement and the other Related Documents have been duly authorized, executed and delivered by all parties thereto (other than the Bank) and are valid and binding agreements of those Persons, enforceable according to their terms, except as may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights generally and by general principles of equity, (e) all balance sheets, profit and loss statements, and other financial statements and other information furnished to the Bank in connection with the Liabilities are accurate and fairly reflect the financial condition of the Persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates, (f) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) is pending or threatened against it, and no other event has occurred which may in any one case or in the aggregate materially adversely affect it or any of its Subsidiaries' financial condition, properties, business, affairs or operations, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by the Bank in writing, (g) all of its tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being contested by it in good faith and for which adequate reserves have been provided, (h) it is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended, (i) there are no defenses or counterclaims, offsets or adverse claims, demands or actions of any kind, personal or otherwise, that it could assert with respect to this agreement or the Credit Facility, (j) it owns, or is licensed to use, all trademarks, trade names, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted, and (k) the execution and delivery of this agreement and the other Related Documents to which it is a party and the performance of the obligations they impose, if the Borrower is other than a natural Person (i) are within its powers, (ii) have been duly authorized by all necessary action of its governing body, and (iii) do not contravene the terms of its Organizational Documents or other agreement or document governing its affairs.

6.2 **Representations and Warranties Regarding Anti-Corruption Laws and Sanctions.** The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrower, any Subsidiary or to the knowledge of the Borrower or such Subsidiary any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No advance, letter of credit, use of proceeds or other transaction contemplated by the Credit Facilities will violate Anti-Corruption Laws or applicable Sanctions.

7. **Default/Remedies.**

7.1 **Events of Default/Acceleration.** If any of the following events occurs, the Note shall become due immediately, without notice, at the Bank's option, and the Borrower hereby waives notice of intent to accelerate the maturity of the Note and notice of acceleration of the Note upon the occurrence of any of the following events:

**A.** Any Obligor fails to pay when due any of the Liabilities or any other debt to any Person, or any amount payable with respect to any of the Liabilities, or under the Note, any other Related Document, or any agreement or instrument evidencing other debt to any Person.

**B.** Any Obligor or any Pledgor: (i) fails to observe or perform or otherwise violates any other term, covenant, condition or agreement of any of the Related Documents; (ii) makes any materially incorrect or misleading representation, warranty, or certificate to the Bank; (iii) makes any materially incorrect or misleading representation in any financial statement or other information delivered to the Bank; or (iv) defaults under the terms of any agreement or instrument relating to any debt for borrowed money (other than the debt evidenced by the Related Documents) and the effect of such default will allow the creditor to declare the debt due before its stated maturity.

**C.** In the event (i) there is a default under the terms of any Related Document, (ii) any Obligor terminates or revokes or purports to terminate or revoke its guaranty or any Obligor's guaranty becomes unenforceable in whole or in part, (iii) any Obligor fails to perform promptly under its guaranty, or (iv) any Obligor fails to comply with, or perform under any agreement, now or hereafter in effect, between the Obligor and the Bank, or any Affiliate of the Bank or their respective successors and assigns.

**D.** There is any loss, theft, damage, or destruction of any Collateral not covered by insurance.

**E.** Any event occurs that would permit the Pension Benefit Guaranty Corporation to terminate any employee benefit plan of any Obligor or any Subsidiary of any Obligor.

**F.** Any Obligor or any of its Subsidiaries or any Pledgor: (i) becomes insolvent or unable to pay its debts as they become due; (ii) makes an assignment for the benefit of creditors; (iii) consents to the appointment of a custodian, receiver, or trustee for itself or for a substantial part of its Property; (iv) commences any proceeding under any bankruptcy, reorganization, liquidation, insolvency or similar laws; (v) conceals or removes any of its Property, with intent to hinder, delay or defraud any of its creditors; (vi) makes or permits a transfer of any of its Property, which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or (vii) makes a transfer of any of its Property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid.

**G.** A custodian, receiver, or trustee is appointed for any Obligor or any of its Subsidiaries or any Pledgor or for a substantial part of their respective Property.

**H.** Any Obligor or any of its Subsidiaries, without the Bank's written consent: (i) liquidates or is dissolved; (ii) merges or consolidates with any other Person; (iii) leases, sells or otherwise conveys a material part of its assets or business outside the ordinary course of its business; (iv) leases, purchases, or otherwise acquires a material part of the assets of any other Person, except in the ordinary course of its business; or (v) agrees to do any of the foregoing; provided, however, that any Subsidiary of an Obligor may merge or consolidate with any other Subsidiary of that Obligor, or with the Obligor, so long as the Obligor is the survivor.

**I.** Proceedings are commenced under any bankruptcy, reorganization, liquidation, or similar laws against any Obligor or any of its Subsidiaries or any Pledgor and remain undismissed for thirty (30) days after commencement; or any Obligor or any of its Subsidiaries or any Pledgor consents to the commencement of those proceedings.

**J.** Any judgment is entered against any Obligor or any of its Subsidiaries, or any attachment, seizure, sequestration, levy, or garnishment is issued against any Property of any Obligor or any of its Subsidiaries or of any Pledgor or any Collateral.

**K.** Any individual Obligor or Pledgor dies, or a guardian or conservator is appointed for any individual Obligor or Pledgor or all or any portion of their respective Property, or the Collateral.

**L.** Any material adverse change occurs in: (i) the reputation, Property, financial condition, business, assets, affairs, prospects, liabilities, or operations of any Obligor or any of its Subsidiaries; (ii) any Obligor's or Pledgor's ability to perform its obligations under the Related Documents; or (iii) the Collateral.

7.2 **Remedies.** At any time after the occurrence of a default, the Bank may do one or more of the following: (a) cease permitting the Borrower to incur any Liabilities; (b) terminate any commitment of the Bank evidenced by the Note; (c) declare the Note or of the Related Documents to be immediately due and payable, without notice of acceleration, intention to accelerate, presentment and demand or protest or notice of any kind, all of which are hereby expressly waived; (d) exercise all rights of setoff that the Bank may have contractually, by law, in equity or otherwise; and (e) exercise any and all other rights pursuant to any of the Related Documents, at law, in equity or otherwise.

A. **Generally.** The rights of the Bank under this agreement and the other Related Documents are in addition to other rights (including without limitation, other rights of setoff) the Bank may have contractually, by law, in equity or otherwise, all of which are cumulative and hereby retained by the Bank. Each Obligor agrees to stand still with regard to the Bank's enforcement of its rights, including taking no action to delay, impede or otherwise interfere with the Bank's rights to realize on any Collateral.

B. **Bank's Right of Setoff.** The Borrower grants to the Bank a security interest in the Deposits, and the Bank is authorized to setoff and apply, all Deposits, Securities and Other Property, and Bank Debt against any and all Liabilities. This right of setoff may be exercised at any time from time to time after the occurrence of any default, without prior notice to or demand on the Borrower and regardless of whether any Liabilities are contingent, unmatured or unliquidated. In this paragraph: (a) the term **"Deposits"** means any and all accounts and deposits of the Borrower (whether general, special, time, demand, provisional or final) at any time held by the Bank (including all Deposits held jointly with another, but excluding any IRA or Keogh Deposits, or any trust Deposits in which a security interest would be prohibited by any Legal Requirement); (b) the term **"Securities and Other Property"** means any and all securities and other personal Property of the Borrower in the custody, possession or control of the Bank, JPMorgan Chase & Co. or their respective Subsidiaries and Affiliates (other than Property held by the Bank in a fiduciary capacity); and (c) the term **"Bank Debt"** means all indebtedness at any time owing by the Bank, to or for the credit or account of the Borrower and any claim of the Borrower (whether individual, joint and several or otherwise) against the Bank now or hereafter existing.

8. **Miscellaneous.**

8.1 **Notice.** Any notices and demands under or related to this agreement shall be in writing and delivered to the intended party at its address stated in this agreement, and if to the Bank, at its main office if no other address of the Bank is specified in this agreement, by one of the following means: (a) by hand; (b) by a nationally recognized overnight courier service; or (c) by certified mail, postage prepaid, with return receipt requested. Notice shall be deemed given: (a) upon receipt if delivered by hand; (b) on the Delivery Day after the day of deposit with a nationally recognized courier service; or (c) on the third Delivery Day after the notice is deposited in the mail. **"Delivery Day"** means a day other than a Saturday, a Sunday or any other day on which national banking associations are authorized to be closed. Any party may change its address for purposes of the receipt of notices and demands by giving notice of the change in the manner provided in this provision.

8.2 **Statements.** The Bank may from time to time provide the Borrower with account statements or invoices with respect to any of the Liabilities ("Statements"). The Bank is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrower's convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Liabilities. If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Bank of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Bank's right to receive payment in full at another time.

8.3 **No Waiver.** No delay on the part of the Bank in the exercise of any right or remedy waives that right or remedy. No single or partial exercise by the Bank of any right or remedy precludes any other future exercise of it or the exercise of any other right or remedy. The making of an advance during the existence of any default or subsequent to the occurrence of a default or when all conditions precedent have not been met shall not constitute a waiver of the default or condition precedent. No waiver or indulgence by the Bank of any default is effective unless it is in writing and signed by the Bank, nor shall a waiver on one occasion bar or waive that right on any future occasion.

8.4 **Integration; Severability.** This agreement, the Note, and the other Related Documents embody the entire agreement and understanding between the Borrower and the Bank and supersede all prior agreements and understandings relating to their subject matter. If any one or more of the obligations of the Borrower under this agreement, the Note, or the other Related Documents or any provision thereof is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of the Borrower and the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one

jurisdiction shall not affect the validity, legality or enforceability of such obligations or provisions in any other jurisdiction.

**8.5   Joint and Several Liability.** Each party executing this agreement as the Borrower is individually, jointly and severally liable under this agreement.

**8.6   Governing Law and Venue.** This agreement shall be governed by and construed in accordance with the laws of the State of Texas; EXCEPT THAT, NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, MATTERS REGARDING INTEREST TO BE CHARGED BY THE BANK AND THE EXPORTATION OF INTEREST SHALL BE GOVERNED BY FEDERAL LAW (INCLUDING WITHOUT LIMITATION 12 U.S.C. SECTIONS 85 AND 1831u) AND THE LAW OF THE STATE OF OHIO, WHERE THE MAIN OFFICE OF THE BANK IS LOCATED. The Borrower agrees that any legal action or proceeding with respect to any of its obligations under this agreement may be brought by the Bank in any state or federal court located in the State of Texas, as the Bank in its sole discretion may elect. By the execution and delivery of this agreement, the Borrower submits to and accepts, for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of those courts. The Borrower waives any claim that the State of Texas is not a convenient forum or the proper venue for any such suit, action or proceeding. The extension of credit that is the subject of this agreement is being made by the Bank in Ohio.

The Credit Facility was made available under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this agreement with respect to the Credit Facility, then under SBA regulations: (a) When SBA is the holder of the Note, this agreement and all documents evidencing or securing the Note, to the extent they relate to the Note, will be interpreted and enforced under federal law, including SBA regulations, and (b) Bank or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. The Borrower and any guarantor of the Note may not claim or assert against SBA any local or state law to deny any obligation of the Borrower, or defeat any claim of SBA with respect to the Credit Facility or preempt federal law.

**8.7   Survival of Representations and Warranties.** The Borrower understands and agrees that in extending the Credit Facility, the Bank is relying on all representations, warranties, and covenants made by the Borrower in this agreement or in any certificate or other instrument delivered by the Borrower to the Bank under this agreement or in any of the other Related Documents. The Borrower further agrees that regardless of any investigation made by the Bank, all such representations, warranties and covenants will survive the making of the Credit Facility and delivery to the Bank of this agreement, shall be continuing in nature, and shall remain in full force and effect until such time as the Liabilities shall be paid in full.

**8.8   Non-Liability of the Bank.** The relationship between the Borrower on one hand and the Bank on the other hand shall be solely that of borrower and lender. The Bank shall have no fiduciary responsibilities to the Borrower. The Bank undertakes no responsibility to the Borrower to review or inform the Borrower of any matter in connection with any phase of the Borrower's business or operations.

**8.9   Indemnification of the Bank.** The Borrower agrees to indemnify, defend and hold the Bank, its parent companies, Subsidiaries, Affiliates, their respective successors and assigns and each of their respective shareholders, directors, officers, employees and agents (collectively, the **"Indemnified Persons"**) harmless from any and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency, expense, interest, penalties, attorneys' fees (including the fees and expenses of any attorneys engaged by the Indemnified Person) and amounts paid in settlement (**"Claims"**) to which any Indemnified Person may become subject arising out of or relating to the Credit Facility, the Liabilities under this agreement or any other Related Documents or the Collateral, **including any Claims resulting from any Indemnified Person's own negligence**, except to the limited extent that the Claims are proximately caused by the Indemnified Person's gross negligence or willful misconduct. The indemnification provided for in this paragraph shall survive the termination of this agreement and shall not be affected by the presence, absence or amount of or the payment or nonpayment of any claim under, any insurance.

**8.10   Counterparts.** This agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same agreement.

**8.11   Advice of Counsel.** The Borrower acknowledges that it has been advised by counsel, or had the opportunity to be advised by counsel, in the negotiation, execution and delivery of this agreement and the Related Documents.

**8.12    Recovery of Additional Costs.** If the imposition of or any change in any Legal Requirement, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify, or make applicable any taxes (except federal, state, or local income or franchise taxes imposed on the Bank), reserve requirements, liquidity requirements, capital adequacy requirements, Federal Deposit Insurance Corporation (FDIC) deposit insurance premiums or assessments, or other obligations which would (A) increase the cost to the Bank for extending, maintaining or funding the Credit Facility, (B) reduce the amounts payable to the Bank under the Credit Facility, or (C) reduce the rate of return on the Bank's capital as a consequence of the Bank's obligations with respect to the Credit Facility, then the Borrower agrees to pay the Bank such additional amounts as will compensate the Bank therefor, within five (5) days after the Bank's written demand for such payment. The Bank's demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by the Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**8.13    Expenses.** To the extent not prohibited by applicable Legal Requirements and whether or not the transactions contemplated by this agreement are consummated, the Borrower is liable to the Bank and agrees to pay on demand all reasonable costs and expenses of every kind incurred (or charged by internal allocation) in connection with the negotiation, preparation, execution, filing, recording, amendment, modification, supplementing and waiver of this agreement and the Related Documents, the making, servicing and collection of the Credit Facility and the realization on any Collateral and any other amounts owed under this agreement or the Related Documents, including without limitation reasonable attorneys' fees and court costs. These costs and expenses include without limitation any costs or expenses incurred by the Bank in any bankruptcy, reorganization, insolvency or other similar proceeding involving any Obligor, Pledgor, or Property of any Obligor, Pledgor, or Collateral. The obligations of the Borrower under this section shall survive the termination of this agreement.

If any action or proceeding is commenced that would materially affect the Bank's interest in the Collateral, if the Borrower fails to comply with any provision of this agreement, or if the Borrower or any third party fails to comply with any provision of the Related Documents, including but not limited to failure to discharge or pay when due any amounts the Borrower or such third party is required to discharge or pay under this agreement or any of the Related Documents, the Bank on the Borrower's or such third party's behalf may (but shall not be obligated to) take any action that the Bank deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. Any amounts disbursed or advanced by the Bank related to the foregoing (including without limitation reasonable attorneys' fees) shall become additional Liabilities and shall bear interest at the highest rate permitted under any of the instruments evidencing any of the Credit Facilities and, at the Bank's option, shall (a) be immediately due and payable upon notice from the Bank to the Borrower, or (b) be added to the balance of any of the instruments evidencing any of the Credit Facilities and be apportioned among and be payable with any installment payments to become due during either, at the Bank's option (i) the term of any applicable insurance policy, (ii) the remaining term of such instrument, or (iii) be treated as a balloon payment which will be due and payable at such instrument's maturity.

**8.14    Reinstatement.** The Borrower agrees that to the extent any payment or transfer is received by the Bank in connection with the Liabilities, and all or any part of the payment or transfer is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid or transferred by the Bank or paid or transferred over to a trustee, receiver or any other entity, whether under any proceeding or otherwise (any of those payments or transfers is hereinafter referred to as a **"Preferential Payment"**), then this agreement and the Note shall continue to be effective or shall be reinstated, as the case may be, even if all those Liabilities have been paid in full and whether or not the Bank is in possession of the Note and whether any of the Note has been marked, paid, released or cancelled, or returned to the Borrower and, to the extent of the payment, repayment or other transfer by the Bank, the Liabilities or part intended to be satisfied by the Preferential Payment shall be revived and continued in full force and effect as if the Preferential Payment had not been made. The obligations of the Borrower under this section shall survive the termination of this agreement.

**8.15    Assignments.** The Borrower agrees that the Bank and its Affiliates may at any time work together and share any information about the Borrower and its Affiliates and their relationships with the Bank or any of its Affiliates or their successors, with and among the Bank or any of its Affiliates or their successors, or any purchaser or potential purchaser of any of the Note or the other Liabilities, or any representative of any of the parties described in this sentence. The Borrower agrees that the Bank may at any time sell, assign or transfer one or more interests or participations in all or any part of its rights and obligations in the Note to one or more purchasers whether or not related to the Bank.

**8.16 Waivers.** To the maximum extent not prohibited by applicable Legal Requirements, each Obligor waives (a) any right to receive notice of the following matters before the Bank enforces any of its rights: (i) any demand, diligence, presentment, dishonor and protest, or (ii) any action that the Bank takes regarding any Person, any Collateral, or any of the Liabilities, that it might be entitled to by law or under any other agreement; (b) any right to require the Bank to proceed against the Borrower, any other Obligor or any Collateral, or pursue any remedy in the Bank's power to pursue; (c) any defense based on any claim that any Obligor's obligations exceed or are more burdensome than those of the Borrower; (d) the benefit of any statute of limitations affecting liability of any Obligor or the enforcement hereof; (e) any defense arising by reason of any disability or other defense of the Borrower or by reason of the cessation from any cause whatsoever (other than payment in full) of the obligation of the Borrower for the Liabilities; and (f) any defense based on or arising out of any defense that the Borrower may have to the payment or performance of the Liabilities or any portion thereof. Each Obligor consents to any extension or postponement of time of its payment without limit as to the number or period, to any substitution, exchange or release of all or any part of any Collateral, to the addition of any other party, and to the release or discharge of, or suspension of any rights and remedies against, any Obligor. The Bank may waive or delay enforcing any of its rights without losing them. Any waiver affects only the specific terms and time period stated in the waiver. No modification or waiver of any provision of the Note is effective unless it is in writing and signed by the Person against whom it is being enforced. To the extent not prohibited by any Legal Requirement, each Obligor waives (a) all of its rights under Rule 31, Texas Rules of Civil Procedure, Chapter 43 of the Texas Civil Practice and Remedies Code, and Section 17.001 of the Texas Civil Practice and Remedies Code: (b) to the extent it is subject to the Texas Revised Partnership Act ("**TRPA**") or Section 152.306 of the Texas Business Organizations Code ("**BOC**"), compliance by the Bank with Section 3.05(d) of TRPA and Section 152.306(b) of BOC; and (c) if the Liabilities are secured by an interest in real Property, all of its rights under Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as amended from time to time).

**8.17 Rights of Subrogation.** Each Obligor waives and agrees not to enforce any rights of subrogation, contribution or indemnification that it may have against any other Obligor, or any Collateral, until each Obligor has fully performed all their obligations to the Bank, even if those obligations are not evidenced by the Note.

**8.18 Creditors Proceedings.** In any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other Legal Requirement affecting the rights of creditors generally, if the obligations of a Borrower under this agreement would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Borrower's liability under this agreement, then, notwithstanding any other provision of this agreement to the contrary, the amount of such liability shall, without any further action by such Borrower or the Bank, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding.

**8.19 Time is of the Essence.** Time is of the essence under this agreement and in the performance of every term, covenant and obligation contained herein.

**8.20 Confidentiality.** The Bank agrees that it will treat information provided by the Borrower or its representatives to the Bank (the "**Information**") as confidential; provided, however, that the Bank may disclose the Information (a) to its Affiliates and its and its Affiliates' directors, employees, officers, auditors, consultants, agents, counsel and advisors (such Affiliates and such Persons collectively, "**Representatives**"), it being understood that its Representatives shall be informed by the Bank of the confidential nature of such Information and be instructed to comply with the terms of this section to the same extent as is required of the Bank hereunder; (b) in response to a subpoena or other legal process, or as may otherwise be required by law, order or regulation, or upon the request or demand of any governmental or regulatory agency or authority having jurisdiction over the Bank or its Representatives or to defend or prosecute a claim brought against or by the Bank and/or its Representatives; (c) to actual and prospective assignees, actual and prospective participants, and actual and prospective swap counterparties, provided that all such participants, assignees or swap counterparties execute an agreement with the Bank containing provisions substantially the same as those contained in this section; (d) to holders of Equity Interests in the Borrower, other than holders of any Equity Interest in a publicly traded company; (e) to any Obligor; and (f) with the Borrower's consent. The restrictions contained in this section shall not apply to Information which (a) is or becomes generally available to the public other than as a result of a disclosure by the Bank or its Representatives in breach of this section, or (b) becomes available to the Bank or its Representatives from a source, other than the Borrower or one of its agents, who is not known to the Bank or its Representatives to be bound by any obligations of confidentiality to the Borrower, or (c) was known to the Bank or its Representatives prior to its disclosure to the Bank or its Representatives by the Borrower or one of its agents or was independently developed by the Bank or its Representatives, or (d) was or is, after the date hereof, disclosed (or required to be disclosed) by the Borrower to the Bank or any of its Representatives under or in connection with any existing financing relationship between the Borrower and the Bank or any of its Representatives, the disclosure of which shall be governed by the agreements

executed in connection with such financing relationship. Any Person required to maintain the confidentiality of the Information as provided in this section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

9. **USA PATRIOT ACT NOTIFICATION.** The following notification is provided to the Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for the Borrower: When the Borrower opens an account, if it is an individual the Bank will ask for its name, taxpayer identification number, residential address, date of birth, and other information that will allow the Bank to identify it, and, if it is not an individual the Bank will ask for its name, taxpayer identification number, business address, and other information that will allow the Bank to identify it. The Bank may also ask, if the Borrower is an individual, to see its driver's license or other identifying documents, and if it is not an individual, to see its Organizational Documents or other identifying documents.

10. **WAIVER OF SPECIAL DAMAGES.** THE BORROWER WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT THE UNDERSIGNED MAY HAVE TO CLAIM OR RECOVER FROM THE BANK IN ANY LEGAL ACTION OR PROCEEDING ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

[The remainder of the page is intentionally left blank.]

11. **JURY WAIVER.** TO THE MAXIMUM EXTENT NOT PROHIBITED BY APPLICABLE LAW, THE BORROWER AND THE BANK (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) BETWEEN THE BORROWER AND THE BANK ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE OTHER RELATED DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE BANK TO PROVIDE THE FINANCING DESCRIBED HEREIN.

**THIS AGREEMENT AND THE OTHER WRITTEN RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Address(es) for Notices:**

Address:   1400 E Jefferson Blvd
Dallas, TX 75203

**Borrower:**

Noble Rey Brewing Company, LLC

By: _____

Christopher Rigoulot         Manager
Printed Name               Title

Date Signed:     10/1/2014

**Address for Notices:**

8111 Preston Rd.
Dallas, TX 75225

Attn: Business Banking

**Bank:**

JPMorgan Chase Bank, N.A.

By: _____

Joey Myers         AVP
Printed Name            Title

Date Signed:     10/1/2014

683.2





**Continuing Security Agreement**

Dated as of September 30, 2014

**Grant of Security Interest. Noble Rey Brewing Company, LLC** (whether one or more, the "Borrower", individually and collectively if more than one) grants to JPMorgan Chase Bank, N.A., whose address is 8111 Preston Rd., Dallas, TX 75225 (together with its successors and assigns, the "Bank") a continuing security interest in, pledges and assigns to the Bank all of the Collateral (as hereinafter defined) owned by the Borrower, all of the collateral in which the Borrower has rights or power to transfer rights and all Collateral in which the Borrower later acquires ownership, other rights or rights or power to transfer rights to secure the payment and performance of the Liabilities.

"Liabilities" means all obligations, indebtedness and liabilities of the Borrower whether individual, joint and several, absolute or contingent, direct or indirect, liquidated or unliquidated, now or hereafter existing in favor of the Bank, including without limitation, all liabilities, all interest, costs and fees arising under or from any note, open account, overdraft, letter of credit application, endorsement, surety agreement, guaranty, credit card, lease, Rate Management Transaction, acceptance, foreign exchange contract or depository service contract, whether payable to the Bank or to a third party and subsequently acquired by the Bank, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing. "Rate Management Transaction" means any transaction (including an agreement with respect thereto) that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option, derivative transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures. The Borrower and the Bank specifically contemplate that Liabilities include indebtedness hereafter incurred by the Borrower to the Bank.

The term "Collateral" means all of the Borrower's "accounts"; "chattel paper"; "equipment", including any documents and certificates of title issued with respect to any of the equipment; "general intangibles" and any right to a refund of taxes paid at any time to any governmental entity; "instruments"; "inventory", including any documents and certificates of title issued with respect to any of the inventory; all as defined in the UCC, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located. In addition, the term "Collateral" includes all "proceeds", "products" and "supporting obligations" (as such terms are defined in the UCC) of the Collateral, including but not limited to all stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, accounts, chattel paper, "instruments," "investment property," "financial assets," and "general intangibles" (as such terms are defined in the UCC) arising from the sale, rent, lease, casualty loss or other disposition of the Collateral, and any Collateral returned to, repossessed by or stopped in transit by the Borrower, and all insurance claims relating to any of the Collateral. The term "Collateral" further includes all of the Borrower's right, title and interest in and to all books, records and data relating to the Collateral, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the Collateral or to access, retrieve, or process any of such information or data. Where the Collateral is in the possession of the Bank or the Bank's agent, the Borrower agrees to deliver to the Bank any property that represents an increase in the Collateral or profits or proceeds of the Collateral.

The term "UCC" means the Uniform Commercial Code of Texas, as in effect from time to time.

**Representations, Warranties and Covenants.** The Borrower represents, warrants, and covenants to the Bank that each of the following is true and will remain true until termination of this agreement and payment in full of all Liabilities and agrees with the Bank that:

1.  At its own expense, it shall maintain comprehensive casualty insurance on the Collateral against such risks, in such amounts, with such deductibles and with such companies as may be satisfactory to the Bank. Each insurance policy on the Collateral shall contain a lender's loss payable endorsement satisfactory to the Bank and a prohibition against cancellation or amendment of the policy or removal of the Bank as loss payee without at least thirty (30) days' prior written notice to the Bank. In all events, the amounts of such insurance coverages on the Collateral shall be in such minimum amounts that the Borrower will not be deemed a co-insurer. The policies on the Collateral, or certificates evidencing them, shall, if the Bank so requests, be deposited with the Bank.

2.  It shall permit the Bank, at the Borrower's expense, to inspect and examine the Collateral and to check and test the same as to quality, quantity, value, and condition.

3.  It shall maintain the Collateral in good repair; use the Collateral in accordance with law and in compliance with any policy of insurance thereon; and exhibit the Collateral to the Bank on demand.

BBHD                                                                                                                                                    113141020390

4.  Until the Bank gives notice to the Borrower to the contrary or until the Borrower is in default, it may use the funds collected in its business. Upon notice from the Bank or upon default, the Borrower agrees that all sums of money it receives on account of or in payment or settlement of the accounts, chattel paper, certificated securities, negotiable certificates of deposit, documents, general intangibles and instruments shall be held by it as trustee for the Bank without commingling with any of the Borrower's other funds, and shall immediately be delivered to the Bank with endorsement to the Bank's order of any check or similar instrument. It is agreed that, at any time the Bank so elects, the Bank shall be entitled, in its own name or in the name of the Borrower or otherwise, but at the expense and cost of the Borrower, to collect, demand, receive, sue for or compromise any and all accounts, chattel paper, certificated securities, negotiable certificates of deposit, documents, general intangibles, and instruments, and to give good and sufficient releases, to endorse any checks, drafts or other orders for the payment of money payable to the Borrower and, in the Bank's discretion, to file any claims or take any action or proceeding which the Bank may deem necessary or advisable. It is expressly understood and agreed, however, that the Bank shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to the Bank or to which the Bank may be entitled at any time or times. All notices required in this paragraph will be immediately effective when sent. Such notices need not be given prior to the Bank's taking action. The Borrower irrevocably appoints the Bank or the Bank's designee as the Borrower's attorney-in-fact to do all things with reference to the Collateral as provided for in this agreement including without limitation (1) to sign the Borrower's name on any invoice or bill of lading relating to any Collateral, on assignments and verifications of account and on notices to the Borrower's customers, and (2) to do all things necessary to carry out this agreement or to perform any of the Borrower's obligations under this agreement, (3) to notify the post office authorities to change the Borrower's mailing address to one designated by the Bank, and (4) to receive, open and dispose of mail addressed to the Borrower. The Borrower ratifies and approves all acts of the Bank as attorney-in-fact. This power of attorney appointment is irrevocable, coupled with an interest, and shall survive the death or disability of Borrower. The Bank shall not be liable for any act or omission, nor any error of judgment or mistake of fact or law, but only for its gross negligence or willful misconduct. This power being coupled with an interest is irrevocable until all of the Liabilities have been fully satisfied. Immediately upon its receipt of any Collateral evidenced by an agreement, "instrument," "chattel paper," certificated "security" or "document" (as such terms are defined in the UCC) (collectively, "Special Collateral"), it shall mark the Special Collateral to show that it is subject to the Bank's security interest, pledge and assignment and shall deliver the original to the Bank together with appropriate endorsements and other specific evidence of assignment or transfer in form and substance satisfactory to the Bank.

5.  It will not, sell, lease, license or offer to sell, lease, license, grant as security to anyone other than the Bank, or otherwise transfer the Collateral or any rights in or to the Collateral, without the written consent of the Bank, except for the sale of inventory in the ordinary course of business; or change the location of the Collateral from the locations of the Collateral disclosed to the Bank, without providing at least ten (10) days' prior written notice to the Bank.

6.  No financing statement or similar record covering all or any part of the Collateral or any proceeds is on file in any public office, unless the Bank has approved that filing.

7.  When the Collateral is located at, used in or attached to a facility leased by the Borrower, the Borrower will, at the request of the Bank, obtain from the lessor a consent to the granting of this security interest and a release or subordination of the lessor's interest in any of the Collateral, in form and substance satisfactory to the Bank.

**Remedies Regarding Collateral.** The Bank shall have the right to require the Borrower to assemble the Collateral and make it available to the Bank at a place to be designated by the Bank which is reasonably convenient to both parties, the right to take possession of the Collateral with or without demand and with or without process of law, and the right to sell and dispose of it and distribute the proceeds according to law. The Borrower agrees that upon default the Bank may dispose of any of the Collateral in its then present condition, that the Bank has no duty to repair or clean the Collateral prior to sale, and that the disposal of the Collateral in its present condition or without repair or clean-up shall not affect the commercial reasonableness of such sale or disposition. The Bank's compliance with any applicable state or federal law requirements in connection with the disposition of the Collateral will not adversely affect the commercial reasonableness of any sale of the Collateral. The Bank may disclaim warranties of title, possession, quiet enjoyment, and the like, and the Borrower agrees that any such action shall not affect the commercial reasonableness of the sale. In connection with the right of the Bank to take possession of the Collateral, the Bank may take possession of any other items of property in or on the Collateral at the time of taking possession, and hold them for the Borrower without liability on the part of the Bank. The Borrower expressly agrees that the Bank may enter upon the premises where the Collateral is believed to be located without any obligation of payment to the Borrower, and that the Bank may, without cost, use any and all of the Borrower's "equipment" (as defined in the UCC) in the manufacturing or processing of any "inventory" (as defined in the UCC) or in growing, raising, cultivating, caring for, harvesting, loading and transporting of any of the Collateral that constitutes "farm products" (as defined in the UCC). If there is any statutory requirement for notice, that requirement shall be met if the Bank sends notice to the Borrower at least ten (10) days prior to the date of sale, disposition or other event giving rise to the required notice, and such notice shall be deemed commercially reasonable. Without limiting any other remedy, the Borrower is liable for any deficiency remaining after disposition of the Collateral. The Bank is authorized to cause all or any part of the Collateral to be transferred to or registered in its name or in the name of any other person or business entity, with or without designating the capacity of that nominee. At its option the Bank may, but shall be under no duty or obligation to, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral, pay for insurance on the Collateral, and pay for the maintenance and preservation of the Collateral, and the Borrower

agrees to reimburse the Bank on demand for any such payment made or expense incurred by the Bank with interest at the highest rate at which interest may accrue under any of the instruments evidencing the Liabilities. The Borrower authorizes the Bank to endorse on the Borrower's behalf and to negotiate drafts reflecting proceeds of insurance of the Collateral, provided that the Bank shall remit to the Borrower such surplus, if any, as remains after the proceeds have been applied, at the Bank's option, to the satisfaction of all of the Liabilities (in such order of application as the Bank may elect) or to the establishment of a cash collateral account for the Liabilities. The Bank shall have the right now, and at any time in the future in its sole and absolute discretion, without notice to the Borrower to (a) prepare, file and sign the Borrower's name on any proof of claim in bankruptcy or similar document against any owner of the Collateral and (b) prepare, file and sign the Borrower's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Collateral.

**Applicable Law For SBA Loans.** One or more loans secured by this agreement was made under a United States Small Business Administration ("SBA") nationwide program which uses tax dollars to assist small business owners ("SBA Loan"). If the United States is seeking to enforce this agreement with respect to an SBA Loan, then under SBA regulations: (a) When SBA is the holder of the underlying promissory note, this agreement and all documents evidencing or securing the SBA Loan, to the extent they relate to an SBA Loan, will be interpreted and enforced under federal law; and (b) Bank or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. The Borrower and any guarantor of an SBA Loan may not claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to an SBA Loan or preempt federal law. Nothing contained herein shall impact the governing law of this agreement with respect to any Liabilities secured hereby other than Liabilities arising out of an SBA Loan.

**[The remainder of the page is intentionally left blank.]**

**Miscellaneous.** A carbon, photographic or other reproduction of this agreement is sufficient as, and can be filed as, a financing statement or similar record. The Borrower authorizes the Bank to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Bank may determine, or the Bank may. at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Borrower will pay the cost of filing them in all public offices where filing is deemed by the Bank to be necessary or desirable. In addition, the Borrower shall execute and deliver, or cause to be executed and delivered, such other documents as the Bank may from time to time request to perfect or to further evidence the pledge, security interest and assignment created in the Collateral by this agreement. If any provision of this agreement cannot be enforced, the remaining portions of this agreement shall continue in effect. All rights of the Bank benefit the Bank's successors and assigns; and all obligations of the Borrower bind the Borrower's heirs, executors, administrators, successors and assigns. If more than one person or entity signs as the Borrower, their obligations are joint and several and each agreement, representation, warranty and covenant shall be individual, joint and several and the "Collateral" includes any property that is owned by any Borrower individually or jointly with any other. This agreement is in addition to and not in substitution or replacement of any other security agreement executed by the Borrower in favor of the Bank, and the Bank's rights under this agreement and any such other security agreement are cumulative. The provisions of this agreement are severable. and if any one or more of the provisions of this agreement are held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of such provision(s) in any other jurisdiction. Time is of the essence under this agreement and in the performance of every term, covenant and obligation contained herein.

**THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**Borrower:**

Address:  1400 E Jefferson Blvd
          Dallas, TX 75203

Noble Rey Brewing Company. LLC

By: _____

Christopher Rigoulot                          Manager
Printed Name                                  Title

Date Signed: _10/1/2017_____

The Bank is executing this agreement for the purpose of acknowledging and agreeing to the notice given under §26.02 of the Texas Business and Commerce Code and the Bank's failure to execute or authenticate this agreement will not invalidate this agreement.

**Bank:**

JPMorgan Chase Bank, N.A.

By: _____

Joey Myers                                    AVP
Printed Name                                  Title

683.2

BBHD                            4                            113141020390

# PROMISSORY NOTE

| | | |
|---|---|---|
| **Borrower:** | Noble Rey Brewing Company, LLC<br>2636 Farrington Street<br>Dallas, TX 75207 | **Lender:** JPMorgan Chase Bank, NA<br>Austin Downtown Sixth Street LPO<br>221 West Sixth Street<br>Austin, TX 78701 |

**Date of Note: January 22, 2016**

**Principal Amount: $200,000.00**

**PROMISE TO PAY.** Noble Rey Brewing Company, LLC ("Borrower") promises to pay to JPMorgan Chase Bank, NA ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Hundred Thousand & 00/100 Dollars ($200,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance or maturity, whichever occurs first.

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule:

Payments of accrued interest at $100.00, whichever is greater, but not to exceed the then outstanding balance of this Note, shall be payable monthly, beginning on February 3, 2016, and on the same calendar day monthly thereafter until the Final Availability Date. The term "Final Availability Date" as used in this Note means the earlier of (i) 21 months from the date of this Note, or (ii) the date of Lender's notice to Borrower of the Final Availability Date, which notice shall be effective as of the date thereof and shall be deposited on the date set forth in such notice in the United States mail, first class postage prepaid, addressed to Borrower. Until the earlier of the Final Availability Date or the occurrence of any default, Borrower may borrow, pay down and reborrow under this Note. As of the Final Availability Date, no further advances under this line of credit will be available. Thereafter, 47 monthly payments shall be due with each payment equal to the greater amount of (1) $250.00, or (2) the aggregate sum of (a) accrued interest, plus (b) 1/59th of the unpaid principal balance immediately following the Final Availability Date, with each payment to be due on the same calendar day as payments were due prior to the Final Availability Date. A final payment shall be due and payable on the same calendar day in the 48th month following the Final Availability Date in the amount of the outstanding principal balance of this Note.

Payments and any other credits shall be allocated among principal, interest and fees at the discretion of Lender unless otherwise required by applicable law. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown on loan account statements sent to the Borrower. Lender's address shown in any payment coupon book provided to the Borrower, or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the Prime Rate (the "Index"). "Prime Rate" shall mean the rate announced from time to time by Lender as its prime rate (which rate may not be the lowest, best or most favorable rate of interest which Lender may charge on loans to its customers). Each change in the rate to be charged on this Note will become effective without notice on the same day as the Index changes. The interest rate to be applied prior to maturity to the unpaid principal balance of this Note will be at a rate of 4.500 percentage points over the Index. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling," as of the date of this Note, as referred to in Chapter 303 of the Texas Finance Code.

**PREPAYMENT.** Borrower may pay without fee all or a portion of the principal amount owed hereunder earlier than it is due. All prepayments shall be applied to the indebtedness in such order and manner as Lender may from time to time determine in its sole discretion. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Business Banking Loan Servicing Disputed Accounts Department, P.O. Box 6026 Chicago, IL 60680-6026.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon the occurrence of any Event of Default, including, but not limited to, (i) any material adverse change in the business assets, affairs, prospects or financial condition of Borrower or any guarantor, (ii) failing to provide financial statements, copies of Federal tax returns and other information relating to the financial condition, property and affairs of the Borrower, any guarantor or grantor, as provided for in this Note and/or any Related Document, or (iii) failure to pay upon final maturity, Lender may, at Lender's option and if permitted by applicable law, a) add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid at the rate provided in this Note, including any increased rate, and/or b), increase the interest rate on this Note by 3.000 percentage points (the "Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no Event of Default. However, in no event will the interest rate exceed the maximum interest rate allowed under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Transfer of Assets.** Borrower leases, sells, or otherwise conveys, or agrees to lease, sell, or otherwise convey, a material part of its assets or business outside of the ordinary course of business.

**Defaults with Respect to Third Parties.** Borrower fails to make any payment when due or fails to comply with or to perform any term, obligation, covenant or condition contained in any agreement between any other person and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Judgments or Decrees.** One or more judgments or decrees shall be entered against the Borrower and such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure, replevin, repossession, attachment, levy, execution, or forfeiture proceedings, whether by judicial proceeding, self-help, or any other method, by any creditor of Borrower, or by any governmental agency against the Collateral or any other assets of Borrower. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Failure to Comply with Laws.** Borrower fails to comply with all applicable statutes, laws, ordinances and governmental rules, regulations and orders to which it is subject or which are applicable to its business, property and assets.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Events Affecting Guarantor.** Any of the preceding Events of Default occurs with respect to any guarantor of the indebtedness or if the word "guarantor" were substituted for the word "Borrower" in such Event of Default, or any guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty.

**Events Affecting Grantor.** Any of the preceding Events of Default occurs with respect to any grantor, pledgor or obligor of the indebtedness as if "grantor", "pledgor" or "obligor" were substituted for the word "Borrower" in such Event of Default, or any grantor, pledgor, or obligor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Related Document or agreement.

# PROMISSORY NOTE
## (Continued)

Page 2

insecurity. Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon the occurrence of any Event of Default, Lender may declare the entire unpaid principal balance on this Note and all the indebtedness and all accrued unpaid interest immediately due, and without notice (except that in the case of any Event of Default of the type described in the DEFAULT - Insolvency section herein, such acceleration shall be automatic and not at Lender's option), and then Borrower will pay that amount. Additionally, upon the occurrence of any Event of Default and until the entire unpaid principal balance on this Note and the indebtedness is paid in full, without notice or demand and without waiving any other right or remedy, Lender may, at Lender's option, elect to impose increases in the interest rate pursuant to and as set forth in the section of this Note captioned "INTEREST AFTER DEFAULT" and, if included in this Note, the section captioned "PERFORMANCE BASED RATE CHANGES. Borrower shall be liable for any deficiency remaining after disposition of any collateral which Lender may choose to realize upon.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**WHEN FEDERAL LAW APPLIES.** When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notices, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

**DISHONORED CHECK CHARGE.** Borrower will pay a processing fee of $25.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

**RIGHT OF SETOFF.** Borrower grants to Lender a security interest in, as well as a right of setoff against, and hereby assigns, conveys, delivers, pledges and transfers to Lender, any and all of Borrower's right, title and interest in and to all Borrower's accounts with Lender (whether checking, savings, or some other account) with Lender or any subsidiary or affiliate of JPMorgan Chase & Co. (each hereinafter referred to as a "Lender Affiliate") and all other obligations at any time owing by Lender or any Lender Affiliate to Borrower. This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, without prior notice to Borrower and irrespective of (i) whether or not Lender has made any demand under this Note or the Related Documents or (ii) whether such indebtedness is contingent, matured or unmatured, to the extent permitted by law, to collect charge and/or setoff all sums owing on the indebtedness against any and all such accounts and other obligations, and, at Lender's option, to administratively freeze or direct a Lender Affiliate to administratively freeze all such accounts and other obligations to allow Lender to protect Lender's security interest, collection, charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by security interest in and lien upon all collateral described in any Related Document.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. The unpaid principal balance of this Note shall increase and decrease with each new advance and repayment hereunder, as the case may be. Subject to the terms hereof, Borrower may borrow, repay and reborrow hereunder. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure. This revolving line of credit shall not be subject to Sec. 346 of the Texas Finance Code.

**CREDIT ADVANCES.** Borrower may obtain credit advances under this Note, in amounts of not less than One Hundred Dollars ($100.00), pursuant to the following methods of advancement, which may be available from time to time:

Credit Line Checks. Writing a preprinted "Credit Line Check" that Lender will supply to Borrower.

Telephone Request. Requesting a credit advance from this Note by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, Borrower acknowledges and agrees that Lender does not accept responsibility for the authenticity of telephone instructions and that Lender will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.

Requests in Person. Requesting an advance in person at any of Lender's authorized locations.

Bank Card Access. Using any specially issued "bank card" to receive a cash advance or to make purchases.

On-Line Access. Requesting an advance through the internet or other electronic transfer communication medium.

**CREDIT HOLDS.** Notwithstanding anything to the contrary in this Note, Lender may apply all payments and credits in accordance with the standard operating procedures of Lender and with the requirements of applicable law. For billing and interest accrual purposes, credit for the payment is given on the Business Day the payment is processed and posted to the account. Nevertheless, after processing Lender may elect to verify the receipt of good funds or otherwise elect to place a "credit hold" on such payments before releasing any payment amount as available credit for additional advances on the line of credit.

Lender makes the following line of credit payments available for readvance the next Business Day after processing: (a) electronic payments, (b) payments made on Chase.com, and (c) payments made at any branch office of Lender if made (i) by check drawn upon a deposit account with Lender or (ii) in cash. Lender currently places a credit hold on most other payments for a period of seven days commencing on the Business Day the payment is processed; provided that when the day following the seventh day of the credit hold period is not a Business Day, then the payment amount will not be available for additional advances until the next Business Day

Lender may change its credit hold policy from time to time and will advise Borrower, including by inclusion of a message on the billing statement for this Note. To preclude an overdraft during the credit hold period Borrower must remember the portion of each payment intended to reduce the principal balance may not be immediately available for additional advances on the line of credit. The balance available for advances can be verified by contacting the Lender on-line, by telephone or in person at a branch location.

**LIMITATIONS ON THE USE OF METHODS AND ADVANCEMENTS.** Lender reserves the right not to honor requests for advances in the following circumstances:

Credit Limit Violation. The advance would result in aggregate outstanding advances in excess of the amount of this Note.

Stolen Access Items. Borrower's Credit Line Checks, bank card or other advance mechanisms have been reported lost or stolen.

Unauthorized Signatures. Borrower's access mechanism is not used by an authorized signer.

Termination or Suspension. Borrower is in default or would be so if Lender made the advance.

Transaction Violation. Borrower requests an advance which is less than the minimum amount required by this Note.

Post-dated Request. Borrower's Credit Line Check is post-dated, provided, however, if a post-dated Credit Line Check is paid and as a result any other Credit Line Check is returned or not paid, Lender is not responsible

If Lender pays any advance under these conditions, Borrower must repay Lender, subject to applicable law, for the amount of the advance. The advance itself will be evidence of Borrower's debt to Lender together with this Note. Lender's liability, if any, for wrongful dishonor of an advance is limited to Borrower's actual damages. Dishonor for any reason as provided in this Note is not wrongful dishonor.

**ACCOUNT.** The term "Account" as used herein means the line of credit established pursuant to this Note.

**ANNUAL FEE.** A non-refundable Annual Fee of One Hundred Fifty Dollars ($150.00) may be charged to your Account at the following times: The Annual Fee is payable in advance for each year at any year that advances are available under this Note or at any time these remains a principal amount outstanding under this Note. The Annual Fee may be charged to the Account not more than one time in each calendar year. No refund of any part of the Annual Fee will be made in the event of cancellation of the Account for any reason. If the Annual Fee has been waived by Lender based on any promotional offer made in connection with Borrower's Chase business checking account, the Annual Fee may be reinstated by Lender if such account is closed for any reason whatsoever.

# PROMISSORY NOTE
## (Continued)

Page 3

**OVERLIMIT FEE.** At its discretion, from time to time, Lender may charge Borrower a fee when any advance increases the principal balance in excess of the maximum principal amount of this Note. If Lender should make any advance in excess of the maximum principal amount of this Note, the making of the advance shall not be deemed to constitute an increase in the maximum principal amount of this Note and shall be due and payable upon demand. The overlimit fee is $26.00.

**STOP PAYMENT CHARGE.** A stop payment charge of $25.00 will be assessed and charged directly to the Account for each check written against the Account upon which a stop payment order is issued.

**ADDITIONAL EXPENSES.** Expenses paid by Lender in connection with the Note, including without limitation, expenses in processing and/or filing any security documents, may be charged directly to the undersigned's depository account ten (10) days after Lender notifies the undersigned of said amount.

**MODIFICATION.** Any fees and charges and the time frames for imposition of such fees and charges set forth in this Note may be modified from time to time by Lender and shall not require the written acknowledgement or consent of Borrower. Any such modification shall be effective immediately upon any change made by Lender without prior written notice to Borrower.

**MODIFICATION.** Any fees and charges and the time frames for imposition of such fees and charges set forth in this Note may be modified from time to time by Lender and shall not require the written acknowledgement or consent of Borrower. Any such modification shall be effective immediately upon any change made by Lender without prior written notice to Borrower.

**FINANCIAL STATEMENTS.** Borrower shall furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**ENFORCEABILITY AND ORGANIZATION.** Borrower is duly authorized to transact business in all states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Borrower's execution, delivery and performance of this Note and all the Related Documents have been duly authorized by all necessary action by Borrower. This Note and all the Related Documents constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms. If applicable, Borrower is an entity which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the state of its organization.

**INFORMATION WAIVER.** Lender may provide, without any limitation whatsoever, to any one or more purchasers, potential purchasers, or affiliates of JPMorgan Chase & Co., any information or knowledge Lender may have about the undersigned or about any matter relating to this document and the Related Documents, and the undersigned hereby waives any right to privacy the undersigned may have with respect to such matters.

**INDEBTEDNESS.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents, together with interest on such amounts as provided in this Note, and all obligations, debts and liabilities, plus interest thereon, of Borrower or any one or more of them to Lender, as well as all claims by Lender against Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of this Note, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, liquidated or unliquidated and whether Borrower may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise and whether recovery upon such amounts may be or hereafter become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter become otherwise unenforceable; and further includes, without limitation, all principal, interest, and other amounts, costs and expenses payable under the Related Documents, whether executed by the Borrower or by any other person or entity, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Related Documents, together with interest thereon as provided in the Related Documents.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now existing or hereafter arising, executed in connection with the Indebtedness.

**LIABILITIES FOR OBLIGATIONS UNDER RELATED DOCUMENTS.** Borrower also promises to pay to Lender all of the Indebtedness. Borrower acknowledges that some of the Related Documents, pursuant to which Indebtedness may arise, may be executed only by persons or entities other than the Borrower.

**PURPOSE.** Borrower agrees that no advances under this Note shall be used for personal, family or household purposes and that all advances hereunder shall be used solely for business, commercial, agricultural or other similar purposes.

**JURY WAIVER. THE UNDERSIGNED AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG THE UNDERSIGNED AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS DOCUMENT, THE RELATED DOCUMENTS, OR ANY RELATIONSHIP BETWEEN OR AMONG THE UNDERSIGNED AND LENDER WHETHER ANY SUCH RIGHT NOW OR HEREAFTER EXISTS. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING EVIDENCED BY THIS DOCUMENT AND THE RELATED DOCUMENTS.**

**GOVERNING LAW.** The Lender's loan production office for this transaction is located at the address and in the State (the "LPO State") indicated in the LPO address or the loan production office address on the first page of this document. This document will be governed by and interpreted in accordance with federal law and the laws of the LPO State, except for matters related to interest and the exportation of interest, which matters shall be governed by and interpreted in accordance with federal law including, but not limited to, statutes, regulations, interpretations and opinions] and the laws of the State of Ohio. However, if there is ever a question about whether any provision of this document is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by this document has been made in the State of Ohio.

**VENUE.** If there is a lawsuit, the undersigned agrees to submit to the jurisdiction of the courts of the county in the LPO State in which the Lender's loan production office is located.

**REDUCTIONS IN CREDIT AVAILABLE; FUTURE MODIFICATIONS; AND AMENDMENTS TO THIS NOTE.** Notwithstanding the provision of this Note requiring the signature of the party or parties to be bound by any agreement altering or amending this Note, Borrower agrees Lender shall have the right, from time to time, to modify this Note in its sole discretion as further described in the following paragraphs:

Reductions in Credit Available. Lender may reduce the maximum amount of principal available under the revolving line of credit evidenced by the Note, at any time, for any reason, and at the sole option and discretion of Lender, to the amount set forth in a Line Reduction Date notice (which amount will not be less than the principal balance outstanding on this Note as of the close of business on the Line Reduction Date). Such reduction in the maximum amount of principal available shall become effective as of close of business on the Line Reduction Date. Notwithstanding any such reduction, all other provisions of this Note shall remain in full force and effect, including the payment terms as set forth in this Note, and including Lender's right to declare Final Availability Date, or to elect to make future further reductions in the available credit. The words "Line Reduction Date" mean the date of Lender's Line Reduction Date notice to Borrower, which notice shall be effective as of the date thereof and shall be deposited on the date set forth in such notice in the United States mail, first class postage prepaid, addressed to Borrower.

Future Modifications. Lender shall have the right, from time to time, to renew, modify and/or extend this Note in its sole discretion (each a "Future Modification"), including, without limitation, the right to (a) increase the principal amount of this Note, (b) extend the Maturity Date, (c) reduce the interest rate temporarily and then increase the rate to no more than the amount provided for herein, (d) permanently reduce the interest rate, (e) modify the periodic payment terms, and/or (f) change fees and time frames for imposition of fees. Lender will inform Borrower of any such Future Modification by written notice, which may take the form of inclusion of such Future Modification in the periodic account statement sent to the Borrower. Any use of the principal amount or any other feature of this Note after such notice shall constitute Borrower's acceptance of such Future Modification.

Amendments to this Note. Lender reserves the right to amend or modify the provisions of this Note at any time by mailing or delivering a copy of such amendment or modification to the Borrower. Such amendment or modification shall be binding on the Borrower thirty days after it is mailed or delivered.

**BORROWER CERTIFICATIONS.** By execution of this Note Borrower hereby certifies to Lender that as of the date hereof:

(1) that there has been no adverse change in Borrower's financial condition, organization, operations or fixed assets since the date the Loan application for the Indebtedness for this Note was signed, and

(2) Borrower is current on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes, and (3) all business and personal financial statements, projections and information submitted with the loan application are accurate, true and complete.

**RENEWAL AND EXTENSION.** This Note is given in replacement, renewal and/or extension of, but not extinguishing the indebtedness evidenced by, that promissory note dated September 30, 2014, executed by Borrower in the original principal amount of $75,000.00, and is not a

# PROMISSORY NOTE
## (Continued)

Page 4

---

novation thereof. All interest evidenced by the note being replaced, renewed, and/or extended by this instrument shall continue to be due and payable until paid.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. If any part of this Note cannot be enforced, this fact will not affect the rest of this Note. It is agreed that any payment which would otherwise for any reason be deemed unlawful interest under applicable law shall be deemed to have been applied to the unpaid principal balance of this Note, or to other indebtedness. The unpaid balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. Unless specifically permitted otherwise by the terms and conditions of this Note, no alteration of or amendment to this Note shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of this Note, or the Related Documents or of any participation interest in this Note or Related Documents to one or more purchasers, whether related or unrelated to Lender. Borrower waives any and all notices of sale of this Note, the Related Documents or of any participation interests, as well as any notices of any repurchases of this Note, the Related Documents, or of any participation interests. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

**BORROWER:**

**NOBLE REY BREWING COMPANY, LLC**

By: _____
Christopher P. Rigoulot, Manager of Noble Rey
Brewing Company, LLC

**UCC FINANCING STATEMENT**

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CT Lien Solutions

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
**CT Lien Solutions
2727 Allen Parkway
Ste. 100
Houston, TX 77019
USA

**FILING NUMBER: 14-0031586492**
FILING DATE: 10/02/2014    09:29 PM
DOCUMENT NUMBER: 571086700001
FILED: Texas Secretary of State
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Noble Rey Brewing Company, LLC | | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1400 E Jefferson Blvd | Dallas | TX | 75203 | USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JPMorgan Chase Bank, NA | | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Collateral Mgmt Small business, P.O. Box 33035 | Louisville | KY | 40232-9891 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:     6b. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY



EXHIBIT
5